Michael P. Canty (*pro hac vice*)
Michael H. Rogers (*pro hac vice*)
Nicholas D. Manningham (*pro hac vice*)
Raquel Panza (*pro hac vice*)

**LABATON KELLER SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: mcanty@labaton.com
        mrogers@labaton.com
        nmanningham@labaton.com
        rpanza@labaton.com

*Attorneys for Lead Plaintiffs and the Class*

Lucas E. Gilmore (#250893)

**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 300
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
Email: lucasg@hbsslaw.com

*Liaison Counsel for the Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

|  |  |
|---|---|
| DEKALB COUNTY PENSION FUND, | ) ) ) **Case No.: 3:23-cv-06618-RS** |
| Plaintiff, | ) ) **AMENDED CLASS ACTION** |
| v. | ) **COMPLAINT FOR VIOLATIONS OF** ) **THE FEDERAL SECURITIES LAWS** |
| ROBLOX CORPORATION, et al., | ) ) **DEMAND FOR JURY TRIAL** |
| Defendants. | ) ) **Hon. Richard Seeborg** |
|  | ) ) ) ) |

# TABLE OF CONTENTS

Page

I.      NATURE OF THE ACTION ................................................................................... 2

    A.      Leading Up to Roblox's Direct Listing, Investors Focused on Defendants'
        Ability to "Age Up" the Platform and Attract Older Users .................................... 3

    B.      Defendants Engage in a Scheme to Take Roblox Public as Quickly as Possible
        to Capitalize on the Company's Unprecedented Growth .......................................... 4

    C.      Defendants Mislead Investors About the Ostensible Success of Roblox's
        Ability to Age Up ................................................................................................... 6

    D.      Defendants Continue Misleading Investors in the Midst of Increasing Pressure
        to Implement Parental Controls and Schools Reopening ........................................ 7

    E.      The Truth Begins to Emerge on December 15, 2021 and Is Fully Revealed on
        February 15, 2022 .................................................................................................. 11

II.     JURISDICTION AND VENUE ............................................................................. 12

III.    PARTIES ............................................................................................................... 13

    A.      Lead Plaintiffs ..................................................................................................... 13

    B.      Defendants ........................................................................................................... 13

    C.      Relevant Third Parties ......................................................................................... 16

IV.     SUBSTANTIVE ALLEGATIONS OF FRAUD ................................................... 17

    A.      Overview of Roblox's Business ............................................................................ 17

    B.      Roblox Experiences Blockbuster Growth Fueled by Young Children ................. 19

    C.      Roblox Faces Increasing Scrutiny for Profiting Off Young Children .................. 19

    D.      Defendants Knew That Roblox's Growth Was Heavily Reliant on the Under-
        13 Age Group ....................................................................................................... 21

    E.      Defendants Take Roblox Public as Quickly as Possible to Personally Take
        Advantage of Roblox's Unprecedented Growth ................................................... 23

    F.      Heading into the Direct Listing, Investors Were Singularly Focused on
        Roblox's Ability to Age Up ................................................................................. 25

        1.      Investors Were Concerned About the Sustainability of Relying on
            Children for Roblox's Bookings ............................................................. 25

2.     Investors Were Focused on Roblox's Ability to Drive Bookings with
       an Older Audience ................................................................................27

G.     Defendants Mislead Investors About Roblox's Efforts to Age Up ....................28

       1.     The March 10, 2021 Prospectus...............................................................28

       2.     The March 10, 2021 Squawk Box Interview .............................................31

       3.     The March 11, 2021 Schwab Network Interview.......................................33

H.     Defendants Immediately Begin Liquidating Their Roblox Holdings on the
       Day of the Direct Listing ........................................................................35

I.     Defendants Continue Misleading Investors on May 10, 2021.............................37

J.     Defendants Unload Another $54.3 Million Worth of Stock Based on Their
       Knowledge of Material Nonpublic Information .....................................................39

K.     Defendants Face Increasing Regulatory Pressure to Implement Parental
       Controls.................................................................................................40

L.     Defendants Continue Misleading Investors on August 17, 2021 ........................40

       1.     Defendants Mislead Investors About Roblox's Purported Aging Up
              Success.........................................................................................40

       2.     Defendants Downplay the Importance of ABPDAU To Throw
              Investors Off the Scent of Their Scheme to Defraud................................43

M.     Defendants Continue Offloading Their Stock Based on Their Knowledge of
       Material Nonpublic Information ........................................................................46

N.     Defendants Slowly Implement Enhanced Parental Controls in the Fall of 2021 ..47

O.     Defendants Continue Misleading Investors in November 2021 ...........................48

P.     Defendants Unload Another $169 Million Worth of Stock Knowing Their
       Fraud Would Soon be Revealed ........................................................................50

Q.     The Truth That Roblox Is Unable to Sustain Its High Growth is Gradually
       Revealed.................................................................................................51

       1.     Defendants Disclose Declining Monetization Metrics from November
              2021.................................................................................................51

       2.     Defendants Disclose Even Worse Monetization Metrics for the Full
              Fourth Quarter 2021.........................................................................52

V.      FALSE AND MISLEADING STATEMENTS AND OMISSIONS...............................55

        A.      March 10, 2021 – Defendant Baszucki's Squawk Box Appearance ....................55

        B.      March 11, 2021 – Schwab Network Interview .......................................................57

        C.      May 10 and 11, 2021 – Q1 2021 Press Release and Earnings Call .....................58

        D.      August 16 and 17, 2021 – Q2 2021 Press Release and Earnings Call..................60

        E.      November 8 and 9, 2021 – Q3 2021 Press Release and Earnings Call ................62

VI.     LOSS CAUSATION............................................................................................................ 65

        A.      December 15, 2021 – Partial Corrective Disclosure/Materialization of the Risk..67

        B.      February 15 and 16, 2021 – Final Corrective Disclosure/Materialization of the
                Risk ........................................................................................................................68

VII.    ADDITIONAL INDICIA OF SCIENTER ....................................................................... 71

        A.      Defendants' Exorbitant Stock Sales—Totaling More Than $548 Million—
                Made with Knowledge of Material Nonpublic Information Support a Strong
                Inference of Scienter ..............................................................................................72

                1.      Defendants Immediately Dump $238 Million In Roblox Stock Within
                        Two Days of Roblox's Direct Listing.........................................................73

                2.      Defendants Offload Another $54 Million in Roblox Stock After They
                        Made False and Misleading Statements on May 10, 2021 .......................73

                3.      Defendants Make Another $55 Million in Insider Sales After They
                        Made False and Misleading Statements on August 16, 2021 and
                        Before Rolling Out Parental Controls.......................................................74

                4.      Defendants Unload Another Roughly $200 Million Worth of Roblox
                        Stock Before Parental Controls and Schools Reopening Begin to
                        Affect Bookings Growth ............................................................................75

        B.      Defendant's Statements Themselves Prove They Closely Monitored the
                Company's Topline Metrics, Including Bookings-By-Age-Group .....................76

        C.      Defendants Knew They Would Have to Implement Enhanced Parental
                Controls, Which Would Harm Bookings ...............................................................79

VIII.   CONTROL PERSON ALLEGATIONS............................................................................ 81

IX.     THE STATUTORY SAFE HARBOR IS INAPPLICABLE.............................................. 82

X.      APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET
        DOCTRINE ................................................................................................................ 83

XI.     CLASS ACTION ALLEGATIONS ......................................................................... 85

XII.    COUNTS AGAINST DEFENDANTS..................................................................... 87

        COUNT I ................................................................................................................... 87

        For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b)
        Promulgated Thereunder Against All Defendants ........................................................ 87

        COUNT II ................................................................................................................. 89

        For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5(a) and (c)
        Promulgated Thereunder Against All Defendants ........................................................ 89

        COUNT III................................................................................................................. 91

        For Violations of Section 20(a) of the Exchange Act  Against the Individual
        Defendants ................................................................................................................ 91

XIII.   REQUEST FOR RELIEF ........................................................................................ 92

XIV.    JURY DEMAND ...................................................................................................... 93

Court-appointed Lead Plaintiffs Arkansas Teacher Retirement System ("ATRS") and DeKalb County Pension Fund ("DeKalb," and together with ATRS, "Lead Plaintiffs"), individually and on behalf of all persons and entities who or which, during the period from March 10, 2021 through February 15, 2022, inclusive (the "Class Period"), purchased the publicly traded Class A common stock of Roblox Corporation ("Roblox" or the "Company") and were damaged thereby (the "Class"),[1] bring this Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint") against Roblox and current Chief Executive Officer David Baszucki ("Baszucki"), current Chief Financial Officer Michael Guthrie ("Guthrie"), and former Chief Business Officer Craig Donato ("Donato"), (the "Individual Defendants" and together with Roblox, "Defendants").

Lead Plaintiffs' claims are brought upon personal knowledge as to their own acts and upon information and belief as to all other matters, based upon, among other things, a review and analysis of: (1) reports and documents filed by Roblox with the Securities and Exchange Commission ("SEC"); (2) reports issued by analysts covering or concerning Roblox and its business; (3) press releases, news articles, transcripts, videos, and other public statements issued by or about Roblox, its business, and Defendants; (4) an investigation conducted by Lead Plaintiffs' attorneys, including interviews with confidential witnesses ("CWs");[2] and (5) other publicly available information concerning Roblox, its business, and the allegations contained herein. Lead Plaintiffs believe that substantial additional evidentiary support exists for the allegations herein and will continue to be revealed after Lead Plaintiffs have a reasonable opportunity for discovery.

---

[1] Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director, and/or control person of Roblox during the Class Period, and members of their immediate families; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Roblox's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person, in their capacities as such.

[2] All CWs are former employees of Roblox.

# I.      NATURE OF THE ACTION

1.      On March 10, 2021, after nearly 20 years as a private company, Roblox went public.  Rather than do so via an initial public offering ("IPO"), however, Defendants utilized a "direct listing."   Unlike a traditional IPO, which statutorily mandates a "lock-up period" for company insiders during which no open market sales may occur, the salient feature of a direct listing is that insiders may entirely bypass the lock-up period and sell shares immediately.  This is exactly what the Individual Defendants did.

2.      On March 10 and 11, 2021—the start of the Class Period—Defendants Baszucki, Guthrie, and Donato sold *$238 million* worth of Roblox stock.  Moreover, at the same time, Defendants Baszucki and Guthrie went on a televised dog-and-pony show, promoting the very stock they were actively dumping.  And why were the Individual Defendants selling their brand-new shares, at the same time they were actively promoting them and encouraging investors to buy?  Because, and as explained in far greater detail below, they possessed material nonpublic information about the age demographic of Roblox users—namely, that during the Class Period, Roblox's users remained mostly under 13 years old, and these under-13 users were responsible for an overwhelming majority of the Company's revenue.  Moreover, as a result of this continued heavy reliance on under-13 users, Defendants knew that Roblox's extraordinary success during the pandemic year of 2020 was unsustainable and would reverse once those under-13 users returned to school post-COVID, and after Roblox implemented parental control and safety measures to prevent unfettered spending and access from these under-13 users.

3.      Despite possessing this material information, Defendants publicly stated the opposite.  Specifically, on the first day of the Class Period, Defendants told investors that the Company's remarkable growth would continue after COVID.  Then, throughout the rest of the Class Period, Defendants affirmatively lied about the percentages of users and revenue for the significant under- and over-13-year-old age groups, which misled investors into believing that older users would sustain the Company's revenue once under-13 users returned to school and Roblox implemented enhanced parental control and safety measures.

4.     Before the truth was revealed, and with the market unaware of the material information, the Individual Defendants unloaded nearly ***$550 million*** worth of Roblox stock between March and December 2021.  When Defendants' scheme and false statements were fully revealed in February 2022, Roblox's market capitalization dropped by over ***$11 billion***.

A.     **Leading Up to Roblox's Direct Listing, Investors Focused on Defendants' Ability to "Age Up" the Platform and Attract Older Users**

5.     Founded in 2004, Roblox operates an online video game platform that provides its users with tools to create games that are played by other users.  While Roblox is free to join, many games and activities on the platform require the purchase of the Company's proprietary online currency, "Robux."  These Robux, purchased for U.S. dollars via credit card, permit users to buy virtual goods and access certain paid experiences on the Roblox platform.  These Robux purchases—or bookings, as known in Company and industry analyst parlance—constitute nearly all of Roblox's revenue.

6.     Roblox has historically been a platform for children under 13 years old. Throughout 2020, as the COVID pandemic forced children inside, Roblox experienced unprecedented growth in both the number of users and revenue obtained from those under-13 users.  However, this revenue growth was unsustainable.  Indeed, internally, Defendants told employees that the Company's bookings growth would not last once these young children returned to school after COVID and resumed their pre-pandemic activities.

7.     Roblox's reliance on under-13 users for its revenue was unsustainable for the additional reason that the Company was facing increasing pressure to implement enhanced parental control and safety measures to protect the young children on Roblox's platform, which would harm the Company's bookings since under-13 users spent the most money on Roblox. Indeed, in the lead up to the direct listing, several news articles detailed examples of children being exposed to harmful conduct on Roblox's platform—such as adult content, online predators, and hate speech—and other articles detailed several instances where children went on spending sprees and racked up thousands of dollars in charges on their parents' credit cards.  As a result, as

explained by a former Roblox employee, CW 3, it was a huge priority for Roblox to attract an older audience, partially because leadership knew that it had to address parental controls due to external pressures from parents and the news media.

8.      As a result, leading up to the direct listing, potential investors were focused on Roblox's ability to "age up" its platform and attract an older audience because these investors understood that older users provided sustainable long-term revenue for the Company.  Critically, potential investors were focused not only on Roblox's ability to attract older users, but also how Roblox would make money from these older users, i.e., how Roblox would monetize this older audience.  As one industry analyst explained before the direct listing, Roblox's ability to age up was "the single biggest question that I would need to be comfortable with, if I were considering becoming a shareholder."

**B.      Defendants Engage in a Scheme to Take Roblox Public as Quickly as Possible to Capitalize on the Company's Unprecedented Growth**

9.      Looking to take advantage of Roblox's unprecedented growth in 2020—which was fueled by young children stuck at home during lockdowns—Defendants looked for a way to take the Company public as quickly as possible.  Defendants chose a direct listing because it allowed them to start selling their shares **immediately**, before Roblox's growth declined after the pandemic.  Critically, a direct listing, in contrast to a standard IPO, allows insiders to avoid the statutorily mandated lock-up period when they cannot sell their shares.  In a direct listing, those same insiders can sell their shares the first day the company goes public.

10.      And that is exactly what the Individual Defendants did here, to the tune of **$238 million on the first two days Roblox stock was available for open market purchases and sales**.  Notably, and true to a pattern that would continue unabated throughout the Class Period, none of the Individual Defendants purchased so much as a single share of the Company stock they were so passionately touting.

11.      Moreover, several former Roblox employees explained that leading up to the direct listing, Defendants Baszucki and Guthrie told employees during town hall meetings that they

1    chose a direct listing over an IPO because it allowed the Company's employees—including

2    themselves—to take advantage of Roblox's unprecedented growth, which they knew would not

3    last once children returned to school and Roblox implemented enhanced parental controls.  For

4    example, CW 2 recalled that during town hall and quarterly meetings starting before Roblox's

5    March 2021 direct listing, Defendants Baszucki and Guthrie told employees that its bookings

6    would decline once children returned to school after COVID.  CW 2 stated that Guthrie told

7    employees during internal town hall and quarterly meetings that bookings growth would not last

8    past COVID and therefore it was the right place right time to go public.

9         12.    Defendants also benefited from the direct listing because they could sell their

10   shares before Roblox implemented enhanced parental controls, which they knew would harm

11   bookings from their main driver of revenue, the under-13 userbase.[3]  Indeed, according to former

12   Roblox employees, Defendants put off implementing enhanced parental controls for as long as

13   possible because they knew that implementing parental controls would harm the Company's

14   bookings, which were driven mostly by children under-13.  For example, CW 5—a member of

15   the Content and Safety Team at Roblox—stated that Roblox did not significantly address parental

16   controls earlier because it was hesitant to limit features that generated revenue for the Company.

17   Specifically, CW 5 explained that spending limits would have negatively impacted Roblox's

18   bookings because it obtained 60 to 70% of its bookings from users under 13-years-old in 2021.

19   Similarly, CW 3 explained that during town hall meetings, Baszucki responded to employee

20   concerns about parental controls by indicating that Roblox was going to address parental concerns

21   as little as possible so that it would not negatively impact revenue.

22

23

24

_____

25   [3] Throughout this Complaint, Lead Plaintiffs use bookings and revenue interchangeably.
     Roblox derives substantially all of its revenue from bookings, which are the sales of virtual items
26   on the Roblox platform. The Company recognizes revenue over the estimated period of time the
     virtual items are available to the user on the Roblox platform (estimated average lifetime of a
27   paying user) or at the time the virtual item is consumed.

28

### C.   Defendants Mislead Investors About the Ostensible Success of Roblox's Ability to Age Up

13.   Knowing that investors wanted Roblox to age up its platform, Defendants engaged in a scheme to artificially inflate the price of Roblox stock by falsely telling investors that Roblox had successfully aged up and attracted older users, and thus, older users were generating additional revenue for the Company.

14.   From the start of the Class Period, Defendants touted the Company's purported success aging up and attracting older users while at the same time leading investors to believe that this older userbase was sustaining the Company's bookings and leading to sustainable revenue. However, Defendants intentionally withheld from investors the material fact that the Company's bookings were still overwhelmingly reliant on the unsustainable under-13 userbase.  As a result, unlike Defendants, investors did not know that Roblox's bookings would decline substantially once Roblox implemented enhanced parental controls and children returned to school after COVID.

15.   On March 10 and 11, 2021, the first two days Defendants took Roblox public via direct listing, Defendants Baszucki and Guthrie engaged in a high-profile television press tour as part of their scheme to promote the direct listing and inflate the stock price as much as possible so they could start dumping their shares immediately.

16.   For example, on March 10, 2021, as his personal coffers filled up with the proceeds of his Day One insider sales, Defendant Baszucki appeared on CNBC, touting the Company's ability to continue its bookings growth through COVID reopening.  In response to a question about the Company's bookings, Baszucki falsely stated that "***the stuff*** [i.e., growth] ***we've seen in Covid . . . is going to continue forward so we're very excited about the growth and on the monetization***."  Behind the scenes, however, Defendants were telling employees the opposite. According to former employees that attended town hall meetings before the direct listing, Defendants Baszucki and Guthrie told employees that bookings would decline post-COVID, once children returned to school.

17.     The next day, on March 11, 2021, Defendant Guthrie went on television to participate in an interview with Schwab Network.  In response to a somewhat skeptical question regarding how Roblox could possibly be valued as highly as established video game companies like Electronic Arts—which owns popular games like Madden NFL Football, FIFA Soccer, and the Star Wars franchise games—Defendant Guthrie touted the Company's purported success aging up and falsely stated that Roblox "*ha[s] about 44% of our users that are [] over the age of 13*."  This statement, however, was false.  According to **several** former employees, under-13 users made up at least 60 to 70% of Roblox users at the time.  Thus, over-13 users made up **at most** somewhere between 30%-40% of users when Guthrie falsely claimed they already had 44% of their users over 13.

18.     During the exact same time Defendants made these false and misleading statements, their bank accounts were ballooning based on significant insider trading.  Within two days of the direct listing, the Individual Defendants collectively unloaded over **$238 million** of their Roblox stock, profiting off their insider information that the Company's bookings growth was reliant on children under 13, and as a result, would decline once those children returned to school and Roblox implemented enhanced parental controls.  Specifically, in two days, Baszucki sold 1.3 million shares, totaling **$83.9 million**; Guthrie sold 1.2 million shares, totaling **$77.4 million**; and Donato sold over 1.14 million shares, totaling **$77.5 million**.

19.     But this was just the start of Defendants' scheme.  Throughout the rest of the Class Period, Defendants continued to falsely tout the Company's aging up success and bookings growth while failing to disclose that the Company's bookings were still overwhelmingly reliant on children under 13.  After each false and misleading statement, Defendants continued offloading significant portions of their stock while its value was artificially inflated due to their fraud.

**D.     Defendants Continue Misleading Investors in the Midst of Increasing Pressure to Implement Parental Controls and Schools Reopening**

20.     On May 10, 2021, Defendants issued a press release announcing first quarter 2021 results, and falsely claimed that "*our demographics continued to expand with users over the age*

1    *of 13 growing at 111% and now accounting for 49% of the user base*." However, this was false

2    because, according to several former Roblox employees, under-13 users still made up at least 60

3    to 70% of users at that time. According to CW 2, users under-13-years-old represented 60 to 70%

4    of Roblox's users in March 2021. The under-13 userbase continued to constitute over 60% of

5    Roblox's total users throughout the rest of 2021. For example, CW 3 stated that at least 70% of

6    Roblox users in April 2021 were under-13-years-old, and CW 4 stated that 60 to 70% percent of

7    Roblox's total users in October 2021 were under-13-year-olds.

8         21. Shortly after this false announcement, Defendants collectively sold another **$54.3**

9    **million** worth of Roblox stock.

