BORIS FELDMAN, State Bar No. 128838
boris.feldman@freshfields.com
DORU GAVRIL, State Bar No. 282309
doru.gavril@freshfields.com
ELENA HADJIMICHAEL (*pro hac vice*)
elena.hadjimichael@freshfields.com
FRESHFIELDS BRUCKHAUS DERINGER US LLP
855 Main Street
Redwood City, CA 94063
Telephone: (650) 618-9250

SUSANNAH BENJAMIN (*pro hac vice*)
susannah.benjamin@freshfields.com
FRESHFIELDS BRUCKHAUS DERINGER US LLP
175 Greenwich Street
New York, NY 10007
Telephone: (212) 277-4000

*Attorneys for Defendants Roblox Corporation,*
*David Baszucki, Michael Guthrie,*
*and Craig Donato*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DEKALB COUNTY PENSION FUND, Individually and On Behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br><br>   v.<br><br>ROBLOX CORPORATION, et al.,<br><br>     Defendants. | Case No.: 3:23-cv-06618-RS<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**<br><br>Date:  October 31, 2024<br>Time:  1:30 p.m.<br>Location: Courtroom 3 – 17th Floor<br>Judge:  Hon. Richard Seeborg |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES....................................................................................................ii

TABLE OF ABBREVIATIONS............................................................................................vi

NOTICE OF MOTION AND MOTION................................................................................1

STATEMENT OF ISSUES...................................................................................................1

INTRODUCTION..................................................................................................................1

BACKGROUND....................................................................................................................2

    A. After Years of Steady Growth, Roblox Becomes Publicly Traded............................2

    B. Roblox's Prospectus Warns Investors of Risks to Profitability.................................3

    C. Roblox Sees Considerable Success After Becoming Publicly Traded, but Results
    Dip After the Pandemic Eases.....................................................................................4

    D. Years Later, Plaintiffs File This Lawsuit Before the Limitations Period Expires......5

ARGUMENT...........................................................................................................................5

    I. PLAINTIFFS FAIL TO PLEAD FALSE OR MISLEADING STATEMENTS................6

    A. No False Statements Concerning 13+ Users...............................................................6

    B. No False Statements Concerning Sustainability of Growth.......................................9

        1. No Particularized Facts Contradicting the Challenged Statements.......................9

        2. The Challenged Statements Are Forward-Looking and Protected.................... 10

        3. The Challenged Statements Are Inactionable Opinions....................................13

        4. The Challenged Statements Are Non-Actionable Puffery..................................13

    C. No False Statements Concerning Monetization.........................................................14

        1. Roblox Disclosed the Allegedly Concealed Information...................................14

        2. The Challenged Statements Are Not Misleading...............................................15

    II. PLAINTIFFS FAIL TO PLEAD SCIENTER................................................................17

    A. The CW Allegations Fail to Create a Compelling Inference of Scienter..................17

        1. The CWs Lack Personal Knowledge.................................................................17

        2. The CWs' Statements Are Not Indicative of Scienter.......................................18

    B. Plaintiffs' Insider Trading Allegations Are Unavailing...........................................19

    C. Core Operations Platitudes Cannot Substitute for Particularized Facts...................21

    III. PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION.................................................22

    A. Plaintiffs Substitute Purchase-Price Inflation for "Causal Connection"..................23

    B. Bad News Is Not a Corrective Disclosure................................................................23

    IV. PLAINTIFFS FAIL TO PLEAD A SCHEME.............................................................25

CONCLUSION.....................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page**

*In re Accuray, Inc. S'holder Deriv. Litig.*,
   757 F. Supp. 2d 919 (N.D. Cal. 2010) ……………..…………………………………… 20, 21

*In re BofI Holding, Inc. Sec. Litig.*,
   977 F.3d 781 ………………………………….…………………………………… 24, 25

*Borteanu v. Nikola Corp.*,
   2023 U.S. Dist. LEXIS 17813 (D. Ariz. Feb. 2, 2023) …………………………………… 25

*Browning v. Amyris, Inc.*,
   2014 U.S. Dist. LEXIS 39549 (N.D. Cal. Mar. 24, 2014) ………………….…………….. 21–22

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
   856 F.3d 605 (9th Cir. 2017) …………………………………………..………….….... 13, 18, 20

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
   2019 U.S. Dist. LEXIS 216801 (N.D. Cal. Dec. 17, 2019) …………….………………… 12–13

*In re Copper Mountain Sec. Litig.*,
   311 F. Supp. 2d 857 (N.D. Cal. 2004) ……………………………….…………………… 10

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005) ………………………………………………………………… 22, 23

*In re Eargo, Inc. Sec. Litig.*,
   656 F. Supp. 3d 928 (N.D. Cal. 2023) ………………………………………………… 14

*In re Edward D. Jones & Co., L.P. Sec. Litig.*,
   2019 U.S. Dist. LEXIS 113882 (E.D. Cal. July 9, 2019) ……..……………………..…… 25

*In re Intel Corp. Sec. Litig.*,
   2023 U.S. Dist. LEXIS 57732 (N.D. Cal. Mar. 31, 2023) …………………………… 12

*In re Invision Techs., Inc. Sec. Litig.*,
   2006 U.S. Dist. LEXIS 76458 (N.D. Cal. Aug. 31, 2006) ……..…………………………… 19

*Irving Firemen's Relief & Ret. Fund. v. Uber Techs., Inc.*,
   998 F.3d 397 (9th Cir. 2021) …………………………………………………………… 5

*Jedrzejczyk v. Skillz Inc.*,
   2022 U.S. Dist. LEXIS 117803 (N.D. Cal. July 5, 2022) ………………………………..… 5

*In re Juniper Networks, Inc.*,
   2022 U.S. Dist. LEXIS 117803 (N.D. Cal. Mar. 11, 2004) ……………………………..… 19

Page

*Kelley v. Rambus, Inc.*,
   2008 U.S. Dist. LEXIS 120042 (N.D. Cal. Apr. 17, 2008) ..………………..…………… 7, 8

*Loos v. Immersion Corp.*,
   762 F.3d 880 (9th Cir. 2014) ……………….………………………………………… 23, 24

*Macomb Cnty. Emp. Ret. Sys. v. Align Tech., Inc.*,
   39 F.4th 1092 (9th Cir. 2022) ………..……………………………………………………14

*In re Mellanox Sec. Litig.*,
   2014 U.S. Dist. LEXIS 198759 (N.D. Cal. Mar. 31, 2014) ………..…………………… 13

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008) …………………………….……………………… *passim*

*Monachelli v. Hortonworks, Inc.*,
   225 F. Supp. 3d 1045 (N.D. Cal. 2016) …………….…………………………………… 13

*In re Nektar Therapeutics Sec. Litig.*,
   34 F.4th 828 (9th Cir. 2022) ..…………….………………………….………………….. 5

*In re Netflix, Inc., Sec. Litig.*,
   964 F. Supp. 2d 1188 (N.D. Cal. 2013) …………..                                      10

*Ng v. Berkeley Lights, Inc.*,
   2024 U.S. Dist. LEXIS 28776 (N.D. Cal. Feb. 20, 2024) ……..……….……..…….  14, 16

*In re Nimble Storage Sec. Litig.*,
   2017 U.S. Dist. LEXIS 162947 (N.D. Cal. Oct. 2, 2017) ………….…………………….. 10

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015) …………………………………………………………… 13, 14

*In re Omnicom Grp. Sec. Litig.*,
   597 F.3d 503 (2d Cir. 2010) ………………………………………………………… 25

*In re On24, Inc. Sec. Litig.*,
   2024 U.S. Dist. LEXIS 41897 (N.D. Cal. March 5, 2024) ………………………...……… 10

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
   774 F.3d 598 (9th Cir. 2014) ……………….……………….…..……………………… 14

*In re Oracle Corp. Sec. Litig.*,
   627 F.3d 376 (9th Cir. 2010) ……………….………..……………………………. 23, 24

*Payne v. DeLuca*,
   433 F. Supp. 2d 547 (W.D. Pa. 2006) ………………………………………………… 8

**Page**

*In re Rocket Fuel, Inc. Sec. Litig.*,
  2015 U.S. Dist. LEXIS 171552 (N.D. Cal. Dec. 23, 2015) ………….……………....… 9–10

*Rok v. Identiv, Inc.*,
  2017 U.S. Dist. LEXIS 1019 (N.D. Cal. Jan. 4, 2017) ……………………………… 22, 23

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) …………………………………………………….. 12

*Sakkal v. Anaplan Inc.*,
  F. Supp. 3d 988 (N.D. Cal. 2021) …………………………………………………… 18

*SEC v. Rio Tinto PLC*,
  41 F.4th 47 (2d Cir. 2022) ……………………………………………………… 25

*Shields v. Citytrust Bancorp, Inc.*,
  25 F.3d 1124 (2d Cir. 1994) …………………………………………………… 12