10        22. Then, on August 10, 2021, Defendants received a letter from Congress, addressed

11    to Defendant Baszucki, regarding Roblox's compliance with child safety laws. Among other

12    things, the letter raised concerns over how Roblox profited off children, calling Roblox's platform

13    "akin to gambling" and noting that "[c]hildren are uniquely vulnerable to manipulation and peer

14    pressure associated with in-game purchases." Therefore, after a long period of putting off parental

15    controls in an attempt to delay the negative impact on bookings and keep the Company's stock

16    price artificially inflated, Defendants knew that the party was nearly over, and their bookings

17    would soon decline once they implemented parental controls and young children returned to

18    school in the fall.

19        23. However, rather than truthfully disclose to investors that bookings would soon

20    decline as children returned to school and Roblox was forced to increase parental controls,

21    Defendants doubled down and continued their scheme to mislead investors about the Company's

22    aging up and monetization of its older users.

23        24. For example, on August 17, 2021, Defendants again falsely touted their aging up

24    success. During the earnings call on that day, Defendant Guthrie claimed that "*over 50% of the*

25    *people on our platform are over 13*."

26        25. Then, because Roblox did not disclose what percentage of its bookings came from

27    under-13 users, an analyst asked specifically about the difference in monetization between the

28

under-13 and over-13 age groups.  The analyst asked: "Can we talk about the trends, particularly usage and spending trends between the over 13 and under 13 audience?"

26.    In response, Defendant Guthrie falsely stated that the monetization trends between the over-13 and under-13 age groups were the same.  Specifically, Guthrie claimed: "Yeah. ***They're incredibly similar*** is the short answer. If you – pure engagement and ***monetization [] whether under 13 or over 13 is actually quite similar***."

27.    However, the monetization between the two groups was **<u>not</u>** similar.  At that time, the under-13 age group still accounted for an overwhelming majority of the Company's monetization.  According to CW 5, in September 2021, a significant portion of Roblox's **bookings** still came from users under-13 years-old. CW 5 detailed that easily a majority—between 60 and 70%—of Roblox's bookings in September 2021 came from users under 13-years-old.

28.    Shortly after their false and misleading statements on August 17, 2021, the Individual Defendants offloaded an additional **<u>$55.5 million</u>** worth of their Roblox stock.

29.    Critically, at that time, the Individual Defendants knew that Roblox's bookings would soon decline once children returned to school (in just a few weeks) and the Company implemented enhanced parental controls (which would have to happen soon given the increasing public and regulatory pressure).  Indeed, Defendants slowly started rolling out enhanced user controls in late September.  For example, on or around September 18, 2021, Roblox publicly announced monthly spend restrictions and spend notifications settings for parents.  Then, on or around November 18, 2021, Roblox "officially added Parental controls" allowing parents to "restrict what content is appropriate for their child."

30.    However, before these parental controls could impact bookings, Defendants continued misleading investors during their next earnings call on November 9, 2021, after Roblox announced third quarter 2021 results.  In the press release announcing earnings, Defendant Guthrie claimed that "all of our core metrics . . . displayed strong year-over-year growth despite lapping COVID-impacted periods and back-to-school seasonality."  Then, during the earnings call, Defendant Baszucki again falsely told investors that "***[o]ver half of our people are over 13-***

*year-old plus*."  Later during the call, Defendant Guthrie attributed the Company's revenue and bookings growth, as well as the uptick in other core metrics, to aging up the platform, stating: "Right now, again, we generally are looking at **bookings growth as driven primarily by user and engagement growth**."

31.    These statements were false and misleading because they led investors to (wrongly) believe that the Company's aging up efforts were responsible for strong bookings and monetization growth—even through COVID reopening—while concealing the known, material fact that this growth was still overwhelmingly fueled by under-13 users at that time, and as a result, the Company's bookings were declining as children returned to school and Roblox rolled out enhanced parental controls in the fourth quarter of 2021.

32.    Indeed, Defendants knew that their scheme would unravel by the time they disclosed fourth quarter earnings on February 15, 2022, because the fourth quarter was the period when children returned to school (October, November, and December) and when Roblox had implemented enhanced user controls.  Although Defendants did not warn investors of this impending decline in bookings, internally, Defendants knew the Company's bookings were declining and attributed that decline to lower usage from under-13 users.  According to CW 2, Roblox internally attributed the decline in bookings growth at the end of 2021 to fewer engagement hours from under 13-year-olds.  CW 2 detailed that during internal town hall meetings that CW 2 attended, Baszucki specifically stated that the decline in bookings growth was caused by fewer engagement hours from under-13-year-old-users.

33.    Armed with this insider knowledge, Defendants made significant insider sales in late 2021, while Roblox's stock price was trading at or near all-time highs.  Before the Company's next earnings call—when the full truth about the Company's bookings growth would be fully revealed—the Individual Defendants sold an additional 1,577,980 shares of Roblox stock, **reaping more than $184 million in insider sales**.

**E.     The Truth Begins to Emerge on December 15, 2021 and Is Fully Revealed on February 15, 2022**

34.     By December 15, 2021, however, Defendants could no longer conceal the truth about their failure to age up Roblox's platform or their overwhelming reliance on children under 13 to sustain the Company's bookings growth.  Before the market opened that day, Defendants disclosed metrics from November 2021, revealing that the Company's average bookings per daily active user ("ABPDAU"), a key profitability metric, had declined 8-9% year over year.  On this news, Roblox's stock fell by over 9% in a single day, as investors began to understand that Defendants' prior statements touting their aging up and bookings growth were false and misleading.  However, investors did not fully understand that the Company was still reliant on under-13 users, and as a result, the Company was not successful in aging up the platform.

35.     The full truth was revealed on February 15, 2022.  On that day, the Company announced its fourth quarter 2021 results and released January 2022 key metrics, which showed that bookings growth in the fourth quarter 2021 had decelerated to 20%, well below analysts' consensus target, and in January 2022, average bookings per daily active user ("ABPDAU") (which showed how Roblox was monetizing its users) was down a staggering 22-23% (much lower than November 2021 ABPDAU), revealing that the Company's profitability metrics— bookings and ABPDAU—declined substantially as the full impact of children returning to school and Roblox's enhanced parental controls took effect.

36.     This information revealed to investors for the first time that the Company had not been truthful about aging up, and revealed the extent to which the Company's bookings growth was still reliant on Roblox's under-13 users.  In response to this news, Roblox's stock price dropped dramatically, falling by approximately **26% in a single day**.

37.     The market was shocked by this news, and analysts urged Defendants to start disclosing accurate metrics to judge the Company's ability to age up.  For example, on February 17, 2022, Jefferies called out Defendants for their previous false and misleading statements, and stated that the Company needed "new metrics [] to measure the impact that . . . aging up will have

1    on monetization."  Jefferies urged Roblox to "mov[e] past buzzword and headline metrics" and

2    provide truthful information about whether the Company was successfully aging up and

3    monetizing its older users.

4         38.    All told, while the Individual Defendants personally profited to the tune of more

5    than **$548 million in less than one year**, investors lost **billions** in the value of their investments.

6    When the truth was fully revealed, Roblox's stock dropped by **26%** in a single day, which

7    corresponded to a **$11.3 billion** reduction to the Company's market capitalization.

8         39.    Critically, the Individual Defendants' trading patterns after their fraudulent

9    scheme was revealed demonstrates they knowingly and intentionally misled investors in order to

10   personally enrich themselves.  Between February 16, 2022 and January 24, 2023—a 343-day

11   control period after the Class Period that corresponds to the same number of days in the Class

12   Period—the Individual Defendants collectively sold only 1,379,917 shares of Roblox stock, **a**

13   **nearly 80% reduction** from their Class Period sales of 6,669,294 shares.

14        40.    This Action seeks to recover those losses caused by Defendants' fraud.

15   **II.    JURISDICTION AND VENUE**

16        41.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of

17   the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the

18   SEC (17 C.F.R. § 240.10b-5).

19        42.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C.

20   § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

21        43.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b)-(c), and

22   Section 27 of the Exchange Act, because Roblox's headquarters are located in this District, the

23   Company conducts substantial business in this District, and many of the acts and practices

24   complained of herein occurred in substantial part in this District.

25        44.    In connection with the acts alleged in this Amended Complaint, Defendants,

26   directly or indirectly, used the means and instrumentalities of interstate commerce, including but

27

28

not limited to the mails, interstate telephone communications, and the facilities of the national securities markets.

### III.   PARTIES

#### A.   Lead Plaintiffs

45.    Lead Plaintiff ATRS, headquartered in Little Rock, Arkansas, is a defined benefit retirement plan with approximately $21 billion in total assets under management.  ATRS provides retirement, disability, and survivor benefits to the state's teachers and their beneficiaries. As set forth in its Lead Plaintiff Certification (ECF No. 31-2), ATRS purchased Roblox Class A common stock during the Class Period and suffered damages as a result of Defendants' violations of federal securities laws alleged herein.

46.    Lead Plaintiff DeKalb is a defined benefit pension fund headquartered in Decatur, Georgia with approximately $1.4 billion in assets under management.  DeKalb serves all permanent officers, full and part-time employees, elected officials, and deputies of DeKalb County.  As set forth in its Lead Plaintiff Certification (ECF No. 31-2), DeKalb purchased Roblox Class A common stock during the Class Period and suffered damages as a result of Defendants' violations of federal securities laws alleged herein.

#### B.   Defendants

47.    Defendant Roblox is a Delaware corporation with its principal executive offices located at 970 Park Place, San Mateo, California.  Roblox's Class A common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the symbol "RBLX."

48.    Defendant Baszucki is the Chairman, President, and Chief Executive Officer of Roblox and served in those roles during the Class Period.  In his role as CEO of Roblox, Defendant Baszucki attended town hall meetings and quarterly meetings with Defendants Guthrie and Donato and Roblox employees wherein the Company's internal topline metrics were discussed, including bookings-by-age-demographic.  He also spoke to securities analysts on a quarterly basis and attended media events, during which he made statements about the source of Roblox's financial success, the Company's ability to age up, and bookings growth. During the Class Period,

Baszucki **sold 2,987,500 shares** of Roblox stock in open market transactions, reaping proceeds of **$267,614,256** while in possession of material nonpublic information about the Company's age demographics and the sustainability of Roblox's growth.  Baszucki did not make a single open market purchase of Roblox stock during the Class Period.  Moreover, during the 343-day control period after the Class Period, Baszucki sold only 1.3 million shares, which was more than a 56% reduction from his Class Period sales.

49.     Defendant Guthrie is the Chief Financial Officer of Roblox and held that role during the Class Period.  In his role as CFO of Roblox, Guthrie attended town hall meetings and quarterly meetings with the other Defendants and Roblox employees wherein the Company's internal topline metrics were discussed, including bookings-by-age-demographic.  He also spoke to securities analysts on a quarterly basis, during which he made statements about the source of Roblox's financial success, including bookings, and Roblox's ability to age up.  During the Class Period, Guthrie **sold 1,681,042 shares** of Roblox stock in open market transactions, reaping proceeds of **$125,154,694** while in possession of material nonpublic information about the Company's age demographics and the sustainability of Roblox's growth.  Guthrie did not make a single open market purchase of Roblox stock during the Class Period.[4]  Moreover, during the 343-day control period after the Class Period, Guthrie sold only 26,086 shares, which was more than a 98% reduction from his Class Period sales.

50.     Defendant Donato is the former Chief Business Officer of Roblox and served in that role during the Class Period.  In his role as CBO of Roblox, Donato attended town hall meetings with the other Defendants and Roblox employees wherein the Company's internal topline metrics were discussed, including bookings-by-age-demographic.  Donato participated in quarterly conferences with securities analysts. During the Class Period, Donato **sold 2,000,752 shares** of Roblox stock in open market transactions, reaping proceeds of **$156,215,463** while in

---

[4] On March 16, 2021, Defendant Guthrie acquired 90,000 shares of Restricted Stock Units ("RSUs").  An RSU is an award of stock shares, usually given as a form of employee compensation.

1  possession of material nonpublic information about the Company's age demographics and the

2  sustainability of Roblox's growth.  Donato did not make a single open market purchase of Roblox

3  stock during the Class Period.[5]  Moreover, in the 343-day control period after the Class Period,

4  Donato sold only 53,831 shares, which was more than a 97% reduction from his Class Period

5  sales.

6        51.    Defendants Baszucki, Guthrie, and Donato are referred to throughout as the

7  "Individual Defendants."

8        52.    Roblox is liable for the acts of the Individual Defendants and its employees under

9  the doctrine of *respondeat superior* and common law principles of agency because all of the

10  wrongful acts complained of herein were carried out within the scope of their employment.

11        53.    The scienter of each of the Individual Defendants and each of the other employees

12  and agents of the Company is similarly imputed to Roblox under *respondeat superior* and agency

13  principles.

14        54.    The Individual Defendants, because of their high-level positions of control and

15  authority as senior executive officers of Roblox, possessed the power and authority to control,

16  and did ultimately control, the contents of Roblox's SEC filings, press releases, content on the

17  Company's website, and other market communications during the Class Period.  The Individual

18  Defendants were provided with copies of the Company's reports and other releases alleged herein

19  to be misleading prior to or shortly after their issuance and had the ability and opportunity to

20  prevent their issuance or to cause them to be corrected.  Because of their positions within the

21  Company and their access to material information available to them, the Individual Defendants

22  knew that the adverse facts specified herein had not been adequately disclosed to, and were being

23  concealed from, the public, and that the positive representations being made were then materially

24  false and misleading.  The Individual Defendants are liable for the false statements and omissions

25  pleaded herein.

26

27       [5] On March 16, 2021, Defendant Donato acquired 25,000 shares of RSUs.

28

1
   **C.**  **Relevant Third Parties**[6]

2
   55.  CW 1 joined Roblox in August 2016 in a development and operations role.  Later,

3
CW 1 transitioned to an Engineering Manager in January 2019 and was subsequently promoted

4
to a Principal Engineer in June 2020. CW 1 departed Roblox in January 2022.  In her role as a

5
Principal Engineer, CW 1 worked in the infrastructure department.  CW 1 advised that her role

6
responsibilities as a Principal Engineer included maintaining and running databases.  CW 1 added

7
that she ultimately reported to a director who in turn reported to former Vice President,

8
Engineering: Infrastructure Dan Williams, who in turn reported to current CEO David Baszucki.

9
   56.  CW 2 was employed by Roblox throughout the entire Class Period as a Senior

10
Member of the Trust and Safety team that worked closely with engineers and the Product team.

11
CW 2 advised that her role involved reviewing and handling abusive conduct by Roblox users.

12
As part of her job, CW 2 attended town hall and quarterly meetings that were led by CEO David

13
Baszucki and CFO Michael Guthrie.

14
   57.  CW 3 was employed by Roblox as a Program Manager, Engineering Learning and

15
Development from April 2021 to March 2022.  CW 3 advised that she was hired to assist with

16
engineering onboarding and training for Roblox.  CW 3 noted that she was the first hire to provide

17
internal training at Roblox.  CW 3 stated that she was later looped into general human resources

18
training and responsibilities.  CW 3 added that she reported to former Director of Product and

19
Operations Annie Kwon.

20
   58.  CW 4 joined Roblox in the Fall of 2021 and remained employed there throughout

21
the rest of the Class Period.  During the Class Period, CW 4 was a Manager in the Safety group

22
and oversaw multiple teams.  As part of her job, CW 4 reviewed user data, which included age

23
demographic data, regularly in 2021.  CW 4 was three levels removed from Defendant Donato,

24
and as part of her job responsibilities, CW 4 interacted with Donato.

25

26

27
   [6] All CWs are described in the feminine to protect their identities.

28

59.     CW 5 was employed with Roblox Corporation from September 2021 to August 2023 as a Software Engineer.  CW 5 advised that she was a member of the Content Safety team and worked on content moderation.  CW 5 explained that she and her team determined what games, images and content were safe for Roblox's platform.  CW 5 added that she was also involved in determining content ratings for certain games.  CW 5 noted that she reported to current Product Manager Aykud Gönen.  CW 5 attended town hall meetings that were led by Defendants Baszucki, Guthrie, and Donato, wherein Defendants Baszucki and Guthrie specifically discussed bookings-by-age-group during these meetings.

IV.     **SUBSTANTIVE ALLEGATIONS OF FRAUD**

A.     **Overview of Roblox's Business**

60.     Roblox operates an online video game platform that provides its users with tools to create games that are hosted on the Company's servers.  Other users can access and play these games for free on Roblox's platform.  Because Roblox is free to play, the Company generates essentially **all of its revenue** from sales of its virtual currency, called Robux, which customers may then use to purchase virtual goods and access certain paid in-app experiences in Roblox's virtual economy.

61.     The Company calculates revenue based entirely on its bookings.  Bookings are the amount of cash Roblox takes in from the purchase of Robux during a specified period.  Therefore, because users access the platform at no cost and the vast majority of games are free to play, Roblox needs to attract people who will purchase Robux in order to generate bookings.  The Company refers to players who purchase Robux as "payers."

62.     Roblox tracks its business using several operating metrics. The Company's main metrics are: (1) DAUs; (2) hours engaged; (3) bookings; and (4) average bookings per daily active user ("ABPDAU").  In the Company's prospectus statement filed with the SEC on March 10, 2021 (the "Prospectus"), Defendants told investors that "these operating metrics provide useful information to investors and others in understanding and evaluating our results in the same manner as management."

63.     The ABPDAU metric was particularly important.  Because Roblox is free to all users, the Company could gain DAUs without making any additional revenue (if those new DAUs do not purchase any Robux).  On the flip side, bookings could increase even without any new DAUs (if Roblox's existing users spend more money).  As a result, the Company used the ABPDAU as a way to measure how Roblox was monetizing its users, since it is simply bookings divided by DAUs.

64.     Indeed, the Company explained in its Prospectus filed on March 10, 2021 that Roblox used ABPDAU "as a way to understand how [Roblox is] monetizing across all of [its] users through the sale of virtual currency."  The Company further explained that Roblox's revenue growth depended on increasing ABPDAU.  Specifically, the Prospectus explained that "[o]ur ability to grow our revenue depends in large part on our ability to increase ABPDAU."

65.     Throughout the Class Period, Defendants closely monitored the three top-line metrics.  The Prospectus explained:

> We regularly review metrics, including our DAUs, hours engaged, and average bookings per DAU, or ABPDAU, to evaluate growth trends, measure our performance, and make strategic decisions. These metrics are calculated using internal data gathered on an analytics platform that we developed and operate and have not been validated by an independent third party.

66.     As discussed further below, the astronomically high rate of bookings growth Roblox experienced in the leadup to its direct listing was fueled overwhelmingly by users under the age of 13.

67.     Because Roblox's audience was composed largely of children under 13, the Company is subject to numerous regulations applicable to online providers who cater to children under 13, including the United States Child Online Privacy Protection Act, which, as the Prospectus states, "imposes strict requirements on operators of websites or online services directed to children under 13 years of age."

1

**B.    Roblox Experiences Blockbuster Growth Fueled by Young Children**

2

68.    In early 2020, the COVID-19 virus began to spread rapidly, leading to widespread

3

lockdowns, social restrictions, and school closures.  As a result, for a year and a half, children

4

turned to screens to satisfy the bulk of their social, entertainment, and learning needs.

5

69.    This contributed to a sharp increase in Roblox's DAUs, hours of engagement, and

6

bookings, as Roblox's userbase was made up **mostly of children under the age of 13** who were

7

stuck at home.  For example, the Company's DAU growth increased 73% from the first half of

8

2019 to the first half of 2020; hours engaged on Roblox grew 116% from the first half of 2019 to

9

the first half of 2020; and bookings grew 154% from the first half of 2019 to the first half of 2020.

10

Moreover, the Company's ABPDAU increased from $10.60 to $14.80 after the onset of the

11

pandemic, meaning that as the DAU userbase rapidly grew, bookings grew even faster.  Therefore,

12

in addition to growing its userbase, Roblox was also monetizing its users on the backs of its core

13

under-13 userbase.

14

70.    Critically, prior to the Company's direct listing, the market understood that

15

Roblox's growth had been fueled largely by younger, primarily under-13 children.  For example,

16

on January 28, 2021—shortly before the start of the Class Period—a Bernstein analyst hosting a

17

Webinar regarding Roblox's direct listing stated that the Company's metrics supported a "fair

18

characterization of the company as being mainly for young kids and mainly U.S. dominated, at

19

least from a revenue-weighted basis and a value basis."  However, the market also understood

20

that in order for Roblox to be a sustainable, public company, it needed to shift focus to an older

21

audience because relying on children for profit was a dangerous game.