*Shurkin v. Golden State Vintners, Inc.*,
  2005 U.S. Dist. LEXIS 39301 (N.D. Cal. Aug. 10, 2005) ………………..…………… 13

*In re Silicon Graphics Inc. Sec. Litig.*,
  183 F.3d 970 (9th Cir. 1999) …………………………………………………… 20

*In re Skechers USA, Inc. Sec. Litig.*,
  444 F. Supp. 3d 498 (S.D.N.Y. 2020) …………………..……………………………… 20

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
  160 F. Supp. 2d 1059 (N.D. Cal. 2001) …………………………………………... 7

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
  2000 U.S. Dist. LEXIS 15369 (N.D. Cal. Sept. 29, 2000)…………………………... 9

*Steamfitters Local 449 Pension Plan v. Molina Healthcare*,
  2018 U.S. Dist. LEXIS 217852 (C.D. Cal. Dec. 13, 2018) …………..……………… 11

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007) …………………………………………………..…………… 17

*Veal v. LendingClub Corp.*,
  423 F. Supp. 3d 785 (N.D. Cal. 2019) …………………………………………… 17, 21

*Veltex Corp. v. Matin*,
  2010 U.S. Dist. LEXIS 108402 (C.D. Cal. Sept. 27, 2010) ………………………… 25

*In re Verifone Sec. Litig.*,
  784 F. Supp. 1471 (N.D. Cal. 1992) …………………………….……………… 13

Page

*Weston Family P'ship LLLP v. Twitter, Inc.*,
    29 F.4th 611 (9th Cir. 2022) ……………………………..……………… 11, 12, 14

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994) ………………………………………………… 21

*Ziolkowski v. Netflix, Inc.*,
    2018 U.S. Dist. LEXIS 164641 (N.D. Cal. Sept. 25, 2018) ………..………………… 19

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d. 981 (9th Cir. 2009) ……………………………….…………..…… 17, 18, 22


**Statutes and Rules**          **Page**

15 U.S.C. § 78j(b) ..…………………………………………………………… 1, 5

15 U.S.C. § 78t(a) .……………………………………………………………… 1, 5

15 U.S.C. § 78u–5(c) .……………………………………………………………… 10

15 U.S.C. § 78u-5(i)(1)(B) .…………………………………………………………… 10

28 U.S.C. § 1658(b) .……………………………………………….……………… 5

Private Securities Litigation Reform Act, Pub. . 104–67, 109 Stat. 737 (1995) ……….. 5, 7, 10, 19

## TABLE OF ABBREVIATIONS[1]

| Abbreviation | Meaning |
|---|---|
| ABPDAU | Average bookings per daily active user |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| "Complaint" or ¶ | Plaintiffs' Amended Class Action Complaint for Violations of the Federal Securities Laws, *Dekalb Cnty. Pension Fund v. Roblox Corp.*, No. 23-cv-6618-RS (Apr. 12, 2024), ECF No. 58 |
| CW | Confidential Witness |
| DAU | Daily active user |
| DPO | Direct public offering |
| Ex. | Exhibit attached to the Declaration of Doru Gavril, filed contemporaneously herewith. Unless otherwise noted, all page references refer to internal pagination as it appears in the original cited materials. |
| Individual Defendants | David Baszucki, Michael Guthrie, and Craig Donato |
| MNPI | Material non-public information |
| Prospectus | Roblox's Form 424B4, filed with the SEC on March 10, 2021 |
| PSLRA | Private Securities Litigation Reform Act, Pub. L. 104–167, 109 Stat. 737 (1995) |

---

[1] Herein, emphasis is added unless otherwise noted. Certain quotation marks, alteration marks, citations, and emphases have been omitted.

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that at the time and place noted above, Defendants will and do move to dismiss Plaintiffs' Complaint pursuant to Rules 12(b)(6) and 9(b).

## STATEMENT OF ISSUES

Do Plaintiffs state a claim under Sections 10(b) or 20(a) of the Exchange Act?

## INTRODUCTION

This is a simple case. Like many others dismissed by federal courts over the last few years, it tries to plead securities fraud on the basis of stock price variability during and after the COVID-19 pandemic. Plaintiffs claim that, at the height of COVID-19, Roblox should have predicted that its growth would slow down after the pandemic. Plaintiffs are not satisfied that the Company disclosed the risk of such an event—they claim Roblox should have stated it as a fact, presciently, a year in advance. This theory must have struck even Plaintiffs as far-fetched, since they waited two years until the limitations period had nearly run to file this lawsuit.

Plaintiffs fail to plead each of the elements of a securities fraud claim under Section 10(b): (1) a material misrepresentation or omission; (2) made knowingly or recklessly (i.e., with scienter); (3) that caused the alleged stock price decline. The Ninth Circuit instructs that each of the elements must be pleaded with particularized facts, under the stringent standard Congress imposed in the Private Securities Litigation Reform Act of 1995. *Id.*

First, Plaintiffs start on the wrong foot with respect to falsity. *Infra* Section I. They acknowledge that at the time it went public in March 2021, Roblox disclosed that its recent growth rates for very specific metrics might slow down after the pandemic. But then they claim that generically optimistic statements about the Company's long-term growth were a guarantee of never-ending growth with respect to those specific metrics. The absurdity of that claim must have prompted Plaintiffs to diversify their allegations and, by paraphrasing statements by former employees, imply that Roblox's metrics were not what the Company disclosed them to be.

Roblox stands by its metrics. Plaintiffs cavalierly use different metrics interchangeably and get confused by a publicly-filed presentation they failed to read carefully. They mix up year/year growth rates with the makeup of Roblox's user base. That is enough to dismiss the Complaint.

Second, Plaintiffs cannot plead the state of mind of any Defendant. *Infra* Section II. Instead, they ask the Court to infer it from banal corporate events, such as town hall meetings with employees about Company performance, stock sales by executives protected by Rule 10b5-1 predetermined trading plans, and even from executives' familiarity with key metrics of Roblox's performance. Thankfully, courts do not infer an intent to commit fraud from executives' diligent monitoring of key performance metrics, otherwise every good CEO would be liable.

Third, Plaintiffs fail to plead loss causation. *Infra* Section III. They claim the market was "shocked" by Roblox's performance results in early 2022. No analyst appeared shocked, and certainly none suspected any wrongdoing. The market simply reacted to slowing growth in certain metrics as pandemic restrictions eased. The irony is that Roblox continued to grow across many metrics, just less quickly: bookings had grown by "only" 20%, and Daily Active Users ("DAUs") by a "mere" 33%. *See* ¶ 192. That all companies should be so lucky.

This is not even a close case. It should be dismissed.

## BACKGROUND

### A.  After Years of Steady Growth, Roblox Becomes Publicly Traded

Roblox was founded in 2004 as an online platform for users to play or create games and other immersive experiences. Ex. 1 at 2–3. Users can join and play for free. *Id.* at 3. They also have the option to enhance their experiences by buying Robux, a virtual currency used to purchase virtual items on the platform. *Id.* Qualified users who build successful games and experiences can earn Robux and exchange them for real-world currency. *Id.*

As a private company, Roblox invested heavily in its platform and had a history of losses. *Id.* at 15–16. Roblox's revenue and user engagement skyrocketed during the pandemic, as shelter-in-place policies caused users around the world to spend more time online. *Id.* at 15; ¶¶ 68–69, 109. A period of rapid growth in 2020 saw DAUs and bookings (sales of Roblox's virtual currency) increase 85% and 171% year over year. *Id.* at 4, 13–15, 88–89.

After assessing various liquidity opportunities for stockholders and employees, Roblox decided to pursue a public offering through a direct listing. *Id.* at 1, 191. Unlike an IPO, a direct listing does not have a set price, and is not intermediated by underwriters. As a result, anyone can

buy stock. Similar to an IPO, all stock offered for sale must be registered with the SEC (or qualify

under an exemption). Both employees and existing shareholders can sell in IPOs and in direct

listings. In February 2021, Roblox raised awareness about its offering with an "Investor Day." *Id.*

at 58; *see also* Ex. 14. On March 10, 2021, Roblox became publicly traded. Ex. 1 at 191; ¶ 1.

**B.      Roblox's Prospectus Warns Investors of Risks to Profitability**

Roblox was transparent about the risks associated with its business and the challenges that

it had experienced in the past. Roblox's Prospectus made clear that the Company had "incurred

net losses since our inception," that "we expect to continue to incur net losses in the near future,"

and that "[we might] not be able to achieve or maintain profitability in the future." Ex. 1 at 16.

The Prospectus listed a further 50 pages of specific risks to profitability. *Id.* at 15–69.