22

**C.    Roblox Faces Increasing Scrutiny for Profiting Off Young Children**

23

71.    Despite being aimed at young children and being advertised as free to join and

24

download, Roblox also did not have adequate parental controls, spending limitations, or purchase

25

notifications for parents, which enabled children to go on spending sprees with their parents'

26

payment information.  Indeed, children's purchases of Robux for virtual items on Roblox's

27

gaming platform, such as clothing and accessories for their avatars, could cost hundreds, and

28

sometimes even thousands, of dollars at a time.  Even if parents refused to add credit card information to the platform, children still could purchase Robux in the app using third-party services like PayPal, Windows, Amazon, and Apple.

72.    Numerous campaigns and articles exposed cases of children making in-app purchases without their parents' permission.  As one example, a March 3, 2021 article from the The Gamer covered a case where parents encountered a shocking bill for more than $3,000 of in-app purchases from their 11-year-old daughter.

73.    Similarly, on June 21, 2021, a parent watchdog group, the ParentsTogether Foundation,[7] wrote an article titled, "Warning for Parents: Kids spending thousands of dollars on 'free' Roblox game."  The article characterized Roblox as a "financial and emotional minefield for kids" and contained several examples of "cases of children being lured into casino-level spending sprees without parents' knowledge, in some cases racking up bills of thousands of dollars in just days."  For example, the article detailed that one father "discovered his 10-year-old daughter had spent $7,200 on Roblox over two months during lockdown, despite setting a spending cap on her purchases when they set up the account."

74.    Moreover, seeking refunds for these unauthorized purchases is often difficult for parents because third-party payment platforms and banks deemed these purchases authorized so long as the devices that children were using to play Roblox had access to parents' payment information.  As ParentsTogether explained, in order to seek refunds, parents "often need to navigate the varying refund policies of the third-party providers.  Some have reported being refused refunds by Apple, for example, or being pinged between Roblox, Paypal and their bank."

75.    These unauthorized spending sprees and other instances of Roblox's financial exploitation of children led to several lawsuits.  For example, on May 25, 2021, a group of users filed a class action lawsuit against Roblox alleging that Roblox earns a profit from in-app

---

[7] The ParentsTogether Foundation is a group of parents who, according to their website, "cover the latest research, policies, and trends affecting kids and families, so busy parents have the information they need to help their families thrive."

purchases made primarily by children, deletes the purchased content for violating its policies, and then refuses to issue refunds.  The complaint illustrates how Roblox profits from exploiting young children, noting: "even though the loyalty of millions of children has turned Roblox into a wild success during [COVID,] when many other businesses have suffered, Roblox systematically takes advantage of them."  The complaint goes on to highlight that "Roblox faces a problem of competing financial incentives: . . . vulgar, or otherwise objectionable content is in high demand and genuinely valuable to the platform's bottom line, but so is the perception that Roblox . . . maintains community standards."

76.     Moreover, in addition to unauthorized spending from under-13 users, Roblox has also been the subject of many online campaigns and articles cataloging disturbing examples of children under 13 being exposed to explicit adult content, online predators, bullying and hate speech.  These articles demonstrate that Roblox did not have adequate parental controls to protect children from potentially harmful material on its platform.

77.     Although information regarding Roblox's lack of parental controls was public, at no point during the Class Period did Roblox publicly disclose how much of their bookings came from children under the age of 13, thus obscuring from investors the risk that the Company's bookings growth would decline substantially once the Company implemented parental controls and children returned to school post-COVID.

**D.      Defendants Knew That Roblox's Growth Was Heavily Reliant on the Under-13 Age Group**

78.     Defendants, on the other hand, knew that Roblox's blockbuster bookings growth was driven, in large part, by children under the age of 13.  Defendants also knew that the bookings growth would soon come to an end once the Company implemented enhanced parental controls and children returned to school after COVID.  As a result, Defendants were motivated to avoid implementing effective controls for as long as possible because it would harm bookings from the Company's key under-13 user group.

79.     The need for enhanced parental controls was discussed internally amongst employees and during town hall meetings with Defendant Baszucki.  According to CW 3, it was known within the Company that implementing parental controls would negatively impact revenue because Roblox's userbase was largely under 13-years-old.  CW 3 explained that parental spend restrictions were discussed multiple times during town hall meetings and on Slack.[8]  CW 3 recalled that during her tenure, Roblox employees asked Baszucki during town hall meetings how Roblox was going to address parental controls while simultaneously conserving resources. According to CW 3, Baszucki responded to these concerns by indicating that Roblox was going to address parental concerns as little as possible so that it would not negatively impact revenue. Similarly, CW 3 recalled that Roblox's leadership told its employees not to comment on articles reporting on children spending a lot of money on Roblox's platform without their parents' permission.

80.     Defendants knew that increasing parental controls would harm bookings because excessive, unauthorized spending by under-13 users had an outsized impact on the Company's bookings (which investors did not know).  For example, CW 5 explained, Roblox generated a substantial portion of its bookings from a few so-called "whales," almost all of whom were children under 13-years of age.  Moreover, CW 5 explained that spending limits would have negatively impacted Roblox's bookings because the Company obtained 60 to 70% of its bookings from users under 13-years-old in 2021.

81.     CW 5 explained that Roblox did not significantly address parental controls earlier because the Company was hesitant to reduce features that generated revenue for the Company. Indeed, CW 5 detailed that she and members of the Content Safety team were instructed by current Product Manager Aykud Gönen to be careful when implementing new safety features on the platform so that they would not negatively affect bookings growth and user engagement.  CW 5

---

[8] Slack is a communication platform that allows employees to send public or private messages to their coworkers and members of their team.

explained that she and her colleagues were told to roll out new safety features slowly and to "keep an eye on topline metrics."

82.     Similarly, CW 3 explained that it would have been unsustainable for Roblox to fully address parental concerns because it was known that implementing strict controls would negatively impact revenue and because Roblox would have to spend a lot of money to expand its Trust & Safety team and appropriately monitor its platform.  According to CW 3, it was a huge priority for Roblox to attract an older audience throughout her tenure, partially because leadership knew that it had to address parental controls due to external pressures from parents and the news media.

**E.     Defendants Take Roblox Public as Quickly as Possible to Personally Take Advantage of Roblox's Unprecedented Growth**

83.     In the midst of Roblox's blockbuster growth and sharp uptick in monetization trends driven by under-13 users in 2020, on October 9, 2020, Roblox indicated in a draft registration statement filed with the SEC its intent to go public.

84.     In that initial draft, Roblox announced it would go public through an IPO. However, the IPO process was short lived.  Shortly thereafter, in mid-December 2020, Roblox switched gears and decided to go public via a direct listing.  According to a letter Roblox sent to the SEC, dated December 23, 2020, Roblox believed that a direct listing would "provide for an improvement over an underwritten offering for its employees and stockholders who elect to sell any of their shares of Class A common stock."

85.     Critically, during the period between Defendants' initial announcement of an IPO and the subsequent decision to forego it and go public by way of a direct listing, the Company's valuation (and its common stock valuation) had skyrocketed.  Although the Company's valuation was $8.35 per share as of September 30, 2020, it had jumped to $41.52 per share by December 31, 2020, based on Roblox's independent valuation.

86.     A direct listing, in contrast to an IPO, allows insiders to avoid a lock-up period. Unlike a traditional IPO, where insiders are subject to a 90-to-180-day lock-up period where they

1    cannot sell their shares, in a direct listing, those same insiders can sell their shares the first day

2    the company goes public.  Indeed, according to CW 2, Roblox's initial efforts to go public via an

3    IPO fell through at the end of 2020 because the Company did not get favorable terms and because

4    Roblox's executives and early-stage investors did not want to wait six months to cash out early.

5         87.    Several CWs provide corroborating allegations that the Individual Defendants

6    chose a direct listing in order to cash out as quickly as possible, knowing that once children under

7    13 returned to school and Roblox rolled out enhanced parental controls, the Company's bookings

8    would decline.  These CWs detail how, leading up to the direct listing, Defendants Baszucki and

9    Guthrie told employees during town hall meetings that they chose a direct listing over an IPO

10   because it allowed Roblox employees—including the Individual Defendants—to take advantage

11   of Roblox's unprecedented growth and sell their shares before children returned to school and

12   Roblox implemented enhanced parental controls.

13        88.    Specifically, CW 2 recalled that Roblox's direct listing was celebrated internally

14   because there was no lock-up period and therefore Roblox executives and employees could sell

15   their shares immediately before bookings declined post-COVID lockdowns.  CW 2 recalled that

16   Baszucki and Guthrie told employees during town hall and quarterly meetings starting before

17   Roblox's March 2021 direct listing that its bookings would decline.  CW 2 detailed that Baszucki

18   and Guthrie specifically told employees during this time that Roblox was enjoying a COVID

19   bump but that it would not last after COVID lockdowns lessened and kids returned to school.

20        89.    Similarly, CW 1 explained that Roblox first discussed selling its shares via a direct

21   listing at a town hall meeting in approximately October or November 2020. According to CW 1,

22   Roblox executives, including Baszucki, told employees that it was listing its shares through a

23   direct listing instead of an IPO to allow Roblox employees to sell their shares immediately and

24   that one of the benefits of the direct listing was to avoid the IPO lock-up period that prohibits

25   shareholders from selling their shares for approximately six months.

26        90.    Moreover, according to CW 2, Roblox's March 2021 direct listing felt rushed.  CW

27   2 suggested there were complications that made going public via the traditional IPO route more

28

difficult for Roblox, and that the due diligence process was problematic. CW 2 identified Roblox's lack of GDPR compliance as one of those complications.[9]

91.     CW 2 detailed that Guthrie told employees during internal town hall and quarterly meetings in 2021 that bookings growth would not last past COVID and therefore it was the right place right time to go public. CW 2 further recalled that Guthrie stated in 2021 that the decline in bookings once COVID ended and the under-13 cohort returned to school could happen at any point. CW 2 stated that Baszucki attended these specific town hall and quarterly meetings.

92.     In other words, as part of their scheme, Defendants chose a direct listing over an IPO because it allowed them to go public and sell their shares before schools reopened and before Roblox implemented enhanced parental controls, both of which the Defendants knew would harm the company's bookings, revenue growth, and therefore its stock price.

**F.     Heading into the Direct Listing, Investors Were Singularly Focused on Roblox's Ability to Age Up**

93.     It was no secret that Roblox had historically relied on children under 13 for much of its growth. However, leading up to the direct listing, the market was concerned about the sustainability of a business model that relied overwhelmingly on under-13-year-old children for its revenue. As a result, industry analysts covering the Company focused almost exclusively on Roblox's ability to successfully "age up," and maintain the same rate of bookings growth with an ostensibly older audience.

**1.     Investors Were Concerned About the Sustainability of Relying on Children for Roblox's Bookings**

94.     Leading into the direct listing, investors were concerned about Roblox's historical reliance on children to drive its revenue growth. For example, on November 29, 2020, Bernstein analysts questioned whether Roblox could sustain its rate of growth, stating that the "[k]ey under-13 demographic has low brand loyalty and is particularly sensitive to 'fads'. . . . And the explosive

---

[9] According to Lead Plaintiffs' investigation, the GDPR, or General Data Protection Regulation, is a European Union regulation whose goal is to enhance an individual's control and rights over their personal information.

1   user growth during the pandemic shows that most of their current users are relatively new to the

2   platform. Could Roblox just be another fad that many give up shortly after the pandemic ends?"

3        95.     Similarly, a December 7, 2020 report regarding investor feedback and questions

4   for management, Bernstein analysts wrote that Roblox would have "a very big challenge . . . in

5   getting older kids (especially teenagers) to continue using Roblox as they get older."  They went

6   on to note: "a very common behavior (at least in the US) is that once a tween-age kid gets their

7   own cell phone and Snapchat/Instagram account, they (and all their friends) immediately abandon

8   Roblox. Not only do they stop using it, but they wouldn't be caught dead using it. 'Roblox is for

9   babies.'"

10        96.     Based on this, the report explained that investors wanted to know "[w]hat percent

11   of []DAUs are below the age of 13?  **What percent of spend comes from this cohort**?"[10]

12   Likewise, in a January 28, 2021 analyst report, Bernstein stated the question "how do you

13   overcome" that Roblox is for children was "a super important question" leading into the direct

14   listing.

15        97.     Analysts were also aware that relying on children under 13 made Roblox

16   susceptible to the public's perception that Roblox was dangerous for children, which could harm

17   the Company's bookings if parents stopped letting their under-13 children use the platform.  For

18   example, in a report issued before the direct listing, Bernstein analysts wrote: "Roblox's focus on

19   very young children means it is absolutely critical that it provides (and is perceived as providing)

20   a safe online environment for this vulnerable demographic."

21        98.     Moreover, the market was concerned about the sustainability of relying on under-

22   13-year-old children for Roblox's revenue due to the strict regulations aimed at protecting

23

24

25          [10] DAU is a daily active user.  According to the Company's 2021 Annual Report, a DAU is

26   defined as "a user ser who has logged in and visited Roblox through our website or application

    on a unique registered account on a given calendar day."  The Company uses "DAUs as an

27   indicator of the size of the audience engaged on [its] platform."

28

children online.[11]  Analysts were concerned that after going public, Roblox would be subject to regulatory action or negative press which necessarily would harm the Company's bookings and revenue.  For example, during Bernstein's pre-direct listing investor feedback session, which was published in an analyst report on January 28, 2021, a potential investor asked Bernstein the following question: "[D]oing a Google search for Roblox child predators, we can see some negative headlines, **won't these be amplified post direct listing** and cause parents to rethink allowing their kids on the platform?"  In response, the Bernstein analyst highlighted that "the headline risk here . . . [is] that the parents could start to police or be reticent about letting their kids hang out there. And remember, it's the parent spending the money."

### 2. Investors Were Focused on Roblox's Ability to Drive Bookings with an Older Audience

99.     Moreover, because Roblox generated revenue only from new users who spent money on the platform, investors were also concerned that—even if Roblox could rebrand itself as a platform for older users despite its history as a children's game—older users might not spend as much money on the platform as under-13 users.  For example, in their December 7, 2020 report incorporating investor feedback, Bernstein analysts wrote: "there are already a lot of Roblox users who are above the age of 13 . . . a really important question, we think, is to understand where these older users came from, what attracted them, what are they spending time doing, **how much are they spending**?"  The analyst followed up on January 28, 2021 about Roblox's  ability to age up: "**I'm still stuck on this as maybe the single biggest question that I would need to be comfortable with, <u>if I were considering becoming a shareholder</u>**."

---

[11] Indeed, heightened regulations protecting the privacy of children online also threatened the sustainability of under-13-fueled growth.  For example, the Children's Online Privacy Protection Rule ("COPPA") imposes certain requirements on operators of websites or online services directed to children under 13 years of age.  Among other things, COPPA prevents companies from collecting and tracking personally identifiable information of children under the age of 13 without the consent of their parents. COPPA also requires operators to keep personal information they collect from children secure, including by imposing retention and deletion requirements, and prohibits them from conditioning children's participation in activities on the collection of more personal information than is reasonably necessary to participate in such activities.

100.     Defendants understood that they needed to convince investors that they could attract older users.  As explained in a CNBC article published on February 26, 2021, right before the direct listing, Roblox was "looking to a future of sustained expansion and less reliability on kids, particularly as classrooms and real-world theme parks reopen, Roblox is targeting older users and non-gamers."

101.     Indeed, Defendants told investors that their bookings growth depended on their ability to age up.  According to the Company's Prospectus, people over the age of 13 have "a higher propensity to spend on content, and our ability to increase penetration in, and user contribution from, this demographic will affect our ability to grow revenue."  Thus, investors closely monitored the Company's aging up success to determine if the Company could continue to grow its revenue.

102.     Understanding that the single most important question for investors was whether Roblox could successfully age up the platform and sustain long-term bookings growth, Defendants engaged in a scheme to pump up the price of Roblox stock by falsely touting that the Company had already successfully aged up its platform while they collectively dumped over **$548 million** worth of Roblox stock.

103.     As explained below, from the start of the Class Period, Defendants intentionally misled investors about the Company's bookings growth by falsely stating that the Company had already successfully aged up Roblox's platform while concealing the material fact that the Company's bookings were still overwhelmingly reliant on the under-13 userbase.  As a result, Defendants' statements were false and misleading for failing to disclose the known risk that the Company's bookings and monetization growth would decline once the Company increased its parental controls and children under 13 returned to school.

**G.     Defendants Mislead Investors About Roblox's Efforts to Age Up**

**1.     The March 10, 2021 Prospectus**

104.     From the start of the Class Period, Defendants touted their aging up efforts alongside their strong bookings growth.  For example, on March 10, 2021, the first day of the

1   Class Period, Roblox released metrics from previous quarters showing their astronomical

2   financial growth leading up to the direct listing.  Specifically, the Prospectus highlighted the fact

3   that the strongest growth in DAUs was coming from the over-13 cohort and claimed that this was

4   "[a]n early sign of what is possible: DAUs from our 17 to 24-year-old user age group grew faster

5   than our core under 13 age group in the year ended December 31, 2020."

6      105. In the Prospectus, Defendants included the following metrics touting their

7   astronomical growth:

8        Daily active users, or DAUs, on Roblox grew 47% from 12.0 million
     DAUs in 2018 to 17.6 million in 2019 and grew 85%, to 32.6 million, in
9        2020.

10       Daily paying users on Roblox grew from approximately 125,000 in 2018
     to approximately 184,000 in 2019, and approximately 490,000 in 2020.
11

12       Revenue grew 56% from $325.0 million in 2018 to $508.4 million in 2019
     and grew 82%, to $923.9 million, in 2020.
13

14       Bookings grew 39% from $499.0 million in 2018 to $694.3 million in 2019
     and grew 171%, to approximately $1.9 billion, in 2020.
15

16     106. Defendants touted these numbers while, at the same time, leading the market to

17  believe that they had aged up the platform and attracted older users.  This led investors to believe

18  that the Company was successfully aging up and sustaining the Company's blockbuster growth

19  with an ostensibly older audience.  However, Defendants intentionally concealed from investors

20  that the Company was still overwhelmingly reliant on children under the age of 13 for the majority

21  of its bookings.  This fact was material to investors because they cared about how Roblox was

22  monetizing its older audience in order to drive sustainable revenue through COVID reopening

23  and after the Company implemented enhanced parental controls.

24     107. Indeed, because Roblox is free to use, the Company could grow its DAUs without

25  generating any additional bookings (and therefore revenue).  What was important to investors,

26  therefore, was how the Company was turning that DAU growth into more bookings.  Thus, by

27  touting both DAU growth from an older audience and bookings growth simultaneously—while

28

1    concealing that the bookings were still overwhelmingly reliant on the less-sustainable under-13

2    userbase—Defendants misled investors into believing that aging up was sustaining and driving

3    incremental bookings growth.

4         108.   By failing to disclose that the Company still obtained an overwhelming majority

5    of its bookings from under-13 users, Defendants misled investors about the Company's purported

6    success aging up, and as a result, investors did not understand that the Company's bookings would

7    decline substantially once children returned to school post-COVID and Roblox implemented

8    enhanced parental controls.

9         109.   Knowing that (i) the Company remained overwhelmingly dependent on under-13-

10   year-old users, and that (ii) bookings would decline once that cohort returned to school (to say

11   nothing of the negative revenue impact of augmented parental controls), the Company's

12   Prospectus contained the following risk disclosure:

13        ***We have experienced rapid growth in recent periods, and our recent
         growth rates may not be indicative of our future growth or the growth of
14        our market.***

15        We have experienced rapid growth in the three months ended June 30,
         2020, September 30, 2020, December 31, 2020, and for a portion of the
16        three months ended March 31, 2020, due in part to the COVID-19
         pandemic given our users have been online more as a result of global
17        COVID-19 shelter-in-place policies. For example, our bookings increased
         171% from the year ended December 31, 2019 to the year ended December
18        31, 2020. We do not expect these activity levels to be sustained, and in
         future periods we expect growth rates for our revenue to decline, and we
19        may not experience any growth in bookings or our user base during periods
         where we are comparing against COVID-19 impacted periods (i.e. the three
20        months ended March 31, 2020, June 30, 2020, and September 30, 2020 and
         December 31, 2020). Our historical revenue, bookings and user base
21        growth should not be considered indicative of our future performance.

22

23   (Emphasis in original).

24        110.   However, this risk disclosure was inadequate because it did not address

25   Defendants' misrepresentations.   Specifically, this risk disclosure did not adequately warn

26   investors of the risk that Roblox's growth would decline once children returned to school post-

27

28

COVID **because** Roblox's bookings were still overwhelmingly reliant on children under the age of 13.  Moreover, this risk disclosure did not adequately warn investors that because Roblox's bookings came mostly from under-13 users, the Company's bookings would decline once Roblox implemented enhanced parental controls.[12]   Finally, and most importantly, before the ink had dried on the March 10 Prospectus, both Baszucki and Guthrie made public statements to the market that contradicting the very risk disclosures outlined in the Prospectus.