**COVID-19.** Acknowledging its recent "rapid growth," "due in part to the COVID-19

pandemic," Roblox disclosed that "***in future periods we expect growth rates for our revenue to

decline***," and that it "may not experience any growth in bookings or our user base during periods

where we are comparing against COVID-19 impacted periods." *E.g.*, *id.* at 15. Roblox explained

that "DAU growth rate" could "slow in the future due to various factors, including the end of

COVID-19 related shelter-in-place orders." *Id.* at 25. Likewise, the "increase in engagement and

monetization" was likely "temporary" and would "moderate over time." *Id.* at 91.

**Child Safety.** Noting that a significant portion of its DAUs were under 13, Roblox warned

that the "success of our business model is contingent upon our ability to provide a safe online

environment for children to experience." *Id.* at 9. Roblox explained that, occasionally, bad actors

had allegedly abused the platform "to identify and communicate with children and to possibly

entice them to interact off-platform," beyond the protection of Roblox's on-platform safety

measures. *Id.* at 21. Despite devoting considerable resources to safety, Roblox warned that "we

are unable to prevent all such interactions from taking place" in the future. *Id.*

**Aging Up.** Roblox also disclosed its "strategy" to "expand the age groups that make up

our users," noting that its "business performance" depended in part on "increasing our penetration

and engagement across all user demographics, in particular those over the age of 13." *Id.* at 26,

87. Roblox warned that such initiatives could be "difficult, costly or time consuming," and that

revenue growth could suffer if "we fail to increase penetration and engagement across all age demographics" or if users cease to interact with the platform as they age. *Id.* at 26, 28.

**Monetization.** Roblox also cautioned that revenue growth could be significantly harmed if "we fail to increase or maintain DAUs," "user growth outpaces our ability to monetize our users," or "users reduce their purchases of Robux." *Id.* at 28.

### C.    Roblox Sees Considerable Success After Becoming Publicly Traded, but Results Dip After the Pandemic Eases

After the DPO, Roblox's user engagement and bookings continued to grow. Bookings climbed from $2.7 billion in 2021, to $2.9 billion in 2022, to $3.5 billion in 2023. Exs. 10, 12, 13. In that same period, DAUs rose from 45.5 million, to 56 million, to 68.4 million. *Id.*

Roblox's efforts to increase its 13+ user population also yielded results. In Q1-21, 13+ users surged to 49% of the total user base—an increase of 111% year over year. Ex. 15 at 20. Under-13 users made up the other 51%—a 60% increase from the prior year. *Id.* By the beginning of Q3-21, over half of Roblox's users were aged 13 and older. *Id.;* Ex. 16 at 12. Users 13 and older have remained the majority of Roblox's user base ever since. Ex. 19 at 23.

Even before the DPO, Roblox already had multiple systems in place to promote safety. For example, it could "adjust a user's experience and available content based on their age, device type, [and] current location," which enabled it to "dynamically apply relevant content filters, . . . payment limits, and parental consent requirements." Ex. 1 at 125. Roblox did not stop there. Eight months after going public, it added a layer of security: front-end parental controls that enabled parents to limit their child's spending, content exposure, and messaging abilities. Ex. 17.

As COVID-19 restrictions waned, Roblox experienced fluctuations in its results. On December 15, 2021, Roblox published its metrics for November 2021. Ex. 18. Bookings and DAUs had grown year over year, by 32% and 35%, respectively. *Id.* Yet the ratio between the two (average bookings per daily active user, or ABPDAU)—a measure of overall monetization—had decreased by 9%. *Id.* Roblox's stock price dipped from $107.67 to $97.95 per share. Ex. 20.

On February 15, 2022, Roblox reported results for FY-21, Q4-21, and January 2022. Ex. 13. These results showed DAUs and bookings had increased year over year. *Id.* Revenue for

2021 had also grown by 108%, to $1.9 billion. *Id.* But Roblox's ABPDAU for January 2022 saw a year-over-year decrease of roughly 22%. *Id.* Despite the overall growth in user engagement and bookings, Roblox's stock dropped from $73.30 to $53.87. Ex. 20.

### D.    Years Later, Plaintiffs File This Lawsuit Before the Limitations Period Expires

In November 2023, shortly before the two-year statute of limitations was due to expire, 28 U.S.C. 1658(b), Plaintiffs initiated this action. ECF No. 1. The initial complaint, which asserted claims under Sections 10(b) and 20(a) of the Exchange Act, alleged that Roblox's disclosures in the three quarters following its DPO misrepresented the sustainability of the Company's growth after COVID-19. *Id.* On April 12, 2024, Plaintiffs filed an amended complaint ("Complaint") that shifted the focus of their allegations to Roblox's aging-up initiatives. *E.g.*, ¶¶ 14, 17, 19, 31. The new allegations fare no better than the old and should be dismissed.

### ARGUMENT

Plaintiffs fail to plead with requisite particularity multiple elements of a claim for securities fraud: "a material misrepresentation or omission," "scienter," and "loss causation." *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 835 (9th Cir. 2022); *Irving Firemen's Relief & Ret. Fund. v. Uber Techs.*, *Inc.*, 998 F.3d 397, 404 (9th Cir. 2021) ("Rule 9(b)['s particularity requirement] applies to all elements of a securities fraud action.").

In passing the PSLRA, Congress sought to prevent "plaintiff[s] from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explanation stating why the defendant's alleged statements or omissions are deceitful." *Nektar*, 34 F.4th at 835. Under the PSLRA, plaintiffs must "specify *each statement* alleged to have been misleading, the reason or reasons why *[each such] statement* is misleading, and, if an allegation . . . is made on information and belief . . . all [particularized] facts on which that belief is formed." *Jedrzejczyk v. Skillz Inc.*, 2022 U.S. Dist. LEXIS 117803, at *12 (N.D. Cal. July 5, 2022). They must also "state *with particularity facts* giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* at *10. This showing is made "only if . . . the inference of scienter [is] cogent and at least as compelling as any opposing inference." *Id.* at *17.

Plaintiffs come nowhere close to satisfying this rigorous pleading standard.

**I.    PLAINTIFFS FAIL TO PLEAD FALSE OR MISLEADING STATEMENTS**

Plaintiffs challenge statements concerning three topics: (A) the percentage of 13+ users that made up Roblox's user base; (B) the sustainability of Roblox's post-COVID-19 growth rate; and (C) Roblox's monetization efforts. Plaintiffs' falsity allegations fail for two key reasons. First, Plaintiffs fail to plead "the reason or reasons why [each challenged] statement is misleading." *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 2012 U.S. Dist. LEXIS 71429, at *22 (N.D. Cal. May 22, 2012) (quoting 15 U.S.C. § 78u-4(b)(1)). Second, many of the challenged statements are inactionable opinions, puffery, or forward-looking statements.

**A.    No False Statements Concerning 13+ Users**

Plaintiffs challenge several public statements regarding the percentage of Roblox's 13+ DAUs, all centered on whether 13+ users accounted for ~50% of Roblox's DAUs.[2] Plaintiffs' falsity allegations suffer from three fatal deficiencies.

**Inconsistent use of metrics.** Plaintiffs' allegations so thoroughly conflate different metrics that it is difficult even to decipher their meaning. In one instance, Plaintiffs attempt to show the falsity of statements about the percentage of Roblox's ***DAUs*** by age, but reference an entirely separate metric: ***bookings*** by age. *Compare* ¶ 213 (challenging statement that "users over the age of 13 . . . now account[] for 49% of the *user base*") *with* ¶ 215 ("CW 2 knew this information [was false] because [Defendants] presented the information about *bookings-by-age*"). DAUs are humans; bookings are dollars.[3] Apples; oranges.

In another example, Plaintiffs challenge a statement about DAUs: "[o]ver half of our people are over 13 year[s] old." ¶ 231. Plaintiffs rely on what they attempt to depict as conflicting DAU data: "users under 13 years old" allegedly "represented 60 to 70% of Roblox's users at the end of 2021." ¶ 232. Though Plaintiffs initially seem to refer to "users," *id.*, they later refer to the very same "60 to 70%" figure as representing ***bookings***. *See* ¶ 290 ("CW5 explained that . . .

---

[2] *See* ¶ 211 (as of March 11, 2021, approximately 44% of user base were 13+ users); ¶ 213 (in Q1-21, 13+ users growing at 111% and accounting for 49% of base); ¶ 133 (as of May 11, 2021, 13+ users were "[c]lose to passing, if not passing," 50% of base); ¶ 221 (as of August 17, 2021, over half of users 13+); ¶ 231 (as of November 9, 2021, over half of users 13+).

[3] Plaintiffs' cavalier treatment of metrics is further evidenced by the Complaint referring to bookings and revenue—two distinct metrics—as interchangeable. *See* ¶ 12 n.3.

[Roblox] obtained **60 to 70%** of its ***bookings*** from users under 13-years-old in 2021").