### 2.    The March 10, 2021 Squawk Box Interview

111.    On March 10, 2021, the same day as the direct listing (and as his personal coffers filled, in real time, with the proceeds of his insider sales), Defendant Baszucki appeared on television, on Squawk Box.  During the interview, CNBC analyst Andrew Ross Sorkin noted that the Company's revenue had "been on fire" during COVID, and asked Baszucki what the Company would look like "a year from now given how unique this past 12–18-month period has been."  Baszucki bragged that the Company would continue on its current growth trajectory "even after Covid."

112.    Andrew Ross Sorkin then asked Baszucki about monetization as the Company scaled up to an older userbase, asking: "What do you think the user growth looks like let's say a year or two out from now, and **let's also talk about monetization over that period** because one of the things that I think you've said in the prospectus itself was that one of the risks is that in a post-pandemic world you are not sure you're going to make as much money."

113.    In response, Baszucki directly contradicted the Company's purported risk disclosure and quelled any concerns about the Company's growth in a post-COVID world by falsely stating that the Company's monetization was expanding in line with the Company's user growth amongst an older audience.  Specifically, Baszucki stated:

> So first off, our users have been growing virally as I said, and what's really
> exciting is that *a lot of the stuff we've seen in Covid . . . [a] lot of that's*

---

[12] Defendants repeated this same risk disclosure in Roblox's quarterly reports filed on May 13, 2021, August 16, 2021, and November 8, 2021. However, these risk disclosures were inadequate for the same reasons.

*going to continue going forward* so we're very optimistic about the growth and on the monetization what's really exciting about Roblox is it's free for most people but people who want to and are interested can use our virtual economy. *That virtual economy has also been scaling with our user and engagement growth and we're very optimistic about it*.

114.    Baszucki's statement was false and misleading because it led investors to believe that the Company was growing the virtual economy—i.e., bookings—in line with user growth—which was from an ostensibly older audience.  But this was false, as the older audience was not sustaining the Company's bookings growth.   Rather, Roblox's bookings were still overwhelmingly reliant on the under-13 audience.  For example, according to CW 2, users under-13-years-old represented 60 to 70% percent of Roblox's users in March 2021.   Moreover, according to CW 5, easily a majority—between 60 and 70%—of Roblox's bookings in September 2021 came from users under 13-years-old.  As a result, Baszucki's statement misled investors by failing to disclose the known risk that the Company's bookings would decline substantially once Roblox implemented parental controls and children under 13 returned to school after COVID lockdowns.

115.    Baszucki's statement was also false and misleading because he **knew** that the monetization growth would not "continue going forward."  Indeed, internally, Defendants stated that bookings would decline once children returned to school post COVID-lockdowns.   For example, according to CW 2, Baszucki and Guthrie told employees during town hall and quarterly meetings starting before the direct listing in March 2021 that its bookings would decline once COVID ended.   CW 2 detailed that leadership specifically told employees that Roblox was enjoying a COVID bump but that it would not last after COVID lockdowns lessened and children returned to school.  CW 2 detailed that Guthrie told employees during internal town hall and quarterly meetings starting before the direct listing in March 2021 that bookings growth would not last past COVID and therefore it was the right place right time to go public.  CW 2 stated that Baszucki attended these town hall and quarterly meetings.

116. Moreover, several CWs confirm that Defendants knew that implementing parental controls—which Defendants were facing increased pressure to do—would also harm the Company's monetization, since its bookings were overwhelmingly reliant on under-13 children. For example, according to CW 3, it was known that implementing parental controls would negatively impact revenue because its userbase was largely under 13-years-old. CW 3 recalled that during her tenure, Roblox employees asked Baszucki during town hall meetings how Roblox was going to address parental controls while simultaneously conserving resources. CW 3 further recalled that Baszucki responded to these concerns by indicating that Roblox was going to address parental concerns as little as possible so that it would not negatively impact revenue. According to CW 3, it was a huge priority for Roblox to attract an older audience throughout her tenure, partially because leadership knew that it had to address parental controls due to external pressures from parents and the news media.

117. Indeed, CW 5 detailed that she and members of the Content Safety team were instructed by current Product Manager Aykud Gönen to be careful when implementing new safety features on the platform so that they would not negatively affect bookings growth and user engagement. CW 5 explained that she and her colleagues were told to roll out new safety features slowly and to "keep an eye on topline metrics." CW 5 recalled that if Roblox noticed that newly rolled out safety features negatively affected its bookings growth, employees were told to pause the roll out, reassess and dive into what is happening. CW 5 explained that spending limits would have negatively impacted Roblox's bookings because it obtained 60 to 70% of its bookings from users under 13-years-old in 2021.

### 3.    The March 11, 2021 Schwab Network Interview

118. On March 11, 2021, the day after the direct listing, and simultaneously to his bank account filling with the proceeds from sales of his newly public Company shares, Defendant Guthrie participated in an interview with Schwab Network. In the interview, Guthrie was asked about the extremely high valuation for the Company. The Schwab Network reporter said: "you

are debuting at a market value of roughly the entire value of Electronic Arts, that has Star Wars franchises and sports franchises, how do you live up to that, Mike?"

119.    In response, Guthrie touted the Company's ability to age up as the main driver of the Company's valuation.  Specifically, Guthrie stated:

> What will keep us growing will be a continued investment in innovation, making the platform better and better so that the content that our developers can build is more interesting and more compelling.  Over the last few years what has really happened on our platform is international growth and aging up.  So what we've seen is . . . we're starting to see the user base get older. **We _now have_ about 44% of our users that are [] over the age of 13**, and some of that is because just better and better and more compelling content.

120.    Defendant Guthrie's statement was false.  According to CW 3, at least 70% of Roblox users in April 2021 were under-13-years-old.  In other words, users over-the-age-of-13 made up at most 30-40% of Roblox's total users at that time.  Therefore, Defendant Guthrie's statement that the Company already had 44% of its users over the age of 13 was false.

121.    Defendant Guthrie's statement—made on day two of Defendants' scheme—was also misleading because it touted the Company's aging up success in response to a direct question about the Company's valuation.  Because investors cared about how aging up would translate into future bookings growth, Defendants statement touting Roblox's purported aging up success—and lying about how many users were already over 13 years old—in response to why Roblox's valuation was so high led investors to believe that the Company's purported success aging up was sustaining the Company's bookings growth, when in reality, the Company's bookings success continued to be driven overwhelmingly by the unsustainable under-13 userbase.

122.    Later during the interview, the Schwab Network reporter asked about the Company's ability to sustain its growth after COVID.  The reported asked:

> Do you think you will be able to keep up the amount of activity happening on the game that's been going on after a period where everybody has been locked inside?  I know you've probably gotten this question a million times, **but for investors thinking about growth and relative growth compared to what you saw over the past year, is that going to be able to be sustainable or should we expect to see something more historically standard?**

123.    However, Defendant Guthrie dodged the question and gave a highly unresponsive answer about how their "enormous growth in the number of users" gave them cash to re-invest in the business.   Defendant Guthrie's answer was highly misleading and indicative of scienter. Indeed, even though Guthrie internally told employees that the Company's growth would decline once COVID ended and children returned to school, *see, e.g.,* ¶ 115, he refused to provide investors a straight response to a question for which he **knew** the answer, despite a clear and direct question about the Company's growth in a post-COVID world.

124.    Based on Defendants' false and misleading statements on March 10 and 11, 2021, investors believed that the Company was successfully aging up and driving future profitability. For example, on April 5, 2021, analysts from Goldman Sachs issued a "buy" rating and noted that "RBLX's faster growth, **which should be driven by aging up** and international expansion, high incremental margins, **and growing profitability**, justifies a premium multiple relative to video game publishers."

**H.    Defendants Immediately Begin Liquidating Their Roblox Holdings on the Day of the Direct Listing**

125.    Armed with material, nonpublic information about the sustainability of Roblox's bookings growth due to its heavy reliance on children, the Individual Defendants unloaded millions of shares of Roblox stock on the very same day of their direct listing.   While Defendants went on a press tour to promote their direct listing and mislead investors about the Company's aging up success, Defendants Baszucki, Donato, and Guthrie unloaded **over $238 million of their stock within two days** of the direct listing.

126.    Specifically, in just two days, the Individual Defendants each sold the following amount of Roblox stock:

- Defendant Baszucki sold 1,300,000 shares, totaling **$83,850,000**;

- Defendant Donato sold 1,143,123 shares, totaling **$77,531,534**; and

- Defendant Guthrie sold 1,200,000 shares, totaling **$77,400,000**.

127.    Notably, none of these sales were made pursuant to a Rule 10b5-1 trading plan (which allows insiders to sell company stock by setting up a predetermined plan that specifies in advance the share price, amount, and transaction date).

128.    But this was only the beginning of Defendants' scheme.  Shortly after the start of the Class Period, the Individual Defendants created a Rule 10b5-1 trading arrangement that allowed them to sell their stock at specific points throughout the rest of 2021.[13]  However, the Individual Defendants entered into this Rule 10b5-1 plan with knowledge of material nonpublic information—namely, that the Company's bookings growth was heavily reliant on under-13 users, and as a result, the Company's bookings would decline substantially once children returned to school and the Company implemented enhanced parental controls.

129.    Given their knowledge of this material nonpublic information, Defendants continued to keep the price of Roblox's stock artificially inflated by misleading investors about the Company's aging up success and bookings growth while selling hundreds of millions of dollars' worth of Roblox stock.  Notably, at no point during the Class Period did the Individual Defendants make a single open market purchase of Roblox stock in return.

130.    As explained below, throughout the Class Period, Defendants made false and misleading statements that the Company was purportedly successfully aging up its platform and, as a result, sustaining its high rate of growth.  Shortly after each of these false and misleading statements, Defendants unloaded **an additional $310.2 million in insider trades**—over $183 million, $47 million, and $78 million for Baszucki, Guthrie, and Donato, respectively—based on their knowledge that their high rate of growth was fueled by under-13 age group, which would soon decelerate as the Company rolled out parental controls in late 2021 and young children returned to school.

---

[13] Defendant Guthrie adopted his Rule 10b5-1 trading plan on March 20, 2021; Defendant Baszucki adopted his plan on March 22, 2021; and Defendant Donato adopted his plan on March 20, 2021.

1    **I.     Defendants Continue Misleading Investors on May 10, 2021**

2        131.   On May 10, 2021, the first time Roblox released earnings results as a public

3    company, Defendants issued a press release, supplemental financial information, and a letter to

4    the Company's shareholders reporting strong financial results for the first quarter of 2021 (the

5    "Q1 2021 Press Release"), including sharp increases in bookings and positive trends in DAUs

6    and hours engaged.  Specifically, the Q1 2021 Press Release touted an apparent increase in DAUs

7    driven, in part, by 111% growth in DAUs over the age of 13.  The Q1 2021 Press Release also

8    touted the Company's bookings and revenue growth.   Specifically, Roblox's press release

9    reporting its 1Q 2021 Financial Results outlined that Roblox's bookings increased 161%

10   compared to pre-Covid levels in Q1 2020.

11       132.   The Q1 2021 Press Release falsely stated: "***In Q1 2021, our demographics***

12   ***continued to expand with users over the age of 13 growing at 111% and now accounting for***

13   ***49% of the user base***."

14       133.   The next morning, before the market opened on May 11, 2021, Defendants held

15   an earnings call to discuss the Company's Q1 2021 earnings.  On the call, Defendant Baszucki

16   stated: "As far as aging up, we continue to be impressed by the quality of the content and the

17   creations that our developers are making.  And more and more of the content is helping drive this

18   exciting trend, ***which we're close to passing, if not passing . . . on having more of our users***

19   ***being 13  over than under 13***."

20       134.   However, these statements were false, as under-13 users still made up an

21   overwhelming majority of Roblox users at that time.  According to CW 2, users under-13-years-

22   old represented 60 to 70% percent of Roblox's users in March 2021.  Similarly, CW 3 stated that

23   at least 70% of Roblox users in April 2021 were under-13-years-old.  The under-13 age group

24   continued to be a majority throughout the rest of 2021.  CW 4 stated that 60 to 70% percent of

25   Roblox's total users in October 2021 were under-13-year-olds. CW 4 knew this information

26   because she reviewed user data, including age demographic data, regularly in 2021.  Similarly,

27   CW 2 explained that under-13 users still represented 60 to 70% of users at the end of 2021.  CW

28

1   2 explained that she knew this information because Baszucki and Guthrie presented the

2   information about bookings-by-age during town hall meetings that CW 2 attended.

3        135.    Moreover, Defendants' statements were also misleading because they led investors

4   to (wrongly) believe that the Company's aging up efforts led to strong bookings and monetization

5   growth, while concealing the known, material fact that this bookings growth was still

6   overwhelmingly fueled by under-13 users at that time.  Because Defendants did not publicly

7   disclose the percentage of bookings generated by under 13-year-olds, their statements touting

8   Roblox's bookings growth at the same times as their statements touting their aging up efforts were

9   misleading because they led investors to believe that the over-13 user base was responsible for

10  the positive bookings and monetization trends experienced in the quarter, when in reality,

11  Roblox's bookings growth was largely still reliant on the unsustainable under-13 userbase.  For

12  example, according to CW 5, between 60 and 70% of Roblox's bookings in September 2021 came

13  from users under 13-years-old.

14       136.    Indeed, Defendants knew that bookings would decline once young children

15  returned to school because their bookings came mostly from under-13 users.  According to CW

16  2, Baszucki and Guthrie told employees during town hall and quarterly meetings starting before

17  the direct listing in March 2021 that the Company's bookings would decline.  Specifically, CW 2

18  detailed that Defendant Guthrie told employees during internal town hall and quarterly meetings

19  in 2021 that bookings growth would not last past COVID.  As a result, Defendants' statements

20  were false and misleading for failing to disclose the known risk that the Company's bookings and

21  monetization growth would decline once the Company increased its parental controls and children

22  under 13 returned to school.

23       137.    Defendants' false and misleading statements on May 11, 2021 successfully

24  convinced analysts that Roblox's aging up "success" would sustain Roblox's blockbuster growth.

25  For example, on May 11, 2021, JP Morgan published an analyst report titled "Strong Out of the

26  Gate; International and 13-Over Lead DAU Growth."  In the report, JP Morgan wrote: "By age,

27  nearly half the platform is now 13-over following faster growth from the cohort. . . . **More notable**

28

**in our view is ABPDAU up 6% m/m in April, which we think indicates that bookings/payer conversion could be stickier than users as the platform moves toward reopening**."

138.    Analysts from Morgan Stanley were similarly convinced that the Company's growth trajectory remained intact despite shifting demographics and COVID reopening and increased their price targets.  Morgan Stanley wrote: "Aging Up Underway… Roblox continues to add more users and engagement even as re-opening continues . . . . **This continued user, engagement and bookings growth should give investors more confidence in the durability of RBLX's forward growth**."

**J.    Defendants Unload Another $54.3 Million Worth of Stock Based on Their Knowledge of Material Nonpublic Information**

139.    Following Defendants' false and misleading statements on May 10 and 11, 2021, Roblox's stock jumped 21% in a single day to close at $77.65 per share at the close of trading on May 11, 2021.  While Roblox's stock remained artificially inflated, the Individual Defendants continued cashing out with knowledge of material nonpublic information that the Company's bookings were still overwhelmingly reliant on under-13 users, and as a result, bookings would decline once children returned to school and Roblox implemented enhanced parental controls.

140.    Over the next two months, while Roblox's stock was trading at all-time highs, the Individual Defendants disposed of another **$54.3 million** worth of Roblox stock.

- On June 1, 2021, Defendant Baszucki sold 375,000 shares for total proceeds of **over $36 million**.

- On June 9, 2021, Defendant Guthrie sold another 50,000 shares for total proceeds over **$4.6 million**.  Then, on July 6, 2021, Defendant Guthrie sold another 45,000 shares for a total of over **$3.9 million**.

- On June 14, 2021, Defendant Donato sold 70,000 shares for total proceeds over **$6.2 million**. Then, on July 14, 2021, Defendant Donato sold another 42,500 shares for a total of over **$3.4 million**.

141.    Although these trades were made pursuant to a Rule 10b5-1 trading plan, Defendants implemented that plan, and executed the June 1, 9, and 14, 2021 and July 6 and 14, 2021 trades, when already in possession of material nonpublic information.

K.   **Defendants Face Increasing Regulatory Pressure to Implement Parental Controls**

142.   On August 10, 2021, Defendants received a letter from Congress, addressed to Defendant Baszucki, regarding Roblox's compliance with child safety laws.   In the letter, Congress noted its concerns that Roblox was among Company's who were at risk of exposing children to "the collection and monetization of children's data, exposure to violent content, [and] online predators" as a result of a "manipulative design."   Moreover, Congress outlined how such manipulative designs enabled children to engage in transactions that were "akin to gambling," writing: "The prevalence of micro-transactions—often encouraged through nudging—have led to high credit card bills for parents. Loot boxes—[bundles of in-app mystery items available for purchase]—go one step further, encouraging purchase before a child knows that the "bundle" contains—akin to gambling."   The letter went on to highlight that "[c]hildren are uniquely vulnerable to manipulation and peer pressure associated with in-game purchases and loot boxes."

143.   Therefore, after a long period of putting off parental controls in an attempt to delay the negative impact on bookings once under-13 users could no longer access explicit content and make excessive, unauthorized purchases, Defendants became increasingly aware that the risks they concealed from investors would soon materialize.   However, rather than truthfully disclose to investors that bookings would soon decline, Defendants continued their scheme to mislead investors about the Company's aging up and monetization of its older users.   Indeed, as explained below, Defendants went a step further and tried to downplay certain monetization metrics—like ABPDAU—to throw investors off the scent and make it appear as if the Company was still successful aging up the platform and sustaining strong bookings growth.

L.   **Defendants Continue Misleading Investors on August 17, 2021**

1.   **Defendants Mislead Investors About Roblox's Purported Aging Up Success**

144.   After receiving the letter from Congress, on August 16, 2021 after the market closed, Roblox issued a press release and supplemental financial information, again reporting strong financial results and positive trends across key operating metrics.

145.    During the earnings call the next morning on August 17, 2021, Defendant Baszucki touted the Company's aging up as a "future growth vector" and falsely stated that over-13 users now made up over 50% of Roblox users.  Specifically, Baszucki stated:

> Jumping to a bit of the vision we shared with all of you over the last six to nine months about the future growth vectors for Roblox. One thing we're really excited about is our 13 and up growth. ***We have passed having the majority of people on our platform be 13 and over as opposed to 13 and under***, which is a huge benchmark for us. And in Q2, we saw 46% 13 and up DAU growth year-on-year, which is a great bellwether for where we're going.

146.    Later, during the question-and-answer portion of the call, an analyst asked the following question about the Company's aging up success: "You guys have made a ton of progress in diversifying your experiences and aging up your user base. I was just wondering if you can talk about a few of the drivers that have led to that, and how that strengthens the durability of the business."

147.    In response, Defendant Baszucki stated: "Aging up is something that we talk about. We're actually in the middle of it, and we've been talking about it for three or four years.  And a lot of the visionary stuff we put in place three or four years ago, is what's been driving this position, ***now over 50% of the people on our platform are over 13***."

148.    However, Baszucki's statements were false.  Several CWs confirm that, at this time and throughout 2021, the majority of Roblox users were still under 13.  For example, according to CW 3 at least 70% of Roblox users in April 2021 were under-13-years-old.  This number remained above 60% through the end of 2021.  According to CW 4, 60 to 70% percent of Roblox's total users in October 2021 were under-13-year-olds. CW 4 knew this information because she reviewed user data, including age demographic data, regularly in 2021.  Similarly, CW 2 stated that users under 13-years-old represented 60 to 70% of Roblox's users at the end of 2021. CW 2 knew this information because Baszucki and Guthrie presented the information about bookings-by-age during town hall meetings that CW 2 attended.

149.    Later during the earnings call, an analyst asked specifically about the difference in monetization between the under 13 and over 13 age groups, since Defendants did not publicly disclose that information.  The analyst asked: "Can we talk about the trends, particularly usage and spending trends between the over 13 and under 13 audience?"

150.    In response, Defendant Guthrie falsely stated that the monetization between the over and under 13 age groups was the same.  Specifically, Guthrie claimed: "Yeah. **They're incredibly similar** is the short answer. If you – pure engagement and **monetization [] whether under 13 or over 13 is actually quite similar**."

151.    However, the monetization between the two groups was **not** similar. At that time, the under-13 age group still accounted for an overwhelming majority of the Company's monetization.  According to CW 5, in September 2021, a significant portion of Roblox's bookings still came from users under-13 years-old. CW 5 detailed that easily a majority—between 60 and 70%—of Roblox's bookings in September 2021 came from users under 13-years-old.  CW 5 knew this because she viewed the metrics on Roblox's analytics platform, which were maintained in Grafana.[14]  CW 5 explained that Roblox's analytics platform was updated daily and contained topline metrics, including bookings-by-age-group and time spent on the platform.   CW 5 confirmed that the Company's analytics platform separated bookings into different age groups.