Adding to the confusion is the fact that no data supports an allegation that users under 13 represented 60 to 70% of *either* DAUs or bookings. One possible explanation is that Plaintiffs, and the CWs they allegedly queried on this, are misreading a publicly available presentation. *See* Ex. 15 at 20. The presentation shows that, in Q1-21, users under 13 were 51% of total DAUs, reflecting **60% year-on-year growth**. *Id.* In short, Plaintiffs appear to be mixing up *percentage growth* of DAUs in that age bracket as the *percentage of total users* in the under-13 demographic. These are exactly the types of ambiguities, or mischaracterizations, that the PSLRA's particularity requirement was meant to avoid. It is not for Defendants, or the Court, to guess at the possible meaning of these allegations. *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1074–75 (N.D. Cal. 2001) ("[N]either the Court nor opposing counsel should be required to . . . figure out exactly what the misleading statements are, and to match the statements up with the reasons they are false or misleading.").

As a function of these confounding allegations, Plaintiffs fail to allege coherently—let alone with particularity—which metrics (if any) were misstated. *See Kelley v. Rambus, Inc.,* 2008 U.S. Dist. LEXIS 120042, at *20 (N.D. Cal. Apr. 17, 2008) ("Particularly because many of Plaintiffs' allegations are confusing and/or internally inconsistent, both Defendants and the Court have been limited severely in attempting to address the substantive adequacy of Plaintiffs' fraud claims in a meaningful way."), *aff'd,* 384 F. App'x 570 (9th Cir. 2010).

**Contradictory theory of falsity.** Plaintiffs' obfuscation of metrics also renders Plaintiffs' own theory of falsity internally contradictory. Plaintiffs first ignore that Defendants' statements about 13+ users concerned DAUs, pretending that these statements were instead about bookings by age. *See, e.g.,* ¶¶ 133–134. Then, Plaintiffs suddenly contradict themselves and admit that the challenged statements *did* pertain to DAU growth—indeed, they *even concede* that "***the Company's user growth was led by over-13 users***"—but now argue that the statements were nonetheless misleading because Roblox's "*monetization* growth was still overwhelmingly reliant on the under-13 audience." ¶ 209. Plaintiffs claim both that Defendants *misstated* the percentage of bookings attributable to 13+ users and simultaneously *failed to disclose* this metric. In short,

not only do Plaintiffs concede the very point they initially disputed—that Roblox's older demographic was growing and ultimately comprised the majority of users on the platform—they also set forth two conflicting assertions that cannot coexist. By presenting an internally incoherent theory of fraud, Plaintiffs fail to state a claim. *See Kelley*, 2008 U.S. Dist. LEXIS 120042, at *20; *accord Payne v. DeLuca*, 433 F. Supp. 2d 547, 612 (W.D. Pa. 2006) (dismissing securities claim where allegations were "self-contradictory, a defect which is fatal to [plaintiffs'] claims").

**Reliance on inconsistent CWs.** Plaintiffs' falsity allegations fail for an additional reason: they rely on statements credited to confidential witnesses that are so mercurial, inconsistent, and unreliable as to make them entirely indecipherable.

The CWs' statements lack credibility from the outset because they contradict one another. Take, for example, the instance of two CWs discussing the same percentages but attributing them to different metrics. *Compare* ¶ 232 (CW 4 alleging that 60-70% of *users* were under 13) *with* ¶ 290 (CW 5 alleging that 60–70% of *bookings* came from users under 13). How is it possible that the same numbers are attributed by two different individuals to different metrics? Did Plaintiffs or their agents feed the numbers to CWs, to their ultimate confusion? Are there recordings or interview notes that could help explain how these contradictory statements make their way into a complaint and somehow remain consistent with Plaintiffs' Rule 11 obligations?

Plaintiffs also fail to plead a plausible basis for each CW's knowledge. Since not a single CW reported directly to any Individual Defendant or participated in executive decision-making, ¶¶ 55–59, Plaintiffs instead allege that the CWs obtained their information chiefly from statements made in company-wide town halls. But it defies logic to suggest that Defendants would leak purportedly secret information to hundreds of Roblox employees if, as Plaintiffs claim, Defendants intended to fraudulently conceal that same information from investors. Tellingly, Plaintiffs paraphrase, rather than directly quote, the CWs, leaving greater opportunity for mischaracterization. To avoid doubt: Roblox has checked its publicly disclosed numbers, which accord with those presented during town halls, and they are accurate. It is impossible to tell which metrics Plaintiffs are referring to, and the Complaint studiously engages in a trompe l'oeil as to which CW said exactly what, when, and about which metric. As a result, Plaintiffs fail to

plead that any of Defendants' representations about user metrics were materially misleading.

### B.    No False Statements Concerning Sustainability of Growth

Plaintiffs' second theory fares no better. They claim that Roblox falsely represented "monetization growth would continue after COVID." ¶¶ 205, 207. This fails for four reasons.

#### 1.    No Particularized Facts Contradicting the Challenged Statements

Plaintiffs challenge two of Mr. Baszucki's statements in a CNBC interview.

First, they denounce as "false and misleading" the simple statement that "Roblox has been growing for 15 years driven by our community, driven by the awesome content[,] driven by our creators, and driven by the ability for people to do things together. That's a long-term growth path and we believe that continues forward even after Covid." ¶ 205. Roblox had indeed been growing, and that growth had been driven by content and community engagement. *See* Ex. 1 at 5, 15–16. This is largely a statement of historical fact; Plaintiffs plead nothing to contradict it. *See In re Splash Tech. Holdings, Inc. Sec. Litig.*, 2000 U.S. Dist. LEXIS 15369, at *54–55 (N.D. Cal. Sept. 29, 2000) (vague assessments of past results and historical facts were not actionable). As for Roblox's "growth path," Mr. Baszucki's statement referred to the Company's overall trajectory, which would unfold over a long period of time. ¶ 205. He was not referring to any particular metric nor to any particular time period—least of all to the immediate aftermath of a pandemic that nobody could see the end of.

Second, Plaintiffs try to portray the CNBC interview as a promise that monetization growth specifically would continue after COVID-19. Mr. Baszucki said that "*a lot of the stuff we've seen in Covid . . . [i]s going to continue going forward so we're very optimistic about the growth and on the monetization*." ¶ 207. His statement does not refer to any particular metric and does not promise any specific performance. The Company's optimism about growth and monetization—in some indeterminate future—is not a promise that after COVID-19, any specific metric would continue on the same trajectory.

In similar circumstances, courts did not find an actionable misrepresentation or omission. *E.g., In re Rocket Fuel, Inc. Sec. Litig.*, 2015 U.S. Dist. LEXIS 171552, at *20  (N.D. Cal. Dec. 23, 2015) (statement that digital ad fraud-detecting company would "'stay ahead of [bots]' makes

no guarantee of any specific level of success" and was thus inactionable); *In re Netflix, Inc., Sec. Litig.*, 964 F. Supp. 2d 1188, 1194–95 (N.D. Cal. 2013), *aff'd*, 647 F. App'x 813 (9th Cir. 2016) (statements that "investing in its DVD business would continue to be a smart choice" inactionable because "they are, in context, optimistic statements about streaming among candid statements of risk"); *In re Nimble Storage Sec. Litig.*, 2017 U.S. Dist. LEXIS 162947, at *7 (N.D. Cal. Oct. 2, 2017), *aff'd*, 756 F. App'x 779 (9th Cir. 2019) ("more general statements of growth . . . not actionable" in light of disclosures); *In re On24, Inc. Sec. Litig.*, 2024 U.S. Dist. LEXIS 41897, at *27-28 (N.D. Cal. March 5, 2024) ("statements like 'we believe we can achieve significant growth by retaining and further penetrating our existing customer base' . . . are not actionable promises without more particularized allegations that the underlying metrics are deceiving").

### 2.    The Challenged Statements Are Forward-Looking and Protected

The language and context of Mr. Baszucki's interview answers make abundantly clear that many are forward-looking statements. *See* ¶ 205 ("long-term growth path" that "we believe [] continues forward even after COVID"); ¶ 207 ("a lot of the stuff we've seen in Covid . . . [will] continue going forward so we're very optimistic").

Defendants are not liable for failing to foresee the future. To this end, "the PSLRA carves out a safe harbor from liability if the statements at issue were forward-looking and accompanied by meaningful risk warnings." *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 866 (N.D. Cal. 2004); 15 U.S.C. § 78u–5(c). Both requirements of the safe harbor are met.

**Forward-Looking Statements.** By definition, a statement "of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer," is a forward-looking statement. 15 U.S.C. § 78u-5(i)(1)(B); *see also Intuitive Surgical*, 759 F.3d at 1058 (forward-looking statement is "any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions underlying or related to any of these issues."). Roblox's statements fall squarely in this category.