152.    CWs also confirm that, at this time, the games generating the highest bookings were overwhelmingly those designed for and played by children under 13.  For example, CW 5 stated that Roblox obtained a significant portion of its bookings from a few so-called "whales," almost all of whom were under-13-years-old.  According to CW 3, Roblox generated most of its revenue from a few really big games, including *Adopt Me!*, that were mostly aimed at under-13-year-olds.

153.    Defendants knew that Roblox's monetization came mostly from under 13-year-olds.  According to CW 5, bookings-by-age-group was a big point of interest and was discussed

_____
[14] Grafana is an analytics and interactive visualization platform used internally by Roblox to analyze and visualize data.

during town hall meetings, which were held every two weeks.  CW 5 stated that Baszucki, Guthrie, and Donato attended these town hall meetings, and Baszucki and Guthrie specifically discussed bookings-by-age-group during these meetings.

154.    Although Defendants attributed the Company's financial success, in part, to aging up the platform, numerous CWs confirm that, at this time, aging up was largely a failure.  For example, CW 3 recalled that Roblox was not very successful in aging up its platform by the time of her departure.  CW 3 further recalled that this was a concern brought up by Roblox's Board of Directors because Roblox knew it needed to attract an older audience in order to sustain growth. CW 3 added that Roblox's Board of Directors were aware that its inability to age up its platform was a concern for investors.

155.    Without knowledge of Roblox's reliance on under-13 users, analysts were convinced by Defendants statements that DAU and engagement growth among over-13 users were a strong indication that Roblox was sustaining its growth as it aged up its platform.  For example, on August 17, 2021, analysts from Morgan Stanley believed Defendants' assertions without question, noting with approval that: "RBLX passed an **important milestone in 2Q** as the **majority** of users on the platform are now <u>over 13 years old</u> . . . these more mature users now account for most DAUs and time spent on RBLX. . . .[T]his speaks to RBLX's continued success [in] retaining users over time."  Moreover, Morgan Stanley wrote that Roblox's second quarter metrics and "strong July growth speak to better than expected trends through reopening."

### 2.    Defendants Downplay the Importance of ABPDAU To Throw Investors Off the Scent of Their Scheme to Defraud

156.    Defendants knew that their fraud would soon be revealed because they were facing increasing pressure to implement more rigorous parental controls and young children were about to go back to school, both of which would harm the Company's bookings.  As a result, Roblox's key monetization metric—ABPDAU (which is simply average bookings per user)—might soon reveal that Roblox was not able to sustain its bookings growth through school reopening and enhanced parental controls, which would in turn reveal that the Company had not been successful

in aging up the platform.  But rather than come clean about Roblox's continued reliance on under-13 users, Defendants furthered their scheme by telling investors to ignore the ABPDAU metric in determining the Company's success.  In other words, by shifting focus away from ABPDAU, Defendants tried to obscure how unsuccessful the Company had thus far been in terms of monetizing its older users.

157.  For example, during the August 17, 2021 earnings call, an analyst asked about the Company's monetization given that ABPDAU growth appeared to be slowing.  Specifically, the analyst asked: "Mike, wonder if you could drill down a little bit further on the monetization or the ABPDAU metric that you disclosed.  It seemed to flatten out in 2Q.  Can you discuss some of the puts and takes on that metric?"

158.  In response, Defendant Guthrie tried to downplay the importance of ABPDAU and use other metrics to mislead investors about the Company's success aging up and sustaining its record growth.  Specifically, Guthrie stated:

> My third comment on monetization is simply just be careful when you're comparing ratios.  We do think that we can have very strong bookings and very strong user growth and ABPDAU can go down.  It's just a ratio.  If your users are growing faster than your bookings, that would lead you to understand that in the future you've got some really powerful tailwinds around bookings but the users might just be growing faster right now.

> Similarly, if you look at just July, hours of engagement was really strong, 3.8 billion hours, quite honestly, was a big number.  It was probably more than we expected to come out.  So if I happen to be looking at bookings per hour, I might look at that number as having gone down in July.  And I can tell you, we're very happy with bookings, and we're very happy with hours.  So when you get to the ratio, you just might have a little bit of movement back and forth.  So when comparing ratios, we should just be careful and make sure we deconstruct that in the – growth in the numerator and growth in denominator.

159.  Similarly, during a September 21, 2021 conference hosted by Goldman Sachs, Guthrie again downplayed ABPDAU, stating: "If we have an internal target for bookings and we hit it, and we have an internal target for DAUs and we hit it, and the DAUs happen to grow faster than the bookings, I do not care if ABPDAU goes up or down or sideways . . . ."

1    160.    Guthrie's statements downplaying ABPDAU misled investors about the success

2    of Roblox's ability to age up its platform because it downplayed an important metric that was

3    previously touted as critical to determining how Roblox was monetizing its users.

4    161.    Up to that point, investors viewed ABPDAU as a proxy for how the Company was

5    monetizing its users.  Indeed, Defendants themselves previously described this metric as "a way

6    to understand how we are monetizing across all of our users."  This is because ABPDAU is simply

7    the average bookings per user.  Therefore, the higher the ABPDAU, the more money each user

8    was spending on Roblox.

9    162.    However, Defendants understood that if they continued highlighting ABPDAU,

10   they risked exposing their fraud.  Specifically, their entire scheme might soon come crashing

11   down if investors understood that Roblox's growth from a purportedly older userbase was not

12   sustaining the Company's revenue growth.

13   163.    Indeed, Defendants knew the Company's bookings would decline or flatten once

14   children returned to school and parents started using Roblox's enhanced parental controls to limit

15   their children's spending.  At the same time, Defendants knew that the purportedly older audience

16   was not spending the same amount of money on the platform as the under-13 audience, i.e., the

17   older userbase was not sustaining the Company's revenue.  As a result, Defendants knew that the

18   ABPDAU would decline when that occurred, which would expose that the true revenue source

19   for the Company had always been the under-13 users, and not the older users that Defendants had

20   touted throughout the Class Period.

21   164.    Indeed, according to former Roblox employees, Defendants moved away from

22   touting their topline metrics because they wanted to try to continue misleading investors about the

23   Company's growth.  For example, according to CW 5, Defendant Guthrie spoke in a town hall

24   meeting in either December 2021 or January 2022.  CW 5 detailed that Guthrie presented metrics,

25   which she described as convoluted and confusing, during this meeting to show that Roblox was

26   doing better and still growing.  According to CW 5, Roblox decided to move away from the

27

28

topline metrics that most companies use, like bookings, and switched to new topline metrics, but no longer included bookings, in order to show that Roblox was growing.

165.     Based on Defendants' false and misleading statements, as well as their insistence that investors should focus on other metrics, investors believed that Roblox would continue its growth post-COVID based on Roblox's purported success aging up the platform.  For example, on October 26, 2021, BTIG issued a "Buy rating" on Roblox's stock because they were "bullish on long-term DAU and developer growth . . . encouraged by recent trends vs. difficult COVID comps."  The analyst report went on to state that they believe "**DAU will be a key driver of bookings performance**, and we've been pleasantly surprised by recent performance against difficult COVID comps."

**M.     Defendants Continue Offloading Their Stock Based on Their Knowledge of Material Nonpublic Information**

166.     Defendants continued offloading their Roblox stock directly after lying to investors about how many users were over the age of 13 and misleading investors about how successful the Company was in monetizing those older users.

167.     Specifically, between August 19 and September 14, the Individual Defendants offloaded an additional **$55.5 million** of their Roblox stock.  Critically, at that time, the Individual Defendants knew that Roblox's bookings would soon decline once children returned to school and the Company implemented enhanced parental controls (which would happen soon given the increasing public and regulatory pressure, including from Congress).

168.     Specifically, shortly after lying to investors about how many users were over the age of 13, and shortly after receiving the letter from Congress, the Individual Defendants made the following insider sales:

- Between August 19 and August 24, 2021, Defendant Donato sold 110,776 shares of Roblox stock, reaping over **$9.2 million in proceeds**.

- On August 23, 2021 and August 25, 2021, Defendant Guthrie sold 65,515 shares for more than **$5.8 million**.

- Next, on August 30, 2021, Defendant Baszucki sold an additional 375,000 shares, reaping more than **$30.6 million in proceeds**.

- Between September 8-10, 2021, Defendant Guthrie sold another 46,800 shares totaling over **$3.89 million**.

- Finally, on September 14, 2021, Defendant Donato sold 70,000 shares, totaling more than **$5.85 million**.

169.    Accordingly, Defendants continued to profit off of the high rate of growth fueled by under-13 users before the impacts of parental controls and post-pandemic return-to-school began affecting bookings and revenue.

**N.    Defendants Slowly Implement Enhanced Parental Controls in the Fall of 2021**

170.    Only after Defendants had already pulled in millions from their insider sales, did Roblox finally start rolling out enhanced parental controls and spending restrictions, wherein parents were able to set internal spending limits on purchases for children under the age of 13.

171.    Specifically, on or around September 18, 2021, shortly after under-13 users began returning to school after COVID lockdowns were lifted, Roblox introduced Monthly Spend Restrictions and Spend Notifications settings for parents.  According to Roblox's website, this setting enabled parents to block spending over and above a certain amount on a per-month basis. Roblox's website explains: "When the user reaches the monthly spend restrictions, they will see a popup message and will not be able to continue making purchases that month."  With respect to Spend Notifications, Roblox's website explains: "Spend Notification settings give parents/guardians increased control and visibility over their children's spending on a Roblox account by sending emails to the verified parent/guardian email address on an under 13 user's account . . . . It allows parents/guardians to customize the spend notification frequency in a secure way."

172.    Next, on or around September 21, 2021, Roblox introduced age verification as an opt-in service.  The change was rolled out gradually, meaning not all users had the option

1    immediately.  With age verification, Roblox users could only unlock new features—like voice

2    chat—if they proved they were 13 or older by uploading a picture of their ID along with a selfie.

3         173.   Shortly thereafter, on or around October 8, 2021, Roblox updated its terms of

4    service to prohibit dating and romantic content on its platform.  Then, on or around November

5    18, 2021, Roblox "officially added Parental controls" allowing parents to "restrict what content

6    is appropriate for their child."

7    **O.    Defendants Continue Misleading Investors in November 2021**

8         174.   On November 8, Roblox issued a press release, supplemental financial

9    information, and a letter to its shareholders, again reporting strong financial results and growth

10   across nearly all the Company's operating metrics.  In the press release, Roblox reported Q3 2021

11   bookings of $637.8 million and Q3 2021 revenue of $509.3 million.  Both figures exceeded

12   analysts' expectations.   In the press release, Defendant Baszucki again represented that

13   engagement, rather than ABPDAU, was the most important metric to track the Company's long-

14   term growth trajectory, and downplayed the impact that COVID reopening was having on the

15   Company's business: "Engagement is our north star . . . people of all ages from across the globe

16   chose to spend over 11 billion hours on Roblox."  Defendant Guthrie added that "all of our core

17   metrics . . . displayed strong year-over-year growth despite lapping COVID-impacted periods and

18   back-to-school seasonality."

19        175.   Rather than warn investors that a bookings deceleration was imminent due to the

20   enhanced parental controls and children returning to school in the fourth quarter of 2021 (which

21   includes the months of October, November, and December, when children were fully back to

22   school), Defendants continued misleading investors about their purported success aging up and

23   monetization.

24        176.   For example, during the related earnings call on November 9, 2021, Baszucki

25   again falsely told investors that "*[o]ver half of our people are over 13-year-old plus*."  Later

26   during the call, Defendant Guthrie attributed the Company's revenue and bookings growth, as

27

28

well as the uptick in core metrics, to aging up the platform, stating: "Right now, again, we generally are looking at **bookings growth as driven primarily by user and engagement growth**."

177.    However, these statements were false and misleading because they led investors to (wrongly) believe that the Company's aging up efforts led to strong bookings and monetization growth, while concealing the known, material fact that this growth was still overwhelmingly fueled by under-13 users at that time, which would soon end.  According to CW 5, in September 2021, a significant portion of Roblox's bookings still came from users under 13-years-old.  CW 5 detailed that easily a majority—between 60 and 70%—of Roblox's bookings in September 2021 came from users under 13-years-old. As a result, Defendants' statements were false and misleading for failing to disclose the known risk that the Company's bookings and monetization growth would decline now that the Company increased its parental controls and children under 13 returned to school.

178.    Indeed, analysts were convinced by Defendants' false statements that the Company was successfully aging up its platform and driving monetization through schools reopening.  For example, on November 9, 2021, JP Morgan Research wrote in an analyst report: "The key takeaway in our view is that **Roblox appears to be maintaining its y/y momentum** (comps in Q4'20 are +172%), **bucking expectations for an eventual post-COVID normalization in spend** . . . and we think this differentiation is driving the shares higher after-hours**.**"

179.    Similarly, on the same day, Jefferies Research stated in an analyst report: "We were pleased to see monetization come in better than expected, putting an end to 4 months of declining spend per hour of engagement. **We believe this is helping to calm investor concerns about school re-opening**."

180.    Later, on November 17, 2021, analysts from Morgan Stanley raised their price targets, noting they were "particularly encouraged by the October trends (bookings/DAUs/hours . . .) **as we think they speak to RBLX's better than appreciated growth runway/ability to continue growing its user base, engagement, and monetization even through reopening**."

**P.**   **Defendants Unload Another $169 Million Worth of Stock Knowing Their Fraud Would Soon be Revealed**

181.   Based on Defendants' false and misleading statements on November 9, 2021 (before the market opened), the Company's stock price increased by more than 35% in a single day to close at $109.52 per share on November 9, 2021, an all-time high for Roblox's stock price. Then, as the market continued to digest Defendants' false and misleading statements—believing that the Company had successful aged up its userbase—the Company's stock price continued increasing to close at another all-time high on $134.72 on November 19, 2021.

182.   However, investors did not know that Roblox still heavily relied on children under 13 to drive its monetization, and as a result, these investors did not understand the risk that Roblox's bookings and monetization were declining in the fourth quarter of 2021 as Roblox implemented enhanced parental controls and the full effect of schools reopening took effect at the end of 2021.

183.   Defendants, however, fully understood that Roblox's bookings and monetization would decline by the time they released their earnings for the fourth quarter of 2021 in February 2022.  Shortly after their false and misleading statements on November 9, 2021, the Individual Defendants disposed of a combined 1,432,980 shares of Roblox stock, **reaping roughly $169 million** in less than two weeks between November 11 and November 23.  Specifically:

- Between November 11 and 12, 2021, Defendant Donato sold 360,000 shares, totaling **more than $35 million in proceeds**.

- On November 22, 2021, Defendant Baszucki sold an additional 937,500 shares of Roblox stock, generating **more than $117 million in proceeds in a single day**.

- On November 22, 2021, Defendant Donato sold an additional 4,300 shares for **more than $533,000**.  These sales were made outside of the parameters of Donato's Rule 10b5-1 trading plan. Then, on November 23, 2021, Donato sold another 2,553 shares for **$303,858.**

- Between November 22 and 23, 2021, Defendant Guthrie sold another 128,627 shares, reaping over **$16.1 million in proceeds**.  Although most of these sales were made pursuant to the Rule10b5-1 plan, Guthrie sold 3,216 shares outside of the parameters of the plan.

184.    The Individual Defendants unloaded such significant amounts of their stock before December because they knew their fraudulent scheme would begin to unravel when they disclosed November metrics.  Indeed, Defendants closely monitored the Company's key metrics, such as bookings, and thus knew that the Company's key profitability metrics in November had declined due to lower usage from the under-13 users.  Moreover, they sold before they would have to disclose full fourth quarter results on February 15, 2022, which would reveal the full effect that children returning to school and parents using enhanced parental controls had on the Company's bookings and monetization growth.

185.    As explained below, investors were left holding the bag when the truth regarding Roblox's aging up success and monetization growth was gradually revealed between December 15, 2022 and February 15, 2022.

**Q.    The Truth That Roblox Is Unable to Sustain Its High Growth is Gradually Revealed**

**1.    Defendants Disclose Declining Monetization Metrics from November 2021**

186.    On December 15, 2021, before the market opened, the truth about the Company's aging up success and Defendants' overwhelming reliance on children under 13 to sustain the Company's bookings growth began to be revealed. Before the market opened that day, Defendants disclosed certain metrics from November 2021, revealing that the Company's ABPDAU, a key profitability metric, had declined 8-9% year-over-year.

187.    In response to this news, Roblox's stock fell by $9.72 per share, or approximately 9.5%, to close at $97.95 per share on December 15, 2021.

188.    The market was shocked by the news of declining monetization and started questioning Roblox's monetization growth.  For example, on December 18, 2021, TheStreet[15] published an article stating, "average bookings (a non-GAAP measure of revenue) per user declined between 8% and 9% . . . [which] shows a negative trend taking shape."  However, the

---

[15] TheStreet is a financial news website that provides both free content and subscription services.

1    market did not fully understand the risk that the Company's bookings and monetization would

2    continue declining as young children returned to their pre-pandemic lives at the end of 2021.

3    Indeed, TheStreet explained, "[w]ith all that being said, I would wait to see how this pandemic

4    boom-bust cycle plays out before I would be concerned."

5        189.    As a result, the Company's stock price remained artificially inflated, even after

6    this news, as Defendants had yet to disclose Roblox's full results for the fourth quarter of 2021,

7    when children returned to school and parents began using Roblox's enhanced parental controls to

8    closely monitor their children's usage and spending on the Roblox platform.

9        190.    Before the full fraud was revealed, therefore, Defendants engaged in one last round

10   of insider trading before their fraud would be revealed when the Company disclosed fourth quarter

11   2021 metrics on February 15, 2022.  In December 2021, Defendant Donato sold another 85,000

12   shares for proceeds over **$9.1 million**, and Defendant Guthrie sold another 60,000 shares for

13   proceeds over **$6.6 million**.  Later, in January 2022, Defendant Donato sold 42,500 shares for a

14   total of roughly **$3.4 million**, and Defendant Guthrie sold 45,100 shares for a total of **$3.7 million**.

### 2.    Defendants Disclose Even Worse Monetization Metrics for the Full Fourth Quarter 2021

17       191.    After the market closed on February 15, 2022, Defendants could no longer hide,

18   obfuscate, and distort the full truth about Roblox's aging up success or the Company's

19   unsustainable bookings and revenue growth.  As young children returned to school in the fourth

20   quarter of 2021 (i.e., October through December) and parents started using Roblox's enhanced

21   parental controls to closely monitor their children's usage and spending on the Roblox platform,

22   Roblox's key profitability metrics—bookings and ABPDAU—declined substantially.  This new

23   information revealed that the Company was not successful aging up, and that the Company's

24   bookings were still overwhelmingly reliant on children under the age of 13.

25       192.    On that day, Roblox issued a press release and supplemental financials disclosing

26   poor Q4 2021 results and January 2022 key metrics.  Specifically, Roblox announced that

27   bookings growth had decelerated to 20%, well below analysts' consensus target.  While DAUs

were up both year-over-year and sequentially compared to the previous quarter—driven by a 49% increase in users 13 and older—ABPDAU was down 10% year-over-year and roughly 13% compared to the previous quarter.  Key metrics for January 2022 were far worse: while DAUs were up 32% year over year, bookings were only up 2-3% and, most notably, ABPDAU was down a whopping 22-23%, a far cry from the 8-9% decline disclosed on December 15, 2021.

193.    Also on February 15, 2022 after the market closed, Defendants filed a shareholder letter with "a few guidelines" on their financial results.  The shareholder letter explained that "Bookings . . . is where year over year comparisons are currently toughest," despite the fact that Roblox had experienced "[u]ser and engagement growth" during that same period, which was "driven primarily by international expansion and growth in users aged 13 and older."  In other words, although Roblox claimed it was "aging up" and growing its over 13-year-old userbase, the Company was nonetheless experiencing lower bookings and monetization.

194.    Indeed, during the related earnings call before the market opened on February 16, 2022, Defendants finally admitted that the Company had experienced lower growth in the under-13 age group, revealing for the first time the full extent of Roblox's continued reliance on this group to drive its bookings and monetization growth.  For example, Guthrie noted the major drop off in the Company's core under-13 cohort, explaining ". . . the slower growth would be core markets, U.S., the core age demographic in the U.S., under 13."

195.    In response, on February 16, 2022, Roblox's stock price dropped dramatically in a single day, falling by more than $19.40 per share, or approximately **26%**, to close at $53.87 per share.

196.    Analysts were shocked by this news and immediately lowered their price targets due to the sharp deceleration in bookings growth and negative monetization trends. Investors finally understood that Roblox's bookings and monetization had been reliant on the under-13 age group and, as a result, Roblox's "aging up" had not been as successful as Defendants previously stated and was just a scheme by Defendants to reap over a half billion dollars in insider sales before the truth was finally disclosed.