**Risk Factors.** Roblox provided meaningful risk disclosures in SEC filings and earnings calls. The Prospectus repeatedly warned of the precise risks that Plaintiffs claim were concealed:

- "We have experienced rapid growth . . . due in part to the COVID-19 pandemic given our users have been online more as a result of global COVID-19 shelter-in-place policies . . . ***We do not expect these activity levels to be sustained, and in future periods we expect growth rates for our revenue to decline,*** and we may not experience any growth in bookings or our user base during periods where we are comparing against COVID-19 impacted periods . . . ***Our historical revenue, bookings and user base growth should not be considered indicative of our future performance.***" Ex. 1 at 15.

- "The COVID-19 pandemic and resulting social distancing, ***shelter-in-place and similar restrictions led to increased . . . user engagement on our platform*** relative to our quarterly forecast and historic trends. ***These increases in user activity are almost certainly not indicative of our financial and operating results in future periods.***" *Id.* at 17–18.

After the direct listing, during earnings calls and in other SEC filings, the Company consistently noted that DAU growth seen during the pandemic was unlikely to persist. *See, e.g.,* Ex. 5 at 55–56 ("[W]e do not expect those [COVID-19] activity levels to be sustained. Recently, we have started to see growth rates and other operating metrics moderate in certain markets"); Ex. 16 at 4 ("Any statements that refer to expectations, projections or other characterizations of future events, including . . . the impact of COVID-19 on our business . . . is a forward-looking statement based on assumptions today. Actual results may differ materially."). Courts have been clear that these risk disclosures are amply sufficient to protect forward-looking statements from liability. *Steamfitters Local 449 Pension Plan v. Molina Healthcare*, 2018 U.S. Dist. LEXIS 217852, at *6 (C.D. Cal. Dec. 13, 2018) ("[E]very earnings call . . . cited . . . incorporated the cautionary language from [the company's] public filings, putting investors on notice of the risks that the [c]ompany was facing."); *Weston Family P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 620–21 (9th Cir. 2022) ("Classic growth and revenue projections . . . accompanied by very detailed meaningful cautionary language" are "forward-looking on their face.").

Unable to ignore that Roblox *disclosed* that growth could (and likely *would*) slow after COVID-19, Plaintiffs claim that Defendants "directly contradicted" the Prospectus risk disclosures, ¶ 113, which were insufficiently precise, ¶ 110. Neither assertion is true.

Mr. Baszucki's expressions of optimism as to some unspecified positive trends continuing post-COVID, ¶ 205, do not contradict Roblox's overarching and specific warning that "in future

periods we expect growth rates for our revenue to decline, and we may not experience any growth in bookings or our user base during periods where we are comparing against COVID-19 impacted periods." Ex. 1 at 15. Plaintiffs' claim that the risk disclosures in the Prospectus "did not adequately warn investors of the risk that Roblox's growth would decline once children returned to school post-COVID," ¶ 110, defies credulity. If stating Roblox "expect[ed] growth rates . . . to decline" was not adequate warning that Roblox expected growth rates to decline, it is hard to imagine what would suffice. *See* Ex. 1 at 15; *see also supra* pp. 3–4, 11.[4]

Even ignoring Roblox's specific risk disclosures, Plaintiffs would still fail to state a claim. Defendants have no obligation to disclose every single detail or spell out every potential scenario in a risk disclosure. *In re Intel Corp. Sec. Litig.*, 2023 U.S. Dist. LEXIS 57732, at *34 (N.D. Cal. Mar. 31, 2023) (cautionary language "does not need to warn of the 'exact risk' that transpires"); *accord Intuitive Surgical*, 759 F.3d at 1061 ("We have expressly declined to require a rule of completeness for securities disclosures because "[n]o matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not."); *Twitter*, 29 F.4th at 620 ("While society may have become accustomed to being instantly in the loop about the latest news . . . our securities laws do not impose a similar requirement.").

Defendants had no obligation to anticipate and disclose a doomsday forecast in March 2021, before any negative events had even transpired. "People in charge of an enterprise are not required to take a gloomy, fearful, or defeatist view of the future." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129–30 (2d Cir. 1994); *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) ("Up to a point, companies must be permitted to operate with a hopeful outlook"). Courts in this district have rejected such claims, holding that complaints that "call on [defendants] to predict future sales (*i.e.*, sustained growth) . . . do not state a claim under the securities laws." *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2019 U.S. Dist. LEXIS 216801, at *31–32

---

[4] Roblox continued to issue similarly specific disclosures throughout the class period. *E.g.*, Ex. 2 at 39 ("However, this increase in engagement and monetization may be temporary and we have begun to see it moderate as shelter-in-place orders and other related measures and community practices evolve."); Ex. 4 at 35 ("[W]e have begun to see it moderate as vaccination rates increase, children return to classrooms or camps**,** and shelter-in-place orders are lifted.").

1   (N.D. Cal. Dec. 17, 2019); *In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1485 (N.D. Cal. 1992)

2   (no claim where defendants failed to disclose that sales were "atypically large and that the future

3   would not be as bright as the past," or that company's sales were "boosted" by large one-time

4   sales which would not recur in future quarters), *aff'd*, 11 F.3d 865 (9th Cir. 1993); *Monachelli v.*

5   *Hortonworks, Inc.*, 225 F. Supp. 3d 1045, 1055 (N.D. Cal. 2016) (rejecting argument that a firm

6   misrepresented when it "touted" accurate financial results without exposing downside impacts on

7   growth because "disclosure[s] of accurate historical data accompanied by general statements of

8   optimism and failure to disclose internal forecasts of future performance are not actionable").

### 3.    The Challenged Statements Are Inactionable Opinions

10          The language and context of the challenged statements also indicate that Mr. Baszucki

11  was expressing non-actionable opinions. "An opinion is a belief[,] a view, or a sentiment" that is

12  distinguishable from "a statement of fact" in that it "rest[s] on grounds insufficient for complete

13  demonstration." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S.

14  175, 183 (2015). Defendants' statements—"we believe" Roblox will continue on "a long-term

15  growth path," ¶ 205, and "we're very optimistic about the [Company's] growth," ¶ 207—reflect

16  inherently subjective views and are expressions of opinion.

17          "Misstatements of opinion can give rise to a claim" only if they "[a]re both objectively

18  and subjectively false or misleading." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v.*

19  *Align Tech., Inc.*, 856 F.3d 605, 614 (9th Cir. 2017). Plaintiffs fail to "allege[] with particularity, "

20  *id.,* that any opinions were objectively false, nor that Mr. Baszucki did not believe those

21  statements when they were made. *Infra* Section II; *Shurkin v. Golden State Vintners, Inc.*, 2005

22  U.S. Dist. LEXIS 39301, at *28 (N.D. Cal. Aug. 10, 2005) ("[T]he relevant inquiry is whether the

23  statement was false . . . when the opinion was disseminated to the public."); *In re Mellanox Sec.*

24  *Litig.*, 2014 U.S. Dist. LEXIS 198759, at *50 (N.D. Cal. Mar. 31, 2014) (plaintiff failed to

25  "plead[] subjective falsity—that [the defendant] actually disbelieved his own [opinion]").

### 4.    The Challenged Statements Are Non-Actionable Puffery

27          Many challenged statements constitute "mere puffery," which is "non-actionable as

28  securities fraud." *In re Eargo, Inc. Sec. Litig.*, 656 F. Supp. 3d 928, 943 (N.D. Cal. 2023).

"Puffery comprises generalized, vague, nonquantifiable statements of corporate optimism." *Id.*; *see also Omnicare*, 575 U.S. at 183–84 (2015) (differentiating "mere puffery" from "determinate, verifiable statement[s]"). "[V]ague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers, are not actionable because professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." *Ng v. Berkeley Lights, Inc.*, 2024 U.S. Dist. LEXIS 28776, at *19 (N.D. Cal. Feb. 20, 2024); *Twitter*, 29 F.4th at 620–21 ("vaguely optimistic assessment" of product development "so imprecise and noncommittal that [it is] incapable of objective verification" inactionable).

Mr. Baszucki's statements concerning future growth are quintessential examples of such inactionable corporate optimism. *Compare Macomb Cnty. Emp. Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1099 (9th Cir. 2022) ("plainly . . . puffery" where statements used "vague, generically positive terms, describing . . . 'a market that's growing significantly for us,' [with] 'really good' 'dynamics,' and . . . performance there as 'tremendous' and 'great'"), *with* ¶ 205 ("growth path" driven by "awesome" content and the "ability for people to do things together") *and* ¶ 207 ("really exciting," and "we're very optimistic").