197.    Indeed, on February 17, 2022, Jefferies called out Defendants for their previous misleading statements touting the Company's aging up and monetization growth.  Specifically, Jefferies argued that because "January produced the most bifurcated results yet since going public: strong DAU growth . . . [but] the weakest net bookings growth" the Company **needed "new metrics [] to measure the impact that . . . aging up will have on monetization**." Jefferies urged Roblox to "**mov[e] past buzzword and headline metrics**" to establish metrics that truthfully and accurately conveyed to investors whether the Company was successfully aging up and monetizing its older users.

198.    Similarly, analysts from Benchmark were shocked by the news, as they finally understood that the Company's aging up campaign was not successful, and the Company had been misleading investors about their bookings growth.  Specifically, on February 16, 2022, Benchmark stated that "RBLX reported an anemic growth rate in January bookings, which if persists would calculate a +$100M miss versus F1Q22 consensus view on bookings growth."  In another analyst report from the same day, Benchmark stated they now believed that "outlier growth results were likely fueled primarily from a global pandemic and are now normalizing" and due to disclosure of declining monetization, Benchmark started to become "concerned [with] management's desire to drive growth through older demographic."

199.    Benchmark went on to note that children had stopped using Roblox at the same rate as before because of all the negative publicity surrounding the safety of its platform for children.  Specifically, Benchmark stated that it appeared that "a user abuse narrative [] has begun to materialize and could begin to erode parental confidence in the platform, which could further discourage parents from supporting their child's play experience on RBLX."

200.    Despite their shock over the Company's results, Benchmark called out Defendants' insider knowledge, noting they "suspect the deacceleration in growth was likely **not a surprise to management**" because of "**meaningful insider sales with the estimated value of stock sales in FY21 including CEO-$235M, CFO-$122M, and CBO-$157M**."

## V.   FALSE AND MISLEADING STATEMENTS AND OMISSIONS

201.   Lead Plaintiffs allege that Defendants' statements highlighted in bold and italics within this section were knowingly and materially false and misleading and/or omitted to disclose material information of which Defendants were aware or were reckless in not knowing.   As alleged herein, such statements inflated and maintained the price of Roblox's publicly traded common stock and operated as a fraud or deceit on all persons and entities that purchased common stock during the Class Period.

202.   Throughout the Class Period, Defendants made a series of misrepresentations concerning the Company's purported success aging up and attracting older users, while simultaneously omitting material facts that the Company's bookings were still overwhelmingly reliant on children under the age of 13.   As a result, Defendants statements touting their bookings growth and aging up success were false and misleading for failing to disclose the known risk that the Company's bookings and monetization growth would decline once the Company increased its parental controls and children under 13 returned to school.

### A.   March 10, 2021 – Defendant Baszucki's Squawk Box Appearance

203.   The Class Period starts on March 10, 2021, the day Roblox went public via a direct listing.   On that day, Defendants engaged in a flurry of interviews to promote Roblox and artificially inflate the price of Roblox stock.

204.   For example, on March 10, 2021, Defendant Baszucki appeared on television, on Squawk Box, to discuss Roblox's direct listing.   During the interview, CNBC analyst Andrew Ross Sorkin noted that the Company's revenue had "been on fire," during Covid and asked Baszucki what the Company would look like "a year from now given how unique this past 12-18 month period has been."

205.   In response, Baszucki bragged that the Company would continue on its current growth trajectory "even after Covid." Specifically, Baszucki responded:

> We hope Covid ends as soon as possible we want to get back to normal. Roblox has been growing for 15 years driven by our community driven by the awesome content driven by our creators and driven by the ability for

people to do things together.  ***That's a long-term growth path and we believe that continues forward even after Covid***.

206.   The CNBC analyst then asked Baszucki about monetization as the Company scaled up to an older userbase, asking: "What do you think the user growth looks like let's say a year or two out from now, and let's also talk about monetization over that period because one of the things that I think you've said in the prospectus itself was that one of the risks is that in a post-pandemic world you are not sure you're going to make as much money."

207.   In response, Baszucki claimed the Company's monetization growth would continue after COVID and that this monetization growth was in line with the Company's user growth (which was purportedly getting older).  Specifically, Baszucki responded:

> Users have been growing virally as I said and what's really exciting is ***a lot of the stuff we've seen in Covid . . . [a] lot of that's going to continue going forward so we're very optimistic about the growth and on the monetization***. What's really exciting about Roblox is it's free for most people but people who want to and who are interested can use our virtual economy. ***That virtual economy* [i.e., monetization] *has also been scaling with our user and engagement growth and we're very optimistic about it***.

208.   However, Baszucki's statements in ¶¶ 205 and 207 was false and misleading because he knew that the monetization growth would not "continue going forward."  Indeed, internally, Defendants admitted that bookings would decline once children returned to school post COVID-lockdowns.  For example, according to CW 2, Baszucki and Guthrie told employees during town hall and quarterly meetings starting before the direct listing in March 2021 that its bookings would decline.  CW 2 detailed that leadership specifically told employees that Roblox was enjoying a COVID bump but that it would not last after COVID lockdowns lessened and children returned to school.  CW 2 detailed that Defendant Guthrie told employees during internal town hall and quarterly meetings in 2021 that bookings growth would not last past COVID and therefore it was the right place right time to go public. CW 2 stated that CEO Dave Baszucki attended these town hall and quarterly meetings.

209.    Moreover, Baszucki's statement in ¶ 207 was false and misleading because the Company's virtual economy—i.e., monetization—was not growing with Roblox's user growth. Specifically, while the Company's **user growth** was led by over-13 users, its **monetization growth** was still overwhelmingly reliant on the under-13 audience.  For example, according to CW 5, easily a majority—between 60 and 70%—of Roblox's bookings in September 2021 still came from users under 13-years-old.  Therefore, Baszucki's statement was false and misleading for the additional reason that it touted the Company's monetization growth without disclosing the material fact that the Company's monetization was still overwhelmingly reliant on the unsustainable under-13 userbase and, as a result, the Company's bookings would decline substantially once Roblox implemented parental controls and children under 13 returned to school after COVID lockdowns.

**B.     March 11, 2021 – Schwab Network Interview**

210.    On March 11, 2021, Defendant Guthrie participated in an interview with Schwab Network to discuss Roblox's direct listing.  In the interview, the Schwab Network reporter expressed some skepticism, asking Guthrie about the Company's extremely high valuation: "you are debuting at a market value of roughly the entire value of Electronic Arts, that has Star Wars franchises and sports franchises, how do you live up to that, Mike?"

211.    In response, Guthrie touted the Company's purported success aging up as the main driver of the Company's valuation.  Specifically, Guthrie stated:

> What will keep us growing will be a continued investment in innovation, making the platform better and better so that the content that our developers can build is more interesting and more compelling.  Over the last few years what has really happened on our platform is international growth and aging up.  So what we've seen is . . . we're starting to see the user base get older. ***We now have about 44% of our users that are [] over the age of 13***, and some of that is because just better and better and more compelling content.

212.    Defendant Guthrie's statement was false and misleading.  According to CW 2, users under-13-years-old represented 60 to 70% percent of Roblox's users in March 2021. Similarly, according to CW 3, at least 70% of Roblox users in April 2021 were under-13-years-

old.  In other words, users over-the-age-of-13 made up only 30-40% of Roblox's total users at that time.  Therefore, Defendant Guthrie's statement that the Company already had 44% of its users over the age of 13 was false because the number was, at best, only 30-40% of users.

### C.    May 10 and 11, 2021 – Q1 2021 Press Release and Earnings Call

213.    On May 10, 2021, Roblox issued a press release, supplemental financial information, and a letter to its shareholders reporting strong financial results for the first quarter of 2021 (the "Q1 2021 Press Release"), including sharp increases in bookings and revenue, and positive trends in DAUs and hours engaged.  The Q1 2021 Press Release falsely stated: "***In Q1 2021, our demographics continued to expand with users over the age of 13 growing at 111% and now accounting for 49% of the user base***."

214.    The next morning, on May 11, 2021, Defendants held an earnings call before the market opened to discuss the Company's Q1 2021 earnings.  On the call, Defendant Baszucki also falsely touted the Company's aging up success.  Specifically, Baszucki stated: "As far as aging up, we continue to be impressed by the quality of the content and the creations that our developers are making.  And more and more of the content is helping drive this exciting trend, ***which we're close to passing, if not passing . . .  having more of our users being 13 over than under 13***."

215.    However, the statements in ¶¶ 213-14 were false because under-13 users still made up well over 51% of Roblox users at that time.  According to CW 3, at least 70% of Roblox users in April 2021 were under-13-years-old.  Indeed, these under-13 users remained the heavy majority of Roblox's users through the end of 2021.  According to CW 2, users under-13-years-old represented 60 to 70% percent of Roblox's users at the end of 2021.  CW 2 knew this information because Baszucki and Guthrie presented the information about bookings-by-age during town hall meetings that CW 2 attended.

216.    Moreover, the statements set forth in ¶¶ 213-14 were also misleading because they led investors to (wrongly) believe that the Company's aging up efforts led to strong bookings and monetization growth, while concealing the known, material fact that this bookings growth was

still overwhelmingly fueled by under-13 users at that time.  Because Defendants did not publicly disclose the percentage of bookings generated by under 13-year-olds, their statements simultaneously touting Roblox's bookings growth and aging up efforts were misleading because they led investors to believe that the over-13 userbase was responsible for the positive bookings and monetization trends experienced in the quarter, when in reality, Roblox's bookings growth was largely still reliant on the unsustainable under-13 userbase.  For example, according to CW 5, between 60 and 70% of Roblox's bookings in September 2021 came from users under 13-years-old.  As a result, the statements were false and misleading for failing to disclose the known risk that the Company's bookings and monetization growth would decline once the Company increased its parental controls and children under 13 returned to school.

217.    Indeed, Defendants themselves knew that bookings would decline once children returned to school.  According to CW 2, Baszucki and Guthrie told employees during town hall and quarterly meetings starting before the direct listing in March 2021 that the Company's bookings would decline.  Specifically, CW 2 detailed that Defendant Guthrie told employees during internal town hall and quarterly meetings in 2021 that bookings growth would not last past COVID.

218.    Based on Defendants' false and misleading statements, analysts were convinced that increasing engagement among older users would sustain Roblox's blockbuster growth.  For example, in an analyst report titled "Strong Out of the Gate; International and 13-Over Lead DAU Growth," a J.P. Morgan analyst wrote: "Growth in users was led [in part] . . . [b]y age, nearly half the platform is now 13-over following faster growth from the cohort. . . . **More notable in our view is ABPDAU up 6% m/m in April, which we think indicates that bookings/payer conversion could be stickier than users as the platform moves toward reopening**."

219.    Analysts from Morgan Stanley were similarly convinced that the Company's growth trajectory remained intact despite shifting demographics and Covid reopening, and increased their price targets, writing: "Aging Up Underway… Roblox continues to add more users and engagement even as re-opening continues . . . . **This continued user, engagement and**

bookings growth should give investors more confidence in the durability of RBLX's forward growth."

    **D.**    **August 16 and 17, 2021 – Q2 2021 Press Release and Earnings Call**

    220.    On August 16, 2021, after the NYSE closing bell, Roblox issued a press release that included its Q2 2021 financial results.  In the press release, Roblox reported Q2 2021 bookings of $665.5 million and Q2 2021 revenue of $454.1 million.  Both figures showed double-digit year-over-year growth.

    221.    The related earnings call was held before the market opened on August 17, 2021. During the call, Defendant Baszucki characterized 13-and-over users as one of the Company's major "growth vectors," stated that users over the age of 13 now made up the majority of Roblox's users, and framed DAUs as the metric upon which investors should evaluate the Company's growth:

> One thing we're really excited about is our 13 year and up growth. ***We have passed having the majority of people on our platform be 13 and over as opposed to 13 and under***, which is a huge benchmark for us. And in Q2, we saw 46% 13 and up DAU growth year-on-year, which is a great bellwether for where we're going.

    222.    Defendant Baszucki's statement was false because the large majority of users were still under 13.  Several CWs confirm that, at this time, the majority of Roblox users were still under 13.  For example, according to CW 2, users under-13-years-old represented 60 to 70% percent of Roblox's users in March 2021.  Similarly, CW 3 stated at least 70% of Roblox users in April 2021 were under-13-years-old.  This number remained above 60% through the end of 2021. According to CW 4, 60 to 70% percent of Roblox's total users in October 2021 were under-13-year-olds.  CW 4 knew this information because she reviewed user data, including age demographic data, regularly in 2021.  Similarly, CW 2 stated that users under 13-years-old represented 60 to 70% of Roblox's users at the end of 2021. CW 2 knew this information because Baszucki and Guthrie presented the information about bookings-by-age during town hall meetings that CW 2 attended.

223. Later during the August 17, 2021 call, an analyst asked specifically about the difference in monetization between the under 13 and over 13 age groups, since Defendants did not publicly disclose that information. The analyst asked: "Can we talk about the trends, particularly usage and spending trends between the over 13 and under 13 audience?"

224. In response, Defendant Guthrie falsely stated that the monetization between the over and under 13 age groups was the same. Specifically, Guthrie claimed: "Yeah. **They're incredibly similar** is the short answer. If you – pure engagement and **monetization [] whether under 13 or over 13 is actually quite similar**."

225. Defendant Guthrie's statement was materially false and misleading because the monetization between the two groups was **not** similar. At that time, the under-13 age group still accounted for an overwhelmingly majority of the Company's monetization. According to CW 5, in September 2021, a significant portion of Roblox's bookings still came from users under-13 years-old. CW 5 detailed that easily a majority—between 60 and 70%—of Roblox's bookings in September 2021 came from users under 13-years-old. CW 5 knew this because she viewed the metrics on Roblox's analytics platform, which were maintained in Grafana. CW 5 explained that Roblox's analytics platform was updated daily and contained topline metrics, including bookings-by-age-group and time spent on the platform. CW 5 confirmed that the Company's analytics platform separated bookings into different age groups.

226. CWs also confirm that, at this time, the games generating the highest bookings were overwhelmingly those designed for and played by children under 13. For example, CW 5 stated that Roblox obtained a significant portion of its bookings from a few so-called "whales," almost all of whom were under-13-years-old. According to CW 3, Roblox generated most of its revenue from a few really big games, including *Adopt Me!*, that were mostly aimed at under-13-year-olds.

227. Moreover, Defendants knew that Roblox's monetization came mostly from under 13-year-olds. According to CW 5, bookings-by-age-group was a big point of interest and was discussed during town hall meetings, which were held every two weeks. CW 5 stated that

Baszucki, Guthrie, and Donato attended these town hall meetings, and Baszucki and Guthrie specifically discussed bookings-by-age-group during these meetings.

228.    Based on Defendants' false and misleading statements, analysts believed that increases in older users was a strong indication that Roblox was sustaining its growth through COVID reopening.  For example, on August 17, 2021, analysts from Morgan Stanley raised their price targets, noting with respect to aging up: "RBLX passed an important milestone in 2Q as the majority of users on the platform are now over 13 years old . . . **these more mature users now account for most DAUs and time spent on RBLX. . . .[T]his speaks to RBLX's continued success [in] retaining users over time**."

229.    Similarly, BTIG initiated coverage on Roblox on October 26, 2021, and issued a "Buy rating" on the stock based on "**Encouraging Post-COVID User Growth**."  Specifically, BTIG was "bullish on long-term DAU and developer growth" and believed "**DAU will be a key driver of bookings performance, and we've been pleasantly surprised by recent performance against difficult COVID comps**."

**E.    November 8 and 9, 2021 – Q3 2021 Press Release and Earnings Call**

230.    On November 8, 2021, Roblox issued a press release that included its Q3 2021 financial results.  In the press release, Roblox reported Q3 2021 bookings of $637.8 million and Q1 2021 revenue of $509.3 million.  Both figures exceeded analysts' expectations.  In the press release, Defendant Baszucki again represented that engagement, rather than ABPDAU, was the most important metric to track the Company's long-term growth trajectory, and downplayed the impact that COVID reopening was having on the Company's business: "Engagement is our north star . . . people of all ages from across the globe chose to spend over 11 billion hours on Roblox."  Defendant Guthrie added that "all of our core metrics . . . displayed strong year-over-year growth despite lapping COVID-impacted periods and back-to-school seasonality."

231.    The related earnings call was held on November 9, 2021.  On the call, Defendant Baszucki discussed how Roblox was protecting younger users from inappropriate content while

becoming mainstream for older audiences, and continued to claim that users 13 and over made up a majority of Roblox's base.  He stated:

> We're already doing this, and I see the metrics every week.  They are already really good, and they keep getting better and better.  It's really the top priority on the platform.  I feel we're in a really good position and that we're starting from a difficult place, which is creating a civil society for people of all ages. . . .  We're already doing it.  We already have a lot of older people on the platform.  **Over half of our people are over 13-year-old plus**.

232.    Defendant Baszucki's statement was false because the majority of people on Roblox's platform at that time were still under 13 years old.  For example, according to CW 3 at least 70% of Roblox users in April 2021 were under-13-years-old. This number remained above 60% throughout 2021.  According to CW 4, 60 to 70% percent of Roblox's total users in October 2021 were under-13-year-olds.  CW 4 knew this information because she reviewed user data, including age demographic data, regularly in 2021.  Similarly, CW 2 stated that users under 13-years-old represented 60 to 70% of Roblox's users at the end of 2021.  CW 2 knew this information because Baszucki and Guthrie presented the information about bookings-by-age during town hall meetings that CW 2 attended.

233.    On the call, Defendant Guthrie assured investors not only that cohorts in Roblox's core markets were continuing to show an increase in spending, but also that the growing number of DAUs in different regions and age groups would behave similarly to Roblox's under-13 userbase, further downplaying the critical fact that bookings were not keeping pace with user growth.  Specifically, he stated:

> **Right now**, again, we generally are looking at **bookings growth as driven primarily by user and engagement growth**. **We get the question a lot about the ratios between monetization per user, and I'll just caution that when you have high bookings growth and high user growth, just the rate of change in the numerator and denominator can make numbers look like they're going up or down.**  Generally, our trends with monetization over a very long period of time are that those payer cohorts tend to increase in monetization over a very long period of time.

234.    Defendant Guthrie's statements were false and misleading because they led investors to (wrongly) believe that the Company's aging up efforts led to strong bookings and monetization growth, while concealing the known, material fact that this growth was still overwhelmingly fueled by under-13 users at that time.  According to CW 5, in September 2021, a significant portion of Roblox's bookings still came from users under-13 years-old.  CW 5 detailed that easily a majority—between 60 and 70%—of Roblox's bookings in September 2021 came from users under 13-years-old.  Moreover, Guthrie's statements concerning monetization trends over time were materially misleading because they intentionally directed investors' attention away from monetization metrics such as ABPDAU, which showed that the rate of average bookings per user trailed as the Company purportedly brought in an older audience.  As a result, Defendants' statements were false and misleading for failing to disclose the known risk that the Company's bookings and monetization growth would decline now that the Company increased its parental controls and children under 13 were going back to school.

235.    Based on Defendants' false and misleading statements, analysts were convinced that the Company was seeing positive monetization trends as it expanded beyond its core under-13 base.  For example, analysts from Jefferies wrote on November 9, 2021: "We were pleased to see **monetization come in better than expected**, putting an end to 4 months of declining spend per hour of engagement. **We believe this is helping to calm investor concerns about school re-opening** . . . ."

236.    Similarly, on November 17, 2021, analysts from Morgan Stanley raised their price targets, noting they were "particularly encouraged by the October trends (bookings/DAUs/hours . . . ) **as we think they speak to RBLX's better than appreciated growth runway/ability to continue growing its user base, engagement, and monetization even through reopening**."

237.    In reaction to Defendants false and misleading statements before the market opened on November 9, 2021, Roblox's stock jumped 42% to $109.52 per share by the close of trading on November 9, 2021, a record high closing price at the time.  As discussed in Section IV(P), Defendants took advantage of this artificially inflated stock price and sold roughly $169

1  million in Roblox stock over the next two weeks, knowing that Roblox's growth was declining

2  and their fraudulent scheme would soon end.

3  **VI.  LOSS CAUSATION**

4          238.  During the Class Period, as detailed herein, Defendants made material

5  misrepresentations and omissions and engaged in a scheme to deceive the market and a course of

6  conduct that artificially inflated the price of Roblox's publicly traded common stock and operated

7  as a fraud or deceit on Class Period purchasers of Roblox common stock by failing to disclose

8  and misrepresenting the adverse facts detailed herein.

9          239.  Class members unknowingly and in reliance upon Defendants' materially false or

10  misleading statements and/or omissions purchased Roblox common stock at artificially inflated

11  prices.  But for Defendants' misrepresentations, omissions, and fraudulent scheme, Lead Plaintiffs

12  and other Class members would not have purchased Roblox stock at the artificially inflated prices

13  at which it traded during the Class Period.

14          240.  The relevant truth regarding Defendants' fraud was revealed in a series of partial

15  corrective disclosures and/or materialization of concealed risk that occurred between December

16  15, 2021 and February 16, 2022 before the market opened.  During this period, Roblox's stock

17  fell precipitously as the artificial inflation caused by Defendants' unlawful conduct and fraudulent

18  scheme exited Roblox's stock price, and the full truth was known to the market, such that there

19  was no longer any artificial inflation in Roblox's stock price attributable to the fraud.