### C.    No False Statements Concerning Monetization

Plaintiffs also allege that Defendants' statements concerning monetization, ¶¶ 207, 224, 233, were misleading because they "intentionally directed investors' attention away from []  metrics such as ABPDAU," ¶ 234, and failed to disclose that monetization was reliant on the Company's under-13 users (such that bookings would decline once Roblox implemented parental controls and children returned to school after lockdowns ended). This argument likewise fails.

### 1.    Roblox Disclosed the Allegedly Concealed Information

Roblox disclosed everything that Plaintiffs claim Defendants concealed.

**ABPDAU.** It is unclear how Roblox could be "downplaying" ABPDAU when it regularly reported it. *See* Ex. 1 at 13 (reporting ABPDAU); Ex. 4 at 33 (same); Ex. 5 at 35 (same); *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014) (disclosed information cannot serve as basis for omission claim). As Plaintiffs' own pleadings show, the market knew that "the rate of average bookings [was] trail[ing]." ¶ 234.

**Decline in growth rate.** As explained, *supra* pp. 3–4, 11–12, the Prospectus was explicit that Roblox anticipated growth in user engagement and bookings to decline once children returned to school: "We have experienced rapid growth . . . due in part to the COVID-19 pandemic given our users have been online more as a result of global COVID-19 shelter-in-place policies . . . ***We do not expect these activity levels to be sustained***, and in future periods we expect growth rates for our revenue to ***decline***, and we ***may not experience any growth*** in bookings or our user base . . . where we are comparing against COVID-19 impacted periods." *E.g.*, Ex. 1 at 15.

**Content controls.** Roblox clearly disclosed that, despite its considerable efforts to maintain the safety and civility of its platform, it could not eliminate the possibility that children would access inappropriate content. *See id.* at 21 ("[A] significant percentage of [our experiences] are designed to be experienced by children. . . . [F]rom time to time inappropriate content is successfully uploaded onto our platform . . . [W]e have faced allegations that our platform has been used by criminal offenders to identify and communicate with children . . . [W]e are unable to prevent all such interactions."). The Company was clear it was "working to roll out a content-ratings system that will allow users to flag certain explicit content in our games and on ways to better optimize our parental controls." Ex. 3 at 59.

### 2. The Challenged Statements Are Not Misleading

Plaintiffs fail to show any of the monetization-related statements were materially misleading. The first challenged statement (a forward-looking statement of optimism and an opinion, *see supra* pp. 10–14, contains nothing misleading: "***[Our] virtual economy has also been scaling with our user and engagement growth and we're very optimistic about it***." ¶ 207. "Scaling" simply means that the virtual economy grows when DAUs and engagement increase. Defendants made no representations as to the rate or degree of scaling. Nevertheless Plaintiffs assume, without support, that the term "virtual economy" means the ***rate*** of monetization would increase. The challenged statement simply says that the number of purchasable items or activities in the virtual economy grows as more users buy or create sellable content and experiences.

Plaintiffs also unsuccessfully challenge the statement that "engagement and monetization

[] whether under 13 or over 13 is actually quite similar." ¶ 224. Plaintiffs plead no facts to suggest that engagement and monetization were dissimilar between the two age demographics. As explained, *supra* Section I, Plaintiffs' allegations concerning Roblox's engagement and monetization metrics are both inconsistent and contradictory, as are the witness statements on which these allegations are exclusively based. Absent a coherent theory of falsehood, Plaintiffs cannot plausibly suggest that Defendants' statement was misleading.

Finally, Plaintiffs fail to identify anything misleading in a statement describing "bookings growth as driven primarily by user and engagement growth." ¶ 233. Mr. Guthrie, Roblox's CFO, explained: "We get the question a lot about the ratios between monetization per user, and I'll just caution that ***when you have high bookings growth and high user growth, just the rate of change in the numerator and denominator can make numbers look like they're going up or down***." *Id.*

This statement is true—the Company can have independently high bookings and high user growth, but if one number is growing at a faster rate than the other, ratio-based metrics (such as ABPDAU) will decline. If, in Period A, a company has $200 in total bookings and 20 daily active users, the ABPDAU will be $10. If the company, in Period B, has $400 in bookings and 50 daily active users, ABPDAU will be $8. As a result, ABPDAU can decline even as the company sees growth in both users and bookings. Contrary to Plaintiffs' insinuation, Mr. Guthrie never said that the *ratio* of bookings to user growth would remain consistent. He simply stated bookings were "driven" by user growth. Plaintiffs cannot mischaracterize a statement to plead falsity. *Berkeley Lights*, 2024 U.S. Dist. LEXIS 28776, at *23 ("[C]ourts in this district have rejected allegations as insufficient where, as here, 'the reasons Plaintiffs offer as to why the statements are false or misleading bear no connection to the substance of the statements themselves'").[5] Moreover, Mr. Guthrie went on to specify that monetization trends are measured "over a very long period of time," such that ABPDAU in any given period may not be representative of broader upward trends. ¶ 233. Plaintiffs conveniently omit this from their analysis.

---

[5] Mr. Guthrie's statement is also consistent with Defendants' other representations. *See* Ex. 1 at 88 ("ABPDAU monetization is dependent on the degree of user engagement, as measured by hours engaged. As such we believe our business performance will be driven in part by our ability to increase hours engaged per DAU on our platform.").

Plaintiffs' jumble of falsity allegations—about metrics, growth, and monetization—resort to loose wording, confusion, and mischaracterization. This is a testament to their weakness.

## II.    PLAINTIFFS FAIL TO PLEAD SCIENTER

The "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 309 (2007). The "complaint must [therefore] contain allegations of specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1066 (9th Cir. 2008). Plaintiffs rely on: (1) confidential witnesses without contemporaneous knowledge; (2) unfounded insider trading allegations; and (3) a generic "core operations" theory. Each falls short.

### A.    The CW Allegations Fail to Create a Compelling Inference of Scienter

Plaintiffs try to bolster their scienter allegations with commentary attributed to five uninformed former employees. But the CWs' purported recollections must be discounted for two reasons, each independently sufficient. "First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d. 981, 995 (9th Cir. 2009). "Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Id.*

#### 1.    The CWs Lack Personal Knowledge

**Detail and reliability.** *Zucco* instructs courts to look to "the level of detail provided by the confidential sources" and "the reliability of the sources." *Id.* Zucco's CWs detailed their interactions with the defendants. They recounted, for instance, personally receiving an email from the defendant's account with instructions to alter accounting software. *Id.* at 992. One of Zucco's CWs reported directly to a defendant. *Id.* Even that, however, was not enough. Moreso here, where the CWs lack "contact with any of the Individual Defendants and therefore cannot provide reliable insight into the Defendants' state of mind." *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 814 (N.D. Cal. 2019). That is no surprise, given that they were not executives and were two

or more steps removed from the Individual Defendants in reporting hierarchy. ¶¶ 55–59.

The Complaint resorts to vague speculation, attributed to CW3, that certain information "was known within the Company," but such claims are insufficient under *Zucco*. 552 F.3d at 998. This Court's analysis in *Sakkal v. Anaplan Inc.* illustrates why Plaintiffs fall short. 557 F. Supp. 3d 988, 999 (N.D. Cal. 2021). There, a CW's "creation and distribution of billings reports at the monthly CFO meetings" came close to alleging the CFO's knowledge "but [was] not on its own capable of bearing the scienter inference." *Id.* Plaintiffs offer no such proximity.

**Corroboration and coherence.** *Zucco* also instructs courts to evaluate "the corroborative nature of the other facts alleged" and "the coherence and plausibility of the allegations." 552 F.3d at 995. There, the CWs' descriptions of accounting manipulation corroborated each other, and they still fell short of scienter. *Id.* at 992–96. Similarly, in *Metzler*, plaintiffs failed to plead scienter as to statements about student enrollment even when "[s]everal confidential witnesses corroborated the fact that [] management closely monitored performance at each campus, including information regarding student enrollment." 540 F.3d at 1058. Here, the CWs not only fail to corroborate, but also contradict each other and themselves in statements about DAU and/or bookings percentages by age. *Compare* ¶¶ 20, 120, 134, 148, 212, 215, 222, 232 (CW2, CW3, and CW4 allege that under-13 users "made up at least 60 to 70% of ***users***") *with* ¶¶ 134, 148, 215, 222, 232 (CW2 "knew this information" about percentage of ***total users*** because Defendants "presented the information about ***bookings-by-age*** during town hall meetings") *and* ¶¶ 12, 27, 80, 114, 151, 177, 209, 234, 290 (CW5 alleges that Roblox "obtained 60 to 70% of its ***bookings***" from under-13 users). *See also supra* Section I. Plaintiff does not point to a single document substantiating CWs' claims, nor to any direct conversations with Defendants.