20          241.  The decline in Roblox's stock price during this period, as summarized below, is

21  directly attributable to the market absorbing information that corrected and/or reflected the

22  materialization of risks concealed by the Defendants' material misrepresentations or omissions.

23          242.  As a result of their purchases of Roblox common stock during the Class Period,

24  Lead Plaintiffs and other Class Members suffered economic loss (i.e., damages) under the federal

25  securities laws.  Defendants' materially false and misleading statements had the intended effect

26  and caused Roblox common stock to trade at artificially inflated levels throughout the Class

27  Period, reaching as high as $134.72 per share on November 19, 2021.

28

243.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Roblox's business.  When the truth about the Company and the extent of the fraud was revealed to the market, the price of Roblox common stock fell significantly.  This decline removed the inflation from the price of Roblox common stock, causing real economic loss to investors who had purchased Roblox common stock during the Class Period.

244.    The decline in the price of Roblox common stock, as detailed below, was a direct or proximate result of the nature and extent of Defendants' fraudulent misrepresentations and/or omissions being revealed to investors and the market.

245.    The economic loss, i.e., damages, suffered by Lead Plaintiffs and other Class members was a direct result of Defendants' false and misleading statements, their fraudulent scheme to artificially inflate the price of Roblox common stock, and the subsequent decline in the value of Roblox common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

246.    The market for Roblox common stock was open, well-developed, and efficient at all relevant times, with average daily trading volume of approximately 13,331,878 shares during the Class Period.  As a result of Defendants' misstatements and material omissions, as alleged herein, Roblox's common stock traded at artificially inflated prices.  Lead Plaintiffs and other Class members purchased Roblox common stock relying upon the integrity of the market relating to Roblox common stock and suffered economic losses as a result thereof.

247.    The declines in Roblox's common stock price on December 15, 2021 and February 16, 2022 were the direct and foreseeable result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors before the market opened on December 15, 2021 and after the market closed on February 15, 2022.  The timing and magnitude of Roblox's stock price decline evidence the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Lead Plaintiffs and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

1

2

3

**A.      December 15, 2021 – Partial Corrective Disclosure/Materialization of the Risk**

248.    On December 15, 2021, before the market opened, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false and misleading representations and omissions during the Class Period were revealed and/or partially materialized. On that day, Roblox issued a press release announcing November 2021 key metrics.  Specifically, Defendants disclosed that estimated bookings for November 2021 were between $208 million and $211 million, a 22-24% increase year over year.  This was lower than analyst expectations for bookings.  Moreover, in the press release, Defendants also disclosed that ABPDAU was down 8-9% year over year.

249.    These disclosures of slowing profitability metrics—bookings and ABPDAU—revealed some of the truth concealed and/or obscured by Defendants' prior misstatements and omissions concerning the sustainability of Roblox's bookings and monetization growth.  The disclosures of declining monetization trends were foreseeable consequences of, and within the zone of risk concealed by, Defendants misrepresentations and omissions **touting their aging up success and misstating and/or omitting the material fact that Roblox's bookings growth was still overwhelmingly fueled by users under the age of 13** and, as a result, the Company's bookings would decline once children under 13 returned to school and Roblox implemented enhanced parental controls.

250.    As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Roblox's common stock fell by $9.72 per share, or approximately 9.5%, to close at $97.95 per share on December 15, 2021.

251.    The market was shocked and started questioning Roblox's monetization growth. For example, on December 18, 2021, TheStreet published an article stating, "[t]hese numbers . . . are a deceleration from the past few months" and, more specifically, "average bookings (a non-GAAP measure of revenue) per user declined between 8% and 9% . . . [which] shows a negative

trend taking shape."  However, the market did not fully understand the risk that the Company's bookings and monetization would continue declining as young children returned to their pre-pandemic lives at the end of 2021.  Indeed, TheStreet explained, "[w]ith all that being said, I would wait to see how this pandemic boom-bust cycle plays out before I would be concerned."

252.    However, the Company's stock remained artificially inflated, even after this news, as Defendants had yet to disclose the full truth or the Company's fourth quarter 2021 results, when children returned to school and parents began using Roblox's enhanced parental controls to closely monitor their children's usage and spending on the Roblox platform.

**B.**    **February 15 and 16, 2021 – Final Corrective Disclosure/Materialization of the Risk**

253.    On February 15, 2022, after the market closed, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false and misleading representations and omissions during the Class Period were fully revealed and/or materialized.  On that day, Roblox issued a press release and supplemental financials disclosing poor Q4 2021 results and January 2022 key metrics.  Specifically, Roblox announced that bookings growth had decelerated to 20%, well below analysts' consensus target.  While DAUs were up both year-over-year and sequentially compared to the previous quarter—driven by a 49% increase in users 13 and older—ABPDAU was down 10% year-over-year and roughly 13% compared to the previous quarter.  Key metrics for January 2022 were far worse: while DAUs were up 32% year over year, bookings were only up 2-3%.  Most notably, ABPDAU was down a whopping 22-23%, significantly lower than the Company's November 2021 ABPDAU, which were released on December 15, 2021.

254.    Also on February 15, 2022 after the market closed, Defendants filed a shareholder letter with "a few guidelines" on their financial results.  The shareholder letter explained that "Bookings . . . is where year over year comparisons are currently toughest," despite the fact that Roblox had experienced "[u]ser and engagement growth" during that same period, which was "driven [in part by] growth in users aged 13 and older."  In other words, although Roblox was "aging up" and growing its over 13-year-old userbase, the Company was nonetheless

experiencing lower bookings and monetization.  This new information revealed to investors for the first time the full extent to which Roblox had been heavily reliant on the under 13-year-old age group to drive its bookings and monetization.

255.    Then, before the market opened on February 16, 2022, Defendants held an earnings call where Defendant Guthrie finally admitted that Roblox could no longer sustain the Company's high rate of growth following the deceleration in growth among Roblox's core under-13 base, revealing for the first time the full extent of Roblox's continued reliance on this group to drive the Company's bookings and monetization growth.  Guthrie explained ". . . the slower growth would be core markets, U.S., the core age demographic in the U.S. is under 13."

256.    In sum, the February 15 and 16, 2022 disclosures fully revealed the relevant truth concerning the unsustainability of Roblox's bookings growth and positive monetization trends. The disclosures of the rapid deceleration in bookings growth and declining engagement and monetization trends were foreseeable consequences of, and within the zone of risk concealed by, Defendants misrepresentations and omissions **touting their aging up success and misstating and/or omitting the material fact that Roblox's bookings growth was still overwhelmingly fueled by users under the age of 13** and, as a result, the Company's bookings would decline once children under 13 returned to school and Roblox implemented enhanced parental controls.

257.    As a direct and proximate result of this corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Roblox stock plummeted by **26.5%** to close at $53.87 per share on February 16, 2022.

258.    Analysts were shocked by the Company's revelation of the sharp deceleration in bookings growth and deteriorating monetization trends, but finally understood that Defendants had not been as successful aging up as they previously claimed.  For example, analysts from Benchmark attributed the Company's abysmal financial performance on the deceleration in under 13 user growth, writing:

> RBLX reported disappointed F4Q22 financial results, with both audience size and player engagement declining in key geographies and demographics. We anticipate lingering weakness in U.S. and Canada, and

in their core under-13 player group, as engagement normalizes and play experiences decay. We are concerned management's desire to drive growth through older demographic and brand advertisements could ultimately create a toxic community experience and further open opportunities for user abuse. We think that core RBLX players (children) primarily do not pay for their play experience, and we suspect parents may allocate less capital to RBLX as inflationary pressures impact family discretionary budgets. **We think the RBLX brand is vulnerable to a user abuse narrative that has begun to materialize** and could begin to erode parental confidence in the platform, which could further discourage parents from supporting their child's play experience on RBLX.

259.    Moreover, Benchmark called out Defendants for their "disingenuous" concealment that the Company's growth would not be sustainable after young children returned to school. Indeed, Benchmark noted Defendants' "insider sales" based on their knowledge that the Company's bookings and monetization would slow, stating:

> We are not impressed with management's grasp of the business and found them to be disingenuous and confused on their earnings call as they seemed to struggle to understand their own data. **We suspect the deacceleration in growth was likely not a surprise to management and note meaningful insider sales with the estimated value of stock sales in FY21 including CEO-$235M, CFO-$122M, and CBO-$157M. We think management credibility has been impaired and outlier growth results were likely fueled primarily from a global pandemic and are now normalizing**.

260.    Similarly, on February 16, 2022, Morgan Stanley wrote: "Our prior view assumed RBLX would continue to grow users and bookings at outsized rates through reopening. We were wrong."  Morgan Stanley further noted that the "4Q sequential decline in higher-monetizing N. America DAUs speaks to larger than expected reopening headwinds and forward growth uncertainty."  Indeed, Morgan Stanley was caught off guard by the sudden deceleration in growth, stating: "The pace of growth deterioration from November to January and commentary to expect continued slower growth . . . further reinforces these challenges" because "[i]n effect,  RBLX has not been able to retain/grow engagement, bookings, or users as well as we hoped through reopening."  Morgan Stanley then explained that "[t]hese results . . . cause us to materially reduce

our forward forecasts. . . . as we lower '22/'23 bookings by 8%/11%" which "impacts profitability substantially."

261.    On February 15, 2022, Jefferies wrote, "[t]he big picture monetization metrics were disappointing" and further explained that "[m]onetization was weak and US/Canada rolled over. Bookings per DAU were down for a second consecutive quarter, this time down 10% y/y. In the month of January, it got worse, down 22% to 23%. Hours engaged in the US/Canada region were down 11% y/y. DAUs were down 1% y/y, the first time they were negative y/y."

262.    Indeed, the market finally understood that Defendants had been misleading investors about their aging up success by touting misleading growth metrics.  For example, on February 17, 2022, Jefferies called out Defendants for their previous misleading statements touting the Company's monetization efforts.  Specifically, Jefferies argued that because "January produced the most bifurcated results yet since going public: strong DAU growth . . . [but] the weakest net bookings growth" the Company needed "new metrics [] to measure the impact that . . . aging up will have on monetization."  Jefferies urged Roblox to "mov[e] past buzzword and headline metrics" to establish metrics that investors could rely on to figure out whether the Company was successfully aging up and monetizing its older users.

## VII.    ADDITIONAL INDICIA OF SCIENTER

263.    Defendants were active and culpable participants in the fraud, as evidenced by their knowing and reckless issuance and/or ultimate authority over Roblox's and their materially false or misleading statements and omissions.  The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements more specifically set forth in Section V, *supra*, were materially false or misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws.  In addition to the specific facts alleged above, Defendants' scienter is further evidenced by the following facts.

1

**A.      Defendants' Exorbitant Stock Sales—Totaling More Than $548 Million—Made with Knowledge of Material Nonpublic Information Support a Strong Inference of Scienter**

2

3          264.    Based on their insider knowledge that Roblox's high rate of growth was fueled by

4    the under-13 cohort, which would soon decelerate as the Company rolled out parental controls in

5    late 2021 and children returned to school, Defendants Baszucki, Guthrie, and Donato enriched

6    themselves at the expense of Roblox investors.  Armed with the knowledge that Roblox's stock

7    price was artificially inflated as a result of their false and misleading statements and omissions

8    regarding Roblox's aging up success and bookings growth, Defendants Baszucki, Guthrie, and

9    Donato collectively sold over **6.6 million shares** in open market transactions, reaping more than

10   **$548 million in proceed** in less than a year, starting the first day Roblox went public via a direct

11   listing and continuing throughout the rest of the Class Period.  Critically, Defendants did not

12   purchase a single share of Roblox stock on the open market during the Class Period, which further

13   supports the inference that they knew the price of Roblox stock was artificially inflated.

14         265.    Although some of these insider sales were made pursuant to a Rule 10b5-1 trading

15   plan, Defendants implemented that plan after the start of the Class Period, with knowledge of

16   material nonpublic information about Roblox's overwhelming reliance on children to drive its

17   bookings growth, and thus, the existence of a Rule 10b5-1 plan does not negate any inference of

18   scienter.

19         266.    Moreover, the Individual Defendants' trading patterns **after** the Class Period

20   further supports scienter.  Between February 16, 2022 and January 24, 2023—a 343-day control

21   period that corresponds precisely to the number of days in the Class Period—the Individual

22   Defendants' sales dropped precipitously once the truth of their scheme to defraud was revealed.

23         267.    Indeed, during the control period, the Individual Defendants collectively sold only

24   1,379,917 shares of Roblox stock, **a nearly 80% reduction** from their Class Period sales totaling

25   6,669,294 shares.  Specifically, as noted in the chart below, during the control period: (i)

26   Defendant Baszucki sold only 1.3 million shares, which was less than half the number of his Class

27   Period sales; (ii) Defendant Guthrie sold only 26,086 shares, which was more than a 98%

28

reduction from his Class Period sales; and (iii) Defendant Donato sold only 53,831 shares, which was more than a 97% reduction from his Class Period sales.

| DEFENDANT | CLASS PERIOD SALES (March 10, 2021 through February 15, 2022) | CONTROL PERIOD SALES (February 16, 2022 through January 24, 2023) | PERCENT CHANGE |
|---|---|---|---|
| David Baszucki | 2,987,500 | 1,300,000 | 56.49% reduction |
| Michael Guthrie | 1,681,042 | 26,086 | 98.45% reduction |
| Craig Donato | 2,000,752 | 53,831 | 97.31% reduction |
| **TOTAL:** | **6,669,294** | **1,379,917** | **79.31% reduction** |

### 1. Defendants Immediately Dump $238 Million In Roblox Stock Within Two Days of Roblox's Direct Listing

268. On March 10 and 11, 2021, the first two days of the Class Period, Defendants falsely touted Roblox's bookings growth and aging up success while concealing the material fact that the Company's bookings were still overwhelmingly reliant on under-13 users. *See* Section V(A)-(B), *supra*. Armed with the knowledge that the Company's growth had been fueled by the under 13 age group, which Defendants knew would soon end once children returned to school and once Roblox implemented parental controls, Defendants Baszucki, Donato, and Guthrie began profiting off of Roblox's inflated valuation through a series of insider transactions as soon as Roblox went public on March 10, 2021. On that day, Baszucki sold 1,300,000 shares, totaling **$83,850,000**; between March 10-11, Donato sold 1,143,123 shares, totaling **$77,531,534.64**; and Guthrie sold 1,200,000 shares, totaling **$77,400,000**. In other words, these Individual Defendants took advantage of the direct listing and their insider knowledge to make over **$238 million within two days** of the direct listing. Notably, none of these sales were made pursuant to a Rule 10b5-1 trading plan.

### 2. Defendants Offload Another $54 Million in Roblox Stock After They Made False and Misleading Statements on May 10, 2021

269. On May 10, 2021, Defendants continued to mislead investors about the Company's bookings and aging up efforts. *See* Section V(C), *supra*. While Defendants touted over-13 DAU

growth alongside strong bookings growth to lead investors to believe that aging up was working and sustaining the Company's high rate of growth, they possessed insider information, including internal metrics on bookings-by-age, which showed that under-13 users were still generating an overwhelming majority of bookings.  Defendants knew this high rate of bookings growth fueled by the under-13 cohort would soon decelerate once Roblox implemented adequate content controls and spending limits and children returned to school.

270.    Armed with the insider knowledge, Defendants Baszucki, Guthrie, and Donato, collectively sold over 582,500 shares, reaping more than **$54 million** between June 1, 2021 and July 14, 2021, shortly after their false and misleading statements on May 10, 2021.  *See* Section IV(J), *supra*.  Although these trades were made pursuant to a Rule 10b5-1 trading plan, Defendants implemented the plan as part of their scheme when they were already in possession of material nonpublic information.

### 3.    Defendants Make Another $55 Million in Insider Sales After They Made False and Misleading Statements on August 16, 2021 and Before Rolling Out Parental Controls

271.    On August 10, 2021, Defendants received a letter from Congress about Roblox's financial exploitation of children.  Thus, Defendants were increasingly aware that the risks they concealed from investors—that Roblox's bookings growth was unsustainable because it still relied overwhelmingly on children—would soon begin to materialize because the Company was facing increased pressure to implement parental controls.  But rather than come clean, Defendants continued their scheme to defraud investors and make hundreds of millions of dollars.  On August 16, 2021, Defendants again misled investors about Roblox's bookings growth and aging up success.  *See* Section V(D), *supra*.  Shortly thereafter, the Individual Defendants continued unloading their Roblox stock—this time selling over 668,091 shares for roughly **$55.5 million**.  *See* Section IV(M), *supra*. Although these trades were made pursuant to a Rule 10b5-1 trading plan, Defendants implemented the plan as part of their scheme when they were already in possession of material nonpublic information.

1    **4.    Defendants Unload Another Roughly $200 Million Worth of Roblox Stock Before Parental Controls and Schools Reopening Begin to Affect Bookings Growth**

2

3    272.    By September 2021, Defendants were aware that the risks they concealed from

4    investors would soon begin to materialize.  Specifically, the period of blockbuster bookings

5    growth and positive monetization trends driven by under-13 users would soon be at an end as the

6    Company was forced to implement parental controls for under-13 users and children started

7    returning to school in the fall of 2021.  Despite their knowledge that the growth fueled primarily

8    by under-13 users would soon slow as the Company was forced to implement parental controls,

9    Defendants continued to profit off investors' belief that aging up was sustaining the Company's

10   growth, just before the impacts of parental controls could begin having a material impact on

11   bookings.

12   273.    Specifically, on the heels of Roblox's release of parental controls and updates to

13   its terms of service, on October 5, 2021, Guthrie sold 40,000 shares totaling more than $2,970,000.

14   Between October 14 and October 29, 2021, Defendant Donato sold 70,000 shares over three

15   separate trading days, worth over $5.5 million.

16   274.    Then, Defendants made false and misleading statements on November 8 and 9,

17   2021 about the Company's purportedly successful aging up and bookings growth.  *See* Section

18   V(E).  Based on these false and misleading statements, Roblox's stock skyrocketed 42% in a

19   single day to close at $109.52 per share on November 9, 2021, a record high closing price at the

20   time.

21   275.    Knowing that the Company's bookings and monetization growth was declining in

22   November, and knowing that the scheme would soon be brought to light when the Company

23   disclosed those metrics publicly, Defendants made substantial insider sales before they disclosed

24   the declining monetization metrics in December 2021.

25   276.    Between November 11 and November 12, Defendant Donato sold 360,000 shares,

26   totaling more than **$35 million**.

27

28

277.    Then, on November 22, 2021, while Roblox's stock was still near an all-time high, Defendant Baszucki sold an additional 937,500 shares of Roblox stock, profiting **more than $117 million in proceeds in a single day**.

278.    Also, between November 22 and 23, 2021, Donato sold an additional 6,853 shares for more than **$837,000.**  Finally, between November 22-23, 2021, Defendant Guthrie sold another 128,627 shares, reaping over **$16.1 million in proceeds**.

279.    Knowing that the full truth would soon be brought to light when the Company disclosed Q4 2021 earnings—i.e., the period when children returned to school and Roblox rolled out enhanced parental controls—Defendants made additional insider sales in December 2021 and January 2022.  In December 2021, Defendant Donato sold another 85,000 shares for proceeds over **$9.1 million**, and Defendant Guthrie sold another 60,000 shares for proceeds over **$6.6 million**.  Later, in January 2022, Defendant Donato sold 42,500 shares for a total of nearly **$3.4 million**, and Defendant Guthrie sold 45,100 shares for a total of **$3.7 million**.

280.    In sum, between the day of the direct listing on March 10, 2021 and before their fraud was revealed on February 15, 2022, Defendants sold a total of more than **$548 million** while in possession of material nonpublic information.  Notably, during this same period, the Individual Defendants did not make a single open-market purchase of Roblox stock.

   **B.    Defendant's Statements Themselves Prove They Closely Monitored the Company's Topline Metrics, Including Bookings-By-Age-Group**

281.    Defendants repeatedly told investors that they closely monitored the Company's key top-line metrics, like bookings and age demographics.  For example, before the Class Period, Defendant Guthrie stated during a February 26, 2021 investor day: "day to day operating the business, the way the team looks at key metrics like engagement is that we tend to look by **age demographics** around the world and we have years of history as to how things like sign-ups and retention and conversion and monetization behave and we normally use that – those historical curves to help us to forecast. **So we use a lot of visualization to look at that data and ultimately to forecast**."

282.    In the Company's Prospectus filed with the SEC on March 10, 2021—i.e., the start of the Class Period—Roblox stated:

> **We regularly review metrics, including our DAUs, hours engaged, and average bookings per DAU, or ABPDAU, to evaluate growth trends, measure our performance, and make strategic decisions.** These metrics are calculated using internal data gathered on an analytics platform that we developed and operate . . . .