## 2.    The CWs' Statements Are Not Indicative of Scienter

The CWs' allegations fail to show what the Individual Defendants knew that contradicted their statements when made. This alone warrants dismissal. *Align*, 856 F.3d at 620 (affirming dismissal where plaintiff did not allege "that the confidential informants personally disclosed Cadent's channel-stuffing to" the defendants). Instead, Plaintiffs plead two types of allegations, both innocuous and neither purported to have been known by the Individual Defendants.

**Allegations regarding user engagement and monetization fail to show scienter.** By virtue of their numerous inconsistencies, the CWs' statements fail to show which metrics were false, *see supra* Section I, let alone what knowledge Defendants had that would alert them to this (as yet unidentified) falsity. Absent a misrepresentation, scienter allegations fall flat. *See Ziolkowski v. Netflix, Inc.,* 2018 U.S. Dist. LEXIS 164641, at *12 (N.D. Cal. Sept. 25, 2018) (plaintiff's ability to plead scienter was "substantially hindered by his inability to plead the existence of a materially false or misleading statement"). Likewise, when complaints contradict themselves, courts dismiss them. *E.g.*, *In re Invision Techs., Inc. Sec. Litig.*, 2006 U.S. Dist. LEXIS 76458, at *21 (N.D. Cal. Aug. 31, 2006) (no scienter when plaintiffs' "own pleadings undermine [their] argument" because PSLRA requires accepting "inferences unfavorable to []] plaintiffs"); *In re Juniper Networks, Inc.*, 2004 U.S. Dist. LEXIS 4025, at *7 (N.D. Cal. Mar. 11, 2004), *aff'd*, 158 F. App'x 899 (9th Cir. 2005) (dismissing in part due to internal contradictions).

**Remaining allegations fail to show scienter.** Even assuming Plaintiffs' paraphrasing of CW testimony is accurate, the CWs allege banal information that does not show Individual Defendants knew they had a duty to disclose something but failed to do so. As explained *supra* Section I, while Plaintiffs allege that CWs confirmed that Defendants told employees (during Company-wide town hall meetings) that growth from COVID-19 was unsustainable and that they knew their user demographic consisted primarily of under-13 users, it defies common sense to infer scienter from such a statement. First, as already discussed, similar information was disclosed to the market. *Supra* pp. 14–15. Second, it is implausible that Defendants knowingly divulged damning MNPI to almost 1,000 employees while planning to utilize that same information to commit securities fraud. *Metzler* is instructive: even where a company's senior-level meetings all but conceded "that it knew compliance problems were detrimental to the company's well-being," the court declined to find scienter. 540 F.3d at 1058–59. In *Metzler*, management's internal debates about regulatory compliance—even instructions arguably suggesting that employees push regulatory boundaries—failed to establish knowledge under the PSLRA. *Id.* at 1069.

## B.    Plaintiffs' Insider Trading Allegations Are Unavailing

Plaintiffs' insider trading allegations also fail to show scienter. "[S]tock sales by corporate

insiders are suspicious only when they are dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Align*, 856 F.3d at 621. "To make this determination, [courts] look to three factors: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id.* There is no inference of scienter here.

As a threshold issue, Plaintiffs identify no material "undisclosed inside information," *id.*, Defendants held in the relevant period. Plaintiffs claim that Defendants traded based on MNPI about "age demographics and the sustainability of Roblox's growth" (¶¶ 48–50), yet they also allege that Defendants aired this very information in a town hall, and published it in the Prospectus, *supra* pp. 3–4, 11–12. This defective theory does not demonstrate scienter.

Next, none of the three factors enumerated in *Align* suggests a suspicious trading pattern. First, during the entire Class Period, Baszucki sold 4.5% of his total holdings, Donato sold 66% of his total holdings, and Guthrie sold 66.9% of his total holdings.[6] These percentages are below the numbers that courts deem suspicious. *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 987 (9th Cir. 1999) (43.6% and 75.3% of total holdings sold not suspicious); *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 525 (S.D.N.Y. 2020) (65% of total holdings sold not suspicious). As discussed below, most of the trades are protected by Rule 10b5-1 trading plans. Outside of those plans, each executive sold only at the time of the direct listing. As Judge Wilken has held, sales in the context of a public offering are not suspicious. *See In re Accuray, Inc. S'holder Deriv. Litig.*, 757 F. Supp. 2d 919, 936 (N.D. Cal. 2010) (no inference of scienter as "the fact that officers and directors sold shares during [an] IPO is far from unusual or suspicious").

Second, the timing of the sales was hardly suspicious, given that each of the Defendants' challenged sales was made (1) under a Rule 10b5-1 trading plan, (2) automatically by the Company to cover tax withholding obligations, or (3) within days of the direct listing. As to trades made under 10b5-1 plans, the insiders had no control over the timing or quantity of shares

---

[6] *See* Ex. 1 at 172 (listing Mr. Baszucki's total holdings as 65,954,865; Mr. Donato's total holdings as 3,069,826; and Mr. Guthrie's total holdings as 2,520,636); Ex. 9 (showing that 1,300,000 of Mr. Baszucki's sales; 1,168,123 of Mr. Donato's sales; and 1,200,000 of Mr. Guthrie's sales were **not** made pursuant to a 10b5-1 plan or for tax withholding purposes).

sold, as the plans were executed by a third party and entered into months in advance of any challenged non-DPO trade. Sales made under 10b5-1 trading plans "rebut [] an inference of scienter." *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1427–28 (9th Cir. 1994). Stock sales made automatically to pay tax liability on vesting stock are likewise "sufficient to defeat any inference of bad faith." *Id.* As to trades made immediately following the direct listing, Defendants could not have engaged in insider trading because all MNPI would have already been disclosed to the market. *See Accuray*, 757 F. Supp. 2d at 950–51.

Third, Plaintiffs point to no prior or subsequent trading history to indicate that the trades are irregular. *See Plumbers v. CareDx*, 2023 U.S. Dist. LEXIS 120632, at *23 (N.D. Cal. May 24, 2023) (no finding of scienter where "[p]laintiffs did not allege [defendant]'s trading activity outside of the Class period to show possibl[e] inconsistency"). Instead, the Complaint makes the absurd argument that the trades were suspicious because Defendants "did not make a single open market purchase of Roblox stock during the Class Period," ¶¶ 48–50, 280, while failing to acknowledge that the executives in question were paid largely in equity, *see* Ex. 11 at 44–46, and had significant equity holdings due to grants made prior to the direct listing, *see, e.g.*, Ex. 1 at 112, 172. They had no need for open-market purchases. The insider sales do not support scienter.

### C.    Core Operations Platitudes Cannot Substitute for Particularized Facts

Unable to rely on their paraphrasing of contradictory CW testimony, Plaintiffs resort to the "core operations" doctrine. Courts may infer scienter under this doctrine only "in rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge" of it. *Intuitive Surgical*, 759 F.3d at 1062.

The Complaint does not present those rare circumstances, as it merely alleges that the Individual Defendants considered user engagement and bookings metrics, not that they knew any particular facts contradicting their public statements. One would hope that executives of Roblox would consider such metrics—that they do so suggests good governance, not securities fraud. *LendingClub* rejected a core-operations theory for that very reason: "Origination fees may be one of LendingClub's main revenue sources, but that fact does not make every piece of information . . . that relates to those fees critical to the business's core operations." 423 F. Supp. 3d at 817; *see*

1    *also Browning v. Amyris, Inc.*, 2014 U.S. Dist. LEXIS 39549, at *55 (N.D. Cal. Mar. 24, 2014)

2    (assumption that executives knew all details of subject matter deemed important to company

3    "would eviscerate the core-operations test and turn it into an automatic presumption of

4    [management's] comprehensive knowledge"); *accord Metzler*, 540 F.3d at 1068 ("general

5    awareness of the day-to-day workings of the company's business does not establish scienter").

6        *Intuitive Surgical* shows the high bar for pleading scienter through core operations.

7    Although executives allegedly knew the "contents of the software-generated reports because the

8    substance of the reports was discussed in meetings," the court rejected scienter because there

9    were no "allegations linking specific reports and their contents to the executives." 759 F.3d at

10   1062–63. Plaintiffs offer even less. Generalized allegations that Roblox executives "regularly

11   review metrics" in order to "make strategic decisions," ¶ 65, is insufficiently particularized to

12   show that Defendants were "involve[d] in the minutia," *Intuitive Surgical*, 759 F.3d at 1062, or

13   "in every detail" required to invoke core operations, *Zucco*, 552 F.3d at 1000. The Ninth Circuit

14   requires "either specific admissions by one or more corporate executives" of such "detailed

15   involvement" or "witness accounts demonstrating that executives had actual involvement in

16   creating false reports." *Intuitive Surgical*, 759 F.3d at 1062. On that score, Plaintiffs' silence is

17   deafening. Even assuming such bare allegations were sufficient, Plaintiffs' failure to establish a

18   single actionable misrepresentation renders this point moot.