283.    Similarly, during the Company's earnings call on November 9, 2021, Defendant Guthrie stated **"[w]e have been tracking aged-up demos for years**."  Likewise, directly after the Class Period, during the earnings call on February 16, 2022, Defendant Guthrie was asked about "the bookings growth evolving throughout 2022 and then into 2023."  In response, Guthrie stated that "I always look [at a] variety of data, but **I look at our bookings charts and our DAU charts a lot**."

284.    Defendant Guthrie's admission that he closely monitored bookings is corroborated by CW allegations.  For example, CW 5 stated that bookings-by-age-group was a big point of interest and was discussed during town hall meetings, which were held every two weeks. CW 5 stated that Baszucki, Guthrie, and Donato attended these town hall meetings, and Baszucki and Guthrie specifically discussed bookings-by-age-group during these meetings.  According to CW 5, Roblox executives, including the Individual Defendants, also discussed daily active users during town hall meetings.

285.    Moreover, Defendants' attempts to downplay ABPDAU further demonstrate scienter.  As alleged above, Defendants tried to move away from ABPDAU right before they rolled out enhanced parental controls and children returned to school in the fall of 2021. Specifically, on August 17, 2021, Defendant Guthrie stated: "just be careful when you're comparing ratios. We do think that we can have very strong bookings and very strong user growth and ABPDAU can go down. It's just a ratio."

286.    Similarly, on September 21, 2021, during a Goldman Sachs Conference, Defendant Guthrie stated:

**If we have an internal target for bookings and we hit it, and we have an internal target for DAUs and we hit it, and the DAUs happen to grow faster than the bookings, I do not care if ABPDAU goes up or down or sideways day-to-day**. It's early to look at that ratio. Just for the reason I just said, we have a bookings target. We love it. The denominator grows faster.

And what happened to per user? Remember, we're adding DAUs very quickly. And DAUs have a, knock on wood when I say this, a fairly predictable thing that they go through. They start, a certain number of them retain, the ones that retain have an engagement curve that is reasonably predictable for us, the ones that engage a lot end up converting into payers, and the ones that start paying that have a somewhat predictable path to paying more.

And those are – the sheer number of cohorts in different geographies are so many that it's really, really hard – we don't guide anyway. But I wouldn't guide too much on this number. **I'm much, much, much, much more concerned with – that we're growing bookings at a rate that seems like we're doing a good job and that we're growing users and hours of rates that seem like we're doing a good job** or rather helping our developers do a great job out there.

287.    These and other similar statements demonstrate that Defendants reviewed all the relevant data, and tried to manipulate that data in a way that kept their fraudulent scheme alive. Indeed, according to CW 5, Defendant Guthrie spoke in a town hall meeting in either December 2021 or January 2022.  CW 5 detailed that Guthrie presented metrics, which she described as convoluted and confusing, during this meeting to show that Roblox was doing better and still growing.  According to CW 5, Roblox decided to move away from the topline metrics that most companies use, like bookings, and switched to new topline metrics, but no longer included bookings, in order to show that Roblox was growing.

288.    The Individual Defendants' knowledge can also be inferred from the fact that the Company's ability to age up was critical to the future success of Roblox's business.  Indeed, leading into the direct listing, investors understood that the Company's future success depended on Roblox's ability to age up and monetize the older users.  For example, in a December 7, 2020 report incorporating investor feedback, Bernstein analysts wrote: "there are already a lot of Roblox users who are above the age of 13 . . . a really important question, we think, is to

understand where these older users came from, what attracted them, what are they spending time doing, **how much are they spending**?"  The analyst followed up on Roblox's ability to age up the platform on January 28, 2021: "**I'm still stuck on this as maybe the single biggest question that I would need to be comfortable with, if I were considering becoming a shareholder**."  Moreover, Bernstein stated that the question "how do you overcome" Roblox is a platform for children was "a super important question" leading into the direct listing.  Indeed, in the Company's Prospectus, Defendants told investors that people over the age of 13 have "a higher propensity to spend on content, and our ability to increase penetration in, and user contribution from, **this demographic will affect our ability to grow revenue**."

289.    Throughout the Class Period, Defendants touted their purported success aging up. Indeed, analysts routinely cited the Company's purported aging up success as a reason to invest in Roblox.  For example, on April 5, 2021, analysts from Goldman Sachs issued a "buy" rating and noted "RBLX's faster growth, **which should be driven by aging up**."  On May 11, 2021, Morgan Stanley wrote: "continued user, engagement and bookings growth should give investors more confidence in the durability of RBLX's forward growth."  On October 26, 2021, BTIG stated they were "bullish on long-term DAU growth" because they believed "DAU will be a key driver of bookings performance."  Finally, on November 17, 2021, Morgan Stanley wrote that Roblox's strong DAU and bookings numbers "speak to RBLX's better than appreciated growth runway/ability to continue growing its user base, engagement, and monetization even through reopening."

### C.    Defendants Knew They Would Have to Implement Enhanced Parental Controls, Which Would Harm Bookings

290.    Defendants knew, since before the Class Period, that implementing parental controls would harm the Company's bookings.  For example, CW 3 explained that it was known that implementing parental controls would negatively impact revenue because its userbase was largely under 13-years-old.  Similarly, CW 5 stated that Roblox did not significantly address parental controls earlier is because it was hesitant to reduce features that generated revenue for

the Company.  Specifically, CW 5 explained that spending limits would have negatively impacted Roblox's bookings because it obtained 60 to 70% of its bookings from users under 13-years-old in 2021.

291.    CW 3 recalled that during her tenure, which was April 2021 to March 2022, Roblox employees asked Baszucki during town hall meetings how Roblox was going to address parental controls while simultaneously conserving resources.  CW 3 further recalled that Baszucki responded to these concerns by indicating that Roblox was going to address parental concerns as little as possible so that it would not negatively impact revenue.

292.    According to CW 3, implementing parental spend restrictions was discussed multiple times during town hall meetings and on Slack.  CW 3 recalled that Roblox's leadership told its employees not to comment on articles reporting on children spending a lot of money on Roblox's platform without their parents' permission.  Furthermore, CW 3 explained that it would have been unsustainable for Roblox to fully address parental concerns because it was known that implementing strict parental controls would negatively impact revenue and because Roblox would have to spend a lot of money to expand its Trust & Safety team and appropriately monitor its platform.  According to CW 3, it was a huge priority for Roblox to attract an older audience throughout her tenure, partially because leadership knew that it had to address parental controls due to external pressures from parents and the news media.

293.    Moreover, Defendants knew that they were facing increasing pressure to implement parental controls by August 2021.  Specifically, on August 10, 2021, Congress sent Defendants a letter, addressed to Defendant Baszucki, which noted Congress's concerns that Roblox was profiting off of children and allowing them to engage in transactions that were "akin to gambling."  The letter explained: "The prevalence of micro-transactions—often encouraged through nudging—have led to high credit card bills for parents. Loot boxes—[bundles of in-app mystery items available for purchase]—go one step further, encouraging purchase before a child knows that the "bundle" contains—akin to gambling."

294.    Therefore, after a long period of putting off parental controls in an attempt to delay the negative impact on bookings once under-13 users could no longer access explicit content and make excessive, unauthorized purchases, Defendants became increasingly aware that the risks they concealed from investors would soon begin to materialize because the Company was facing increased pressure to implement parental controls.

## VIII.   CONTROL PERSON ALLEGATIONS

295.    The Individual Defendants, by virtue of their high-level and controlling positions at Roblox, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information about the Company, its business, operations, internal controls, growth, financial statements, and financial condition as alleged herein.  As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.

296.    Defendants Baszucki, Guthrie, and Donato as senior executive officers of Roblox—a publicly-held company whose common stock was, and is, traded on the NYSE, and governed by the federal securities laws—had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, internal controls, growth, financial statements, and financial condition, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Roblox's publicly traded common stock would be based on accurate information.  Each of the Individual Defendants violated these requirements and obligations during the Class Period.

297.    Defendants Baszucki, Guthrie, and Donato, because of their positions of control and authority as senior executive officers of Roblox, were able to and did control the content of Roblox's SEC filings, press releases, and other public statements issued by or on behalf of Roblox during the Class Period.  Each would have been provided with copies of the statements made in the SEC filings at issue in this action before they were issued to the public and would have had the ability to prevent their issuance or cause them to be corrected.

1   298.   Accordingly, the Individual Defendants were responsible for the accuracy of the

2   public statements alleged herein.

3   299.   The Individual Defendants are liable as participants in a fraudulent scheme and

4   course of conduct that operated as a fraud or deceit on purchasers of Roblox common stock by

5   disseminating materially false and misleading information and concealing and omitting material

6   adverse facts.  The scheme deceived the investing public regarding Roblox's business, operations,

7   and management, and the intrinsic value of Roblox's common stock, and caused Lead Plaintiffs

8   and members of the Class to purchase Roblox common stock at artificially inflated prices.

9   **IX.    THE STATUTORY SAFE HARBOR IS INAPPLICABLE**

10   300.   The statutory safe harbor provided by the PSLRA for forward-looking statements

11   under certain circumstances does not apply to any of the materially false and misleading

12   statements alleged in this pleading.   First, many of the statements alleged to be false and

13   misleading relate to historical facts or existing conditions.   Second, to the extent any of the

14   allegedly false and misleading statements may be characterized as forward-looking, they were not

15   adequately identified as "forward-looking" statements when made.   Third, any purported forward-

16   looking statements were not accompanied by meaningful cautionary language because, among

17   other reasons, the risks that Defendants warned of had already come to pass.

18   301.   To the extent any statements alleged to be false and misleading may be construed

19   to discuss future intent, they are mixed statements of present or historical facts and future intent

20   and are not entitled to PSLRA safe-harbor protection—at least with respect to the part of the

21   statement that refers to the present.

22   302.   In addition, the PSLRA imposes an additional burden on oral forward-looking

23   statements, requiring Defendants to include a cautionary statement that the particular oral

24   statement is a forward-looking statement, and that "actual results might differ materially from

25   those projected in the forward-looking statement."  15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii).  Defendants

26   failed to both identify certain oral statements as forward-looking and include the cautionary

27   language required by the PSLRA.

28

303.    Furthermore, Defendants did not accompany their statements with meaningful cautionary language identifying important factors that could cause actual results to differ materially from any results projected.   To the extent Defendants included any cautionary language, that language was not meaningful because, among other reasons, any potential risks identified by Defendants had already passed or manifested.

304.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Roblox who knew that the statement was false when made.

## X.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

305.    Lead Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's stock traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)    Lead Plaintiffs and other members of the Class purchased Roblox's publicly traded Class A common stock between the time Defendants misrepresented or failed to disclose material facts and the time the facts were disclosed, without knowledge of the misrepresented or omitted facts.

306.    At all relevant times, the market for Roblox shares was efficient for the following reasons, among others:

    (a)    Roblox's Class A common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

    (b)    As a regulated issuer, Roblox filed periodic public reports with the SEC and the NYSE;

    (c)    Roblox regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on the major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; and

    (d)    Roblox was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms.  Each of those reports was publicly available and entered the public marketplace.

307.    As a result of the foregoing, the market for Roblox's securities promptly digested current information regarding Roblox from publicly available sources and reflected such information in Roblox's securities price(s).  Under these circumstances, all persons and entities who or which purchased or otherwise acquired Roblox's Class A common stock during the Class Period suffered similar injuries through their purchase of Roblox common stock at artificially inflated prices and thus, the presumption of reliance applies.

308.    The material misrepresentations and omissions alleged herein would induce a reasonable investor to misjudge the value of Roblox common stock.

309.    Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the Class purchased shares of Roblox's Class A common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

310. To the extent that Defendants concealed or improperly failed to disclose material facts with respect to Roblox's business, Lead Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

## XI.   CLASS ACTION ALLEGATIONS

311. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons and entities who or which, during the period from March 10, 2021 through February 15, 2022, inclusive, purchased the publicly traded Class A common stock of Roblox and were damaged thereby. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director, and/or control person of Roblox during the Class Period, and members of their immediate families; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Roblox's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person, in their capacities as such.

312. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Roblox had between approximately 516 million and 581 million shares of common stock outstanding, which were actively traded on the NYSE. The average daily trading volume during the Class Period was more than 13 million shares. While the exact number of Class members is unknown to Lead Plaintiffs at this time, Lead Plaintiffs believe that there are at least thousands of members of the proposed Class. Record owners and other members of the Class may be identified from records maintained by Roblox or its transfer agent and can be notified of the pendency of this action by mail and publication using forms of notice similar to those customarily used in securities class actions.

313. Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class were similarly damaged by Defendants' wrongful conduct as complained of herein.

314.   Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

315.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

   (a)   Whether the federal securities laws were violated by Defendants' acts as alleged herein;

   (b)   Whether the statements Defendants made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

   (c)   Whether, and to what extent, the market price of Roblox common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;

   (d)   Whether Defendants acted with the requisite level of scienter;

   (e)   Whether the Individual Defendants were controlling persons of Roblox;

   (f)   Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of damages.

316.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expenses and burden of individual litigation make it practically impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

317.   Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine, as discussed in Section X, *supra*.

318. Based upon the foregoing, Lead Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## XII.    COUNTS AGAINST DEFENDANTS

<u>**COUNT I**</u>

**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) Promulgated Thereunder Against All Defendants**

319. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

320. This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder by the SEC, on behalf of Lead Plaintiffs and the Class against all Defendants.

321. During the Class Period, Roblox and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded or were deliberately reckless in disregarding were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

322. Roblox and the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

323. Roblox and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Roblox were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the

1    securities laws.  These Defendants by virtue of their receipt of information reflecting the true facts

2    of Roblox, their control over, and/or receipt and/or modification of Roblox's allegedly materially

3    misleading statements, and/or their associations with the Company which made them privy to

4    material concerning Roblox, participated in the fraudulent scheme alleged herein.

5          324.    The Individual Defendants, who are the senior officers and/or directors of the

6    Company, had actual knowledge of the material omissions and/or the falsity of the material

7    statements set forth above, and intended to deceive Lead Plaintiffs and the other members of the

8    Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain

9    and disclose the true facts in the statements made by them or other Roblox personnel to members

10   of the investing public, including Lead Plaintiffs and the Class.

11         325.    As a result of the foregoing, the market price of Roblox securities was artificially

12   inflated during the Class Period.  In ignorance of the falsity of Roblox's and the Individual

13   Defendants' statements, Lead Plaintiffs and the other members of the Class relied on the

14   statements described above and/or the integrity of the market price of Roblox securities during

15   the Class Period in purchasing Roblox securities at prices that were artificially inflated as a result

16   of Roblox's and the Individual Defendants' false and misleading statements.

17         326.    Had Lead Plaintiffs and the other members of the Class been aware that the market

18   price of Roblox securities had been artificially and falsely inflated by Roblox's and the Individual

19   Defendants' misleading statements and by the material adverse information which Roblox and

20   the Individual Defendants did not adequately disclose to market professionals, they would not

21   have purchased Roblox's securities at the artificially inflated prices that they did, or at all.

22         327.    As a result of the wrongful conduct alleged herein, Lead Plaintiffs and other

23   members of the Class have suffered damages in an amount to be established at trial.

24         328.    By reason of the foregoing, Roblox and the Individual Defendants have violated

25   Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder and are liable to

26   the Lead Plaintiffs and the other members of the Class for substantial damages which they suffered

27   in connection with their purchase of Roblox securities during the Class Period.

28

## COUNT II

**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5(a) and (c) Promulgated Thereunder Against All Defendants**

329.    Lead Plaintiffs repeat and reallege every allegation set forth above as if fully set forth herein.

330.    This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(a) and Rule 10b-5(c) promulgated thereunder by the SEC, on behalf of Lead Plaintiffs and the Class against all Defendants.

331.    Accordingly, although Lead Plaintiffs are not required to allege in this Court nor prove in this case that any of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law, Lead Plaintiffs have adequately alleged that Defendants made materially false and misleading statements for which they are liable under Rule 10b-5(b).

332.    During the Class Period, Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Lead Plaintiffs and the Class; (ii) artificially inflate the price of Roblox common stock; and (iii) cause Lead Plaintiffs to purchase Roblox common stock at artificially inflated prices.

333.    Specifically, Defendants' actions and course of business conduct throughout the Class Period were designed to convince investors that the Company had successfully aged up Roblox's platform and therefore this older audience would sustain revenue growth for the Company even after children returned to school post-COVID lockdowns, and after Roblox implemented enhanced parental controls in the fourth quarter of 2021.

334.    Defendants' fraudulent scheme also involved lying to investors about not only the percentage of users that were over 13 years old, but also that those older users were spending as much money on Roblox as the under-13 userbase.  At the same time Defendants touted their purported success aging up, Defendants concealed the truth that Roblox's userbase was still largely under 13 and that this under-13 userbase was responsible for an overwhelming majority

of Roblox's bookings.  As a result, investors did not know that Roblox's bookings would decline once children returned to school and after Roblox implemented enhanced parental controls.

335.   Moreover, a key aspect of their fraudulent scheme, the Individual Defendants sold nearly $550 million worth of Roblox stock while the stock price was artificially inflated due to their fraudulent scheme.  Indeed, Defendants chose a direct listing over a traditional IPO in order to sell their shares immediately and cash out before children returned to school and before Roblox implemented enhanced parental controls, both of which would cause the Company's bookings to decline.

336.   Defendants' scheme unraveled through a series of two disclosures revealing declining monetization metrics in the fourth quarter of 2021 (when under-13 users went back to school and Roblox rolled out enhanced parental controls).  These disclosures revealed the truth that Roblox had not been successful aging up the platform, but rather, was still largely reliant on the unsustainable under-13 userbase.  Furthermore, and as noted by industry analysts, the Individual Defendants' hundreds of millions of dollars' worth of insider sales demonstrate their scheme.

337.   Defendants directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to perpetrate this fraud.

338.   Defendants had actual knowledge of the deceptive conduct alleged herein, or acted with deliberate reckless disregard for the effect of their deceptive conduct. The facts demonstrating that Defendants acted with actual knowledge and/or deliberate recklessness are stated above.

339.   Defendants' fraudulent devices, schemes, artifices and deceptive acts, practices, and course of business included the knowing and/or reckless suppression and concealment of the Company's scheme to defraud investors concerning, among other things, that Roblox's bookings were still overwhelmingly reliant on under-13 users and, as a result, the Company's bookings

would decline substantially once children returned to school and the Company implemented enhanced parental controls in the fourth quarter of 2021.

340.    Despite the numerous representations that were made to the market—and ample opportunity to supplement, alter, or correct such misrepresentations—Defendants failed to do so thereby concealing the Company's scheme to defraud from investors.

341.    Lead Plaintiffs and the Class reasonably relied upon the integrity of the market in which Roblox's common stock traded.

342.    During the Class Period, Lead Plaintiffs and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct and/or the impact of the fraudulent scheme.  Had Lead Plaintiffs and the Class known the true extent of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased Roblox's common stock, or if they had, would not have done so at the artificially inflated prices paid for such securities.

343.    As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Lead Plaintiffs and the Class suffered damages in connection with their purchases of Roblox common stock during the Class Period.

344.    By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) promulgated thereunder, and are liable to Lead Plaintiffs and the Class for damages suffered in connection with their purchases of Roblox common stock during the Class Period.

### COUNT III

**For Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

345.    Lead Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

346.    During the Class Period, the Individual Defendants participated in the operation and management of Roblox.  The Individual Defendants conducted and participated, directly and

indirectly, in the conduct of Roblox's business affairs.  Because of their senior positions, they knew the material information regarding the Company's operations, including key metrics like DAUs, bookings, usage, ABPDAU, bookings-by-age, age demographics, and parental controls.

347.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Roblox's financial condition and results of operations, and to correct promptly any public statements issued by Roblox which had become materially false or misleading.

348.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Roblox disseminated in the marketplace during the Class Period.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Roblox to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were "controlling persons" of Roblox within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Roblox securities.

349.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Roblox.

## XIII.   REQUEST FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment on behalf of themselves and the Class, as follows:

(a)   Determining that this action is a proper class action and certifying Lead Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

(b)   Awarding compensatory damages in favor of Lead Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to

be proven at trial, including pre-judgment and post-judgment interest, as allowed by law;

(c)     Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Awarding such further relief, including any equitable/injunctive relief, as the Court may deem just and proper.

## XIV. JURY DEMAND

Lead Plaintiffs demand a trial by jury.

Dated: April 12, 2024                 Respectfully submitted,

By: */s/ Michael P. Canty*
Michael P. Canty (*pro hac vice*)
Michael H. Rogers (*pro hac vice*)
Nicholas D. Manningham (*pro hac vice*)
Raquel Panza (*pro hac vice*)

**LABATON KELLER SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: mcanty@labaton.com
       mrogers@labaton.com
       nmanningham@labaton.com
       rpanza@labaton.com

***Attorneys for Lead Plaintiffs and the Class***

Lucas E. Gilmore (#250893)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 300
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
Email: lucasg@hbsslaw.com

***Liaison Counsel for the Class***