19   **III.    PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION**

20       The Court may also dismiss this action because Plaintiffs fail to plead a "causal

21   connection" between the alleged misconduct and alleged injury. *Dura Pharm., Inc. v. Broudo*, 544

22   U.S. 336, 347–48 (2005) ("[A]llowing a plaintiff to forgo giving any indication of [] economic

23   loss and proximate cause . . . would bring [] harm . . . statutes seek to avoid . . . [by]

24   transform[ing] a private securities action into a partial downside insurance policy.").

25       To plead loss causation, "[t]he ultimate question is whether the defendant's misstatement,

26   as opposed to some other fact, foreseeably caused the plaintiff's loss." *Rok v. Identiv, Inc.*, 2017

27   U.S. Dist. LEXIS 1019, at *50 (N.D. Cal. Jan. 4, 2017). Plaintiffs must show that a decline in

28   stock price was proximately caused by a revelation of fraudulent activity rather than by changing

market conditions, investor expectations, or other unrelated factors.

### A.    Plaintiffs Substitute Purchase-Price Inflation for "Causal Connection"

**No requisite link.** Absent a causal link "between the material misrepresentation and [Plaintiffs'] loss," this Court may not order Plaintiffs' investment losses reimbursed. *Dura*, 544 U.S. at 342. Plaintiffs do not allege that "the practices [they] contend[] are fraudulent [were] revealed to the market and caused the resulting losses." *Metzler,* 540 F.3d at 1063; *see also Rok*, 2017 U.S. Dist. LEXIS 1019, at *50 (requiring facts pleading "decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity, rather than other factors"). Plaintiffs instead describe a drop in stock price that resulted from changing investor expectations, ¶¶ 248, 253, which is insufficient. *See Metzler,* 540 F.3d at 1063.

**Purchase-price inflation is not a proxy for loss causation.** Although the Supreme Court rejects "artificially inflated purchase prices" as "sufficient" to plead loss causation, Plaintiffs do just that. *Dura*, 544 U.S. at 347 (allegation that plaintiffs "paid artificially inflated prices for Dura's securities and suffered damage[s]" insufficient). Mirroring *Dura*, Plaintiffs allege Roblox engaged in a "fraudulent scheme to artificially inflate" stock prices, leading Plaintiffs to experience economic loss after a "corrective disclosure." ¶¶ 245, 250, 257. These allegations fail.

### B.    Bad News Is Not a Corrective Disclosure

**Announcements of bad news do not plead loss causation.** Plaintiffs' argument relies on announcements of lower ABPDAU and a "deceleration" of bookings growth for Q4-21 and Q1-22. ¶¶ 249–262; *see supra* pp. 4–5. But Plaintiffs must show "the market learned of and reacted to [the] fraud, as opposed to merely reacting to reports of the defendant's poor financial health generally." *Metzler*, 540 F.3d at 1063. Instead, Plaintiffs describe a stock drop caused by an announcement of financials that changed investor expectations. ¶¶ 248, 253. Even an earnings guidance miss—not present here—is insufficient to establish loss causation. *Metzler*, 540 F.3d at 1063; *see also In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392, 394 (9th Cir. 2010) (market must have learned of and reacted to company's fraudulent practices as opposed to financial impact of those practices). The Ninth Circuit has explicitly rejected loss causation arguments that rely entirely on disappointing earnings announcements. *See Loos v. Immersion Corp.*, 762 F.3d 880,

887–88 (9th Cir. 2014) (disclosures that "simply reveal that [the company] failed to meet its revenue goals" insufficient to establish loss causation); *Oracle,* 627 F.3d at 392, 394 (same).

**Analyst reports are not corrective disclosures.** Plaintiffs cite various analyst reports they claim illustrate the market's purported shock in response to the alleged fraud. In reality, Plaintiffs cobble together a string of remarks only on changing financial metrics and already disclosed information. ¶¶ 251, 258–262. These reports do not express shock, nor do they allude to fraud. For example, Plaintiffs cite a December 2021 report published by TheStreet that expressed the unremarkable opinion that average bookings "declined between 8% and 9% . . . [which] shows a negative trend taking shape." ¶ 251. In doing so, Plaintiffs conflate an acknowledgment of changing metrics with a market-wide shock wave. Notably, the Complaint does not explain how analyst reports discussing "disappointing" "F4Q21 financial results" and "big picture monetization metrics" reveal any alleged fraud. ¶¶ 258–262; *see also Loos*, 762 F.3d at 887–888 (rejecting attempts at pleading loss causation based only on disappointing financial results).

Plaintiffs also fail to identify new information that entered the market on the days the stock price dropped. This is fatal to loss causation. *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 789 (publications based on information already disclosed to market cannot be said to "reveal" anything). To show "market shock," Plaintiffs cite a February 15, 2022 Benchmark report stating "the RBLX brand [wa]s vulnerable to a user abuse narrative that ha[d] begun to materialize." ¶ 258. But Roblox had explicitly anticipated declining growth, engagement, and bookings once children returned to school. *Supra* pp. 3–4, 11–12. It had also warned it could not eliminate the possibility children would access inappropriate content on its platform. *Id.* Similarly, to show "analysts were shocked by Roblox's revelation of the sharp deceleration in bookings growth and deteriorating monetization trends," Plaintiffs cite a February 15, 2022 Jefferies report commenting "big picture monetization metrics were disappointing." ¶ 261. What they ignore is that the report also states that its analysis is "in line with [its] checks and [its] Feb 4 published thoughts." In this February 4 report, Jefferies noted Roblox was "seeing good engagement but not strong conversion," and anticipated the exact "deceleration in net bookings growth and further deterioration in monetization trends," Ex. 21 at 2, that Plaintiffs argue

1    "shocked" the market on February 15. Plaintiffs cite no report "reveal[ing] new information . . .

2    that ha[d] not yet been incorporated into the price." *In re BofI*, 977 F.3d at 794. Neither "negative

3    journalistic characterization of previously disclosed facts," nor analyst speculation constitute

4    corrective disclosures. *See In re Omnicom Grp. Sec. Litig.*, 597 F.3d 503, 512 (2d Cir. 2010).

5    **IV.    PLAINTIFFS FAIL TO PLEAD A SCHEME**

6    　　　　Hedging their bets, Plaintiffs try to plead scheme liability based on two theories.

7    　　　　First, they allege that Defendants conspired to take Roblox public quickly through a direct

8    listing in order to "cash out" before children returned to school and Roblox rolled out stronger

9    parental controls. ¶¶ 9, 23, 32 335–336. Second, they allege that Defendants secretly schemed to

10   mislead investors about the percentage of Roblox users that were 13+ and the amount of money

11   those users were spending on the platform. ¶¶ 13, 19, 23, 92, 121, 156, 196.

12   　　　　Both theories fail on multiple grounds. A scheme liability claim requires particularized

13   facts establishing not only the individualized misconduct of each alleged scheme participant, but

14   also scienter as to each such person. *See Borteanu v. Nikola Corp.*, 2023 U.S. Dist. LEXIS 17813,

15   at *72–73 (D. Ariz. Feb. 2, 2023) (for each alleged participant, "plaintiff mu[st] allege that [they]

16   committed their own deceptive act in furtherance of the scheme"); *Veltex Corp. v. Matin*, 2010

17   U.S. Dist. LEXIS 108402, at *11–15 (C.D. Cal. Sept. 27, 2010). But Plaintiffs allege that

18   "Defendants," as a monolith, engaged in a scheme. *E.g.*, ¶ 332. It is unclear who did what, when.

19   　　　　The scheme allegations also impermissibly recycle Plaintiffs' misrepresentation claims.

20   *See, e.g.*, ¶¶ 331–343. The court in *In re Edward D. Jones & Co., L.P. Securities Litigation*

21   dismissed such a claim, agreeing that it was "nothing more than a repackaging of the Rule

22   10b-5(b) omissions claims," and "largely rests on [defendant's] supposed non-disclosure of

23   certain actions it was taking." 2019 U.S. Dist. LEXIS 113882, at *23 (E.D. Cal. July 9, 2019); *see

24   also SEC v. Rio Tinto PLC*, 41 F.4th 47, 55 (2d Cir. 2022) (plaintiffs may not "repackage their

25   misstatement claims as scheme liability claims to evade [] pleading requirements").

26   　　　　In light of these deficiencies, Plaintiffs fail to state a claim under Rules 10b-5(a) and (c).

27   **CONCLUSION**

28   　　　　For the foregoing reasons, the Complaint should be dismissed.

Dated: June 11, 2024                    FRESHFIELDS BRUCKHAUS DERINGER US LLP

By: */s/ Doru Gavril*
         Doru Gavril

*Attorneys for Defendants Roblox Corporation,*
*David Baszucki, Michael Guthrie,*
*and Craig Donato